1  KEKER & VAN NEST LLP
   DANIEL PURCELL - #191424
2  ERIC H. MacMICHAEL - #231697
   REBEKAH L. PUNAK - #248588
3  633 Battery Street
   San Francisco, CA 94111-1809
4  Telephone: (415) 391-5400
   Facsimile: (415) 397-7188
5
   Attorneys for Plaintiff
6  CARAMAD CONLEY

**FILED**

JAN 27 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

7

8                     UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                       SAN FRANCISCO DIVISION

11

12  CARAMAD CONLEY,                    **CV12    0454**
                                       Case No.
13                    Plaintiff,
                                       **COMPLAINT FOR DAMAGES UNDER**
14       v.                            **42 U.S.C. § 1983**

15  CITY AND COUNTY OF SAN FRANCISCO   **DEMAND FOR JURY TRIAL**
    and PRENTICE EARL SANDERS.
16
                      Defendants.
17

18

19

20                       **PUBLIC VERSION**

21

22

23

24

25

26

27

28

540970.07              COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983
                                        CASE NO.

1     Plaintiff CARAMAD CONLEY ("Conley") hereby alleges as follows:

2                              **INTRODUCTION**

3     1.     Caramad Conley brings this civil-rights suit because the City and County of San

4     Francisco ("City"), acting through the San Francisco Police Department ("SFPD") and former

5     SFPD Inspector Prentice Earl Sanders ("Sanders"), unconstitutionally and maliciously sent him

6     to prison for a crime he did not commit. (Conley refers to the City and Sanders collectively as

7     "defendants.") Defendants assured Conley's wrongful conviction and deprivation of liberty

8     without due process of law by willfully suppressing a mountain of exculpatory evidence showing

9     that the linchpin witness against him, Clifford Polk, had been paid thousands of dollars and

10    received other benefits, in exchange for his testimony. The defendants then knowingly allowed

11    Polk to perjure himself at trial by denying having received any such benefits. The defendants

12    also went to extraordinary lengths to conceal benefits provided to the prosecution's second most

13    important witness, John Johnson. Sanders procured Johnson's testimony at Conley's trial by

14    arranging for Johnson— who at that time was serving a prison sentence of life without the

15    possibility of parole— to have private sexual encounters with a female inmate of the San

16    Francisco County Jail. Sanders deliberately suppressed this information by concealing any paper

17    trail regarding these improper private visits; by telling Johnson and the woman not to discuss

18    these private visits with anyone; and by lying about these private visits when questioned under

19    oath by Conley's counsel. Conley could not have been convicted but for the defendants'

20    malicious constitutional misconduct, which robbed Conley of 18 years of the prime of his life.

21    2.     While imprisoned, Conley suffered physical injuries, including stab wounds from

22    an unprovoked attempted murder by white supremacists, and attendant emotional distress from

23    such incidents, from the loss of freedom due to prolonged physical confinement in a small cell,

24    from prolonged separation from his family and friends, from denial of liberty, and from having

25    to witness violent crimes committed by other inmates, including cold-blooded murder.[1] As a

26    _____

27    [1] Most recently, in the summer of 2010, after the evidentiary hearing on his habeas petition and
      while awaiting transfer from San Quentin State Prison, Conley witnessed from a mere ten feet
28    away the murder of Edward John Schaeffer, who was stabbed repeatedly in the neck by another
      inmate, Frank Souza.

                                        1
                  COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983
                                    CASE NO.

1   result of these events, Conley suffered and continues to suffer physical pain and emotional

2   trauma. Conley seeks compensatory and punitive damages for the loss of liberty, physical

3   confinement, emotional distress, physical injuries, and loss of earnings and impairment of

4   earning capacity that he has suffered as a result of his imprisonment. Defendants' ample,

5   deliberate, and malicious misconduct justifies an award to Conley of compensatory and punitive

6   damages in an amount to be determined at trial, and of reasonable attorneys' fees.

7          3.     Conley was wrongly convicted of a drive-by shooting that took place on April 9,

8   1989. Conley had nothing to do with that shooting and was entirely innocent of all the

9   accusations against him. There was no physical evidence whatsoever linking Conley to the

10   shooting, and no eyewitness testimony placing him at the scene of the crime. Although the

11   shooting took place in 1989, Conley was not arrested for these crimes until November 20, 1992.

12   Because Conley was unable to post the bail amount of $1,000,000, he was forced to remain in

13   jail from his arrest in 1992 through his trial in September 1994. Due to defendants' misconduct,

14   Conley was convicted by a jury of two counts of first degree murder, conspiracy to commit first

15   degree murder, and eleven counts of attempted murder. Conley was convicted only because of

16   the misconduct of the SFPD homicide investigators in charge of the case, Sanders and Napoleon

17   Hendrix ("Hendrix"). Sanders's misconduct was made possible because of the City's and

18   SFPD's official policies enabling suppression of evidence of payments to testifying witnesses

19   and their failures to train and supervise police officers regarding their constitutional obligations,

20   which amounted to deliberate indifference to the constitutional due-process rights of criminal

21   defendants. In this case, the City's dereliction enabled Sanders's campaign of evidence

22   suppression, and his subornation and subsequent failure to correct Polk's perjurious denial on the

23   witness stand that Polk had not received any benefits in exchange for his testimony, all in

24   violation of clearly established United States Supreme Court case law. It also enabled Sanders to

25   provide illicit benefits to John Johnson in order to induce Johnson to falsely implicate Conley in

26   these murders. These constitutional violations deprived Conley of his due-process right to a fair

27   trial and resulted in his unlawful conviction.

28          4.     On January 25, 1995, the San Francisco Superior Court sentenced Conley to life

2

COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983
CASE NO.

1   plus 22 years in prison, without the possibility of parole. After his conviction, Conley

2   unsuccessfully pursued direct appeals. After discovering initial evidence of witness payments to

3   Polk in September 2006, Conley filed his first petition for a writ of habeas corpus, in the

4   California Supreme Court, on November 22, 2006. On December 23, 2008, the California

5   Supreme Court issued an Order to Show Cause directing the State to show cause why Conley's

6   conviction should not be overturned, and remanded the case to the San Francisco Superior Court

7   for an evidentiary hearing.

8           5.      On December 22, 2009, Judge Marla Miller of the San Francisco Superior Court

9   ordered an evidentiary hearing on Conley's habeas claims, permitting Conley to take limited pre-

10  hearing discovery. After discovery was completed, Judge Miller conducted the evidentiary

11  hearing from June 28, 2010 through July 2, 2010. After post-hearing briefing, Judge Miller held

12  closing argument on September 24, 2010. On December 14, 2010, Judge Miller issued a written

13  order ("Order") granting Conley's habeas petition and vacating his conviction. The Order is

14  attached hereto as Exhibit A. In her Order, Judge Miller concluded that Conley had not received

15  a fair trial due to numerous constitutional violations committed by Sanders and the rest of the

16  prosecution team. Judge Miller determined that Sanders and the prosecution team violated

17  Conley's clearly established constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963)

18  and *Napue v. Illinois*, 360 U.S. 264 (1959), and their progeny.

19          6.      Specifically, Judge Miller ruled the prosecution denied Conley his constitutional

20  right to a fair trial by willfully suppressing material, exculpatory evidence that Polk—who was

21  such a critical witness that Conley could not have been tried, much less convicted, without his

22  testimony—had received thousands of dollars in cash payments, plus other benefits, from

23  Inspector Sanders and the SFPD in connection with his testimony against Conley. Judge Miller

24  concluded that none of this evidence had ever been produced to Conley or his counsel at any

25  point prior to Conley's trial. Judge Miller also determined that: (1) Sanders knew the payments

26  to Polk were material impeachment evidence against Polk; (2) Sanders testified falsely under

27  oath at a pre-trial hearing when questioned about these benefits to Polk, giving the false

28  impression that Polk was receiving nothing for his testimony; (3) the suppressed evidence would

3

540970.07                    COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983
                                           CASE NO.

1   have impeached Polk at trial "with documents showing his signature accepting payment again

2   and again;" and (4) "[i]t is undisputed that the case against Conley could not have proceeded

3   without Polk." Ex. A at 13, 26, 37. Judge Miller concluded that the suppressed evidence was

4   prejudicial to Conley, because, had the jury learned the linchpin of the prosecution's case was a

5   paid witness, "there is a reasonable probability that the outcome of Conley's trial would have

6   been different." *Id.* at 47.

7        7.    In addition to this wholesale, deliberate suppression of impeachment evidence,

8   defendants also violated clear constitutional requirements and denied Conley a fair trial by

9   knowingly permitting Polk to perjure himself while testifying against Conley. During trial, the

10  prosecutor, Assistant District Attorney Alfred Giannini ("Giannini"), affirmatively elicited

11  testimony from Clifford Polk that Polk had been in witness protection during the 1992 trial of

12  Paul Green for the same crime. Polk then told the jury that, despite having been a paid, protected

13  witness in the Green case, he was not in witness protection in the Conley trial. Judge Miller

14  ruled that (1) this testimony was false, because Polk had been receiving cash payments from

15  Sanders through the SFPD's witness-protection program for months prior to his testimony; (2)

16  Polk knew his testimony was false at the time he gave it, because Polk, in the course of

17  collecting his cash payoffs over several months, had been signing receipts on SFPD stationery

18  with the subject line "Witness Protection"; (3) "Sanders knew the testimony was false and did

19  nothing to correct it;" and (4) Polk's false testimony "went to the heart of his credibility as a

20  witness" and thus caused prejudice to Conley. Judge Miller concluded that there was a

21  reasonable likelihood that Polk's false testimony could have affected the judgment of the jury in

22  persuading them to convict Conley. Judge Miller also noted the critical fact that Polk's

23  credibility had been a key issue in closing arguments, with Giannini arguing aggressively to the

24  jury that Polk had been honest and forthright and had no motivation to lie.

25       8.    The San Francisco District Attorney's Office conceded both before Conley's trial

26  and during the habeas proceeding that, without Polk's testimony, Conley could not have been

27  tried let alone convicted. That is because Polk's false testimony, procured through the

28  defendants' deliberate misconduct, provided the only direct connection between Conley and

4

COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983
CASE NO.

1    these crimes.  Judge Miller found it was "undisputed that the case against Conley could not have

2    proceeded without Polk."  Ex. A at 13.  Without Polk's false testimony and the wholesale

3    suppression of evidence orchestrated by the defendants, Conley would not have been wrongfully

4    convicted of these crimes.  Judge Miller specifically found that "there is a reasonable probability

5    that the outcome of Conley's trial would have been different" had the defendants not deliberately

6    violated Conley's constitutional rights by suppressing numerous pieces of impeachment evidence

7    and suborning perjury from Polk at trial.  Ex. A at 47.

8         9.       Polk has since admitted that his testimony inculpating Conley was false, and that

9    he, along with the defendants, conspired to send an innocent man to prison.  On December 13,

10   2005, after a series of voluntary meetings with members of the Northern California Innocence

11   Project, Polk executed a declaration under penalty of perjury in which he admitted he never

12   spoke to Conley about the shooting and never had any reason to believe that Conley was

13   involved in the crime.  Polk explained that Sanders and Hendrix pressured him into falsely

14   implicating Conley in the shooting by telling Polk at their very first meeting that they were after

15   Conley specifically and needed Polk to incriminate Conley.  In his declaration Polk admits that

16   Sanders and Hendrix fed him the information implicating Conley in the murders, and coerced

17   him into repeating these lies at Conley's trial.  Under penalty of perjury, Polk admitted that his

18   testimony implicating Conley in the shooting was false.  *"All the things they told me to say*

19   *about Caramad were lies.  What I said in court were lies."*  Polk stated that he was recanting

20   his testimony because he "can no longer live with the knowledge" that his false testimony sent

21   "an innocent man" to prison for life.  Polk's recantation reveals the truth about his false trial

22   testimony and confirms that Conley was sent to prison for 18 years for a crime he did not

23   commit.

24        10.      On January 11, 2011, a month after Judge Miller vacated Conley's conviction, the

25   District Attorney's Office announced that not only would it not appeal Judge Miller's Order, but

26   it would not even seek to retry Conley because it "would not be able to sustain [its] burden of

27   proof at trial" in light of the facts developed during Conley's habeas case.  The State's

28   concession that it has no evidence to even charge Conley with these crimes (now that the truth

1    about Polk has been uncovered) confirms that Conley could not have been convicted but for the

2    defendants' repeated and deliberate violations of Conley's constitutional rights. Conley was

3    finally released from custody on January 12, 2011.

4         11.    Since his release, Conley has uncovered evidence of additional egregious

5    violations of his constitutional rights by the defendants. Sanders and Hendrix deliberately

6    concealed extraordinary benefits provided to the prosecution's second most valuable witness,

7    John Johnson. On several occasions before and during Conley's trial while Johnson was being

8    housed at 850 Bryant Street, Sanders and Hendrix arranged for Johnson to have private sexual

9    encounters with a female inmate of the San Francisco County Jail. Sanders and Hendrix not only

10   arranged for the woman to be brought from the jail to the SFPD in order to spend time alone with

11   Johnson in an office at the SFPD, on each occasion when she was transported from the County

12   Jail to the Homicide Division and then back again, she was personally escorted by either Sanders

13   or Hendrix. Sanders and Hendrix made clear to the woman that these private meetings were

14   designed to induce Johnson to testify favorably for the State at Conley's trial. Sanders and

15   Hendrix directly told both Johnson and the woman that their ability to meet privately was

16   conditioned on Johnson testifying favorably for the prosecution.

17        12.    These private sexual encounters arranged for by Sanders and Hendrix were a

18   material inducement for Johnson to testify against Conley, and should have been disclosed to the

19   defense pursuant to *Brady v. Maryland* and *Giglio v. United States* and their progeny. None of

20   this information was ever disclosed to Conley. Instead, Sanders and Hendrix deliberately and

21   maliciously suppressed this information and made significant efforts to conceal from the defense

22   the fact that Johnson was meeting with this woman, including by refusing to follow proper

23   procedure and not signing the woman in as a visitor at the SFPD, by instructing both her and

24   Johnson not to discuss these facts with anyone, and by Sanders' perjurious testimony denying

25   that Johnson had received these benefits. Had the defendants disclosed this information rather

26   than suppressing it, Conley would have been able to use it to eviscerate the credibility of

27   Johnson, Sanders, and Hendrix.

28        13.    In addition to stealing 18 years of Caramad Conley's life, and consigning him to

1   spend his youth and early adulthood in physical confinement in a prison cell with no legal

2   justification, the sort of flagrant and deliberate misconduct at issue in this case threatens the

3   legitimacy of the American system of justice. It has been established beyond question for

4   decades that it is legally wrong and morally unconscionable for police to suppress material,

5   exculpatory and impeachment evidence and to allow prosecution witnesses to lie on the stand in

6   an effort to obtain a conviction. In this case, defendants' callous disregard for Conley's

7   constitutional rights and their own clear constitutional obligations caused and still cause Conley

8   tremendous personal suffering. Conley can never get back the time he lost, but he is entitled to

9   compensation from defendants for his wrongful confinement.

10                                **JURISDICTION AND VENUE**

11       14.    This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331,

12   because Conley's claim arises under 42 U.S.C.§ 1983, a statute of the United States.

13       15.    This Court has personal jurisdiction over each defendant named herein, because

14   each defendant is currently domiciled in the State of California.

15       16.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2), because all

16   defendants to this action reside in this District and because a substantial part, if not all, of the

17   events or omissions giving rise to Conley's claim occurred in this District.

18                                           **PARTIES**

19       17.    Conley is, and at all relevant times herein mentioned was, a citizen of the State of

20   California and a resident of the City and County of San Francisco.

21       18.    Defendant City and County of San Francisco is a municipal political subdivision

22   of the State of California and is responsible for the administration of the San Francisco Police

23   Department and the employment of the individual defendant in this action. The City and County

24   has a legal obligation to uphold due-process rights guaranteed by the Fourteenth Amendment to

25   the United States Constitution and to assure, through proper training, supervision, and oversight,

26   that the SFPD does the same. As discussed in greater detail below, the SFPD directly or

27   indirectly authorized the unconstitutional actions at issue here. The SFPD created an

28   unconstitutional official policy that failed to require case investigators to turn over to prosecutors

1    evidence of payments to testifying witnesses, created an unconstitutional unofficial custom and

2    practice of delegating plenary authority to case investigators over the use and documentation of

3    witness payments, and failed to adequately train and/or supervise its officers, including Inspector

4    Sanders, as to the proper procedures for using and documenting payments to testifying witnesses.

5    In this case, because of the SFPD's deliberate indifference to the due-process rights of criminal

6    defendants and the obviously foreseeable consequences of their policies and customs, Sanders

7    was able to turn the SFPD Witness Protection Program into a personal slush fund, which he used

8    to funnel cash payments to Polk in exchange for Polk's testimony against Conley, and then to

9    suppress the evidence of those payments to Polk from Conley and his counsel.

10        19.        Defendant Prentice Earl Sanders ("Sanders"), sued here in both his individual and

11   official capacities, is a resident of California. At the time of the events in question, Sanders was

12   employed by the SFPD as an Inspector in the SFPD's Homicide Division, along with his partner

13   Hendrix. At all times relevant to this complaint, Sanders was acting in the course and scope of

14   his employment and under color of California law.

15                        **FACTUAL BACKGROUND AND ALLEGATIONS**

16                        **The Outbreak of Violence in South San Francisco**

17        20.        The summer of 1989 marked the height of violent confrontations between groups

18   of young men in the Hunter's Point and Sunnydale neighborhoods of south San Francisco. The

19   violence claimed the lives of more than 40 people. Understandably, the public was outraged and

20   dismayed at the violence and resulting terror inflicted upon these communities. That public

21   outrage created tremendous social and political pressure on the SFPD and prosecutors to crack

22   down on these violent crimes by catching and convicting the perpetrators.

23                                        **The Crime**

24        21.        Shortly after midnight on April 9, 1989, two cars full of young men drove into the

25   Hunters Point neighborhood in south San Francisco and opened fire on a crowd gathered in the

26   street, killing two Hunters Point residents, Charles "Cheap Charlie" Hughes and Roshawn

27   Johnson. The murders marked the high point of continuing tensions between rival gangs from

28   Hunters Point and neighboring Sunnydale. A few weeks earlier, a Sunnydale man named Peter

                                              8

1   Lee had been murdered, purportedly by young men from Hunters Point, and it was generally

2   believed that Hughes and Johnson had been killed in retaliation for the Lee murder. In August

3   1989, another group of young men shot and killed a Sunnydale man named Roderick Shannon,

4   likely in retaliation for the Hughes and Johnson shootings.[2] Sanders and Hendrix were the lead

5   SFPD homicide investigators on all these cases.

## The Investigation

22.   In 1992, a San Francisco jury convicted Paul Green of orchestrating the shootings

of Hughes and Johnson.[3] After Green's conviction, the SFPD continued to pursue other

individuals who purportedly had assisted Green. Despite having no physical evidence or

eyewitness testimony linking Conley to the crime, Sanders and Hendrix pursued and were

determined to secure a conviction against Conley.

23.   Sanders and Hendrix eventually convinced a man named John Johnson, who had

admitted to driving one of the two cars used in the shooting and thus admitted being an

accomplice to the murders, to state that Conley had gotten into the other car prior to the shooting.

But Johnson could not say that Conley had actually fired any shots at the victims or was even

still present in the other car during the shooting. Further, in addition to the factual shortcomings

of his testimony, Johnson had serious credibility issues. To begin with, he admitted to lying to

the police on multiple occasions about the identities of the passengers in the two cars. When

Sanders and Hendrix first questioned Johnson on April 26, 1989, he denied any knowledge of the

shooting. But Johnson was a crack cocaine addict at the time. After two hours of questioning

Sanders was able to break Johnson's resolve; Johnson later admitted he gave the police

information just so he could leave the police station and "get that next rock." He left the

interrogation room with Sanders and Hendrix and briefly conferred with them outside. Only

---

[2] In August 2003, the two men convicted of killing Shannon, John Tennison and Antoine Goff, had their convictions overturned by this Court after it was discovered Sanders and Hendrix had suppressed numerous items of obvious material, exculpatory evidence, including the audiotaped confession to police of the man who actually killed Shannon and eyewitness statements corroborating that confession. The Tennison-Goff case further establishes Sanders's pattern and practice of maliciously disregarding the constitutional rights of criminal defendants.

[3] Green's conviction was vacated in 2000 because of juror misconduct. *See Green v. White,* 232 F.3d 671 (9th Cir. 2000)

540970.07

1  after that did he return to the interview room, where he named seven men, including Conley, as
2  being involved in the shooting. Johnson later admitted at least one of the people he had named
3  was innocent, again given to police in order to secure his release from custody. Even then,
4  Johnson continued to falsely deny he had been involved in the shooting himself, a fact he later
5  admitted at trial. Finally, during a subsequent 1991 interview, Johnson specifically denied that
6  Paul Green was involved in the shootings, though he would say the exact opposite on the witness
7  stand at Green's trial.

8      24.    An even bigger roadblock to Sanders's hopes of prosecuting Conley was the fact
9  that Johnson was an admitted accomplice in the murders. As an experienced homicide
10  investigator, Sanders knew Johnson's testimony would be inadmissible to prove Conley's guilt
11  without corroborating evidence. California Penal Code section 1111 provides that a conviction
12  may not be had based on the testimony of an accomplice unless that testimony is corroborated by
13  other evidence that tends to connect the defendant with the crime charged. Without another
14  witness, Johnson's already dubious testimony was valueless.

15      25.    Sanders found the necessary corroboration in a vulnerable vagrant named Clifford
16  Polk. Polk, a teenager at this time, was an itinerant crack-cocaine dealer and a former friend and
17  classmate of Conley. Sanders made a multi-year investment in cultivating Polk as the key
18  witness against Conley. Sanders took Polk under his wing, offering him cash on demand,
19  mentorship, employment, housing, and immunity from conviction for his recidivist drug crimes.
20  In return, he asked only that Polk falsely implicate Conley in the shootings.

21                                            **Polk's Testimony**

22      26.    Polk went to bat for Sanders, agreeing to testify that, shortly after the murders, at
23  Conley's house, Conley privately confessed his involvement in the shootings. Notably, it was
24  not until he met with Sanders in May 1991, more than two years after Conley's alleged
25  confession, that Polk came forward to incriminate Conley. As discussed already, Polk's
26  testimony was essential to the prosecution's case against Conley. Indeed, Giannini admitted as
27  early as 1991 that he could not proceed against Conley without Polk's testimony. In a November
28  4, 1991 memorandum to the California Witness Protection Program ("CWPP") seeking funds

1   purportedly to protect Polk in connection with the trial of Paul Green, Giannini wrote that "*[w]e*
2   *cannot proceed against Mr. Conley* ... without this witness [Polk]." In addition to providing the
3   necessary corroboration which would allow Johnson to testify, Polk's testimony provided the
4   only direct link between Conley and the shooting—as noted, no physical evidence linked Conley
5   to the crimes, and none of the eyewitnesses to the shooting identified Conley as being present.

6      27.    Polk testified at Conley's trial that Conley had confessed to him that Conley was
7   involved in the shootings. Polk also confirmed his earlier participation in a witness-protection
8   program during the Green case but denied receiving any such benefits in connection with the
9   Conley case. Taken as a whole, Polk was presented to the jury as an honest citizen who was
10  risking potential danger to his life by implicating an alleged murderer, and was doing so out of a
11  sense of community responsibility rather than because he had been induced to by the police.

12     28.    During closing arguments in Conley's trial, Giannini held Polk out as the most
13  important witness for the State, and further argued that "the defense simply has no evidence that
14  Clifford Polk is being less than truthful or that he ever was ... there is no doubt about it."
15  Conley's defense counsel, Donald Bergerson, attacked Polk's credibility with the information he
16  had, but even he had to acknowledge that "Clifford Polk, if you believe him, does, in fact, link
17  Caramad Conley to the crime. He clearly does. He said Caramad Conley confessed to it."
18  When the jury retired, Conley's fate depended entirely on the jurors' impression of Polk's
19  truthfulness, just as Giannini had known it would when he wrote his November 4, 1991 letter.

20     29.    Ultimately, after several days of deliberation, the jury believed Polk's testimony,
21  and on October 18, 1994, convicted Conley of first-degree murder.

22              **Payments to Polk (and the Suppression of That Evidence) Before Trial**

23     30.    Because of Polk's critical importance to the prosecution's case, Conley's defense
24  counsel Donald Bergerson understood that impeaching Polk's credibility was the crux of
25  Conley's defense. But the State's narrative made impeaching Polk's credibility a serious
26  challenge. The State portrayed Polk as Conley's friend who was reluctant to testify but who
27  came forward with motives of public service rather than for any other reason. Bergerson
28  understood that Polk's testimony would be potent evidence against Conley if the jury believed

1 | Polk had honest motives for agreeing to testify. Bergerson knew that successfully impeaching
2 | Polk depended on convincing the jury that Polk was testifying not out of altruism, but because he
3 | had received or expected a benefit.

4 |      31.     Bergerson suspected before trial that Polk was not motivated by good community
5 | sentiment, as the State suggested, but instead was being offered inducements to testify.
6 | Bergerson had a copy of Giannini's November 4, 1991 memo to the CWPP requesting witness-
7 | protection benefits for Polk. Bergerson also knew that, at some point in 1991 and 1992, Polk
8 | may have been paid witness-protection money through the CWPP. Bergerson also knew that
9 | Polk had an unusually close relationship with Sanders, who had spent time off the job with Polk
10 | and paid Polk small amounts of money for landscaping work at his house. Given this, and the
11 | obviously paramount importance of developing evidence to impeach Polk's motive for
12 | implicating Conley, Bergerson focused his further discovery efforts on identifying the full scope
13 | of benefits given to Polk and the precise nature of Polk's relationship with Sanders. Despite
14 | repeated efforts, Sanders and Giannini stonewalled Bergerson over and over, telling him that the
15 | State had produced all information about Polk, including all information about benefits to Polk,
16 | and that Polk had received nothing of value in connection with Conley's case.

17 |      32.     Bergerson sought to verify the State's representations at every opportunity. At a
18 | December 8, 1993 preliminary hearing in Conley's case, he cross-examined Sanders about his
19 | relationship with Polk. After discussing the work Polk had done at Sanders's house and
20 | Sanders's efforts in 1991 and 1992 to protect Polk through the CWPP, Bergerson asked Sanders
21 | if there was anything else going on between him and Polk. Bergerson questioned the inspector
22 | as to whether he had ever "interfac[ed] with any other bureaucracy, financial institution, or
23 | anything like that" to give benefits to Polk. Sanders said he couldn't recall anything.

24 |      33.     Still Bergerson suspected he did not know the whole story and sought information
25 | from Giannini. On March 28, 1994, about six months before trial, Bergerson filed a formal
26 | motion for discovery of impeachment evidence under the United States Supreme Court's
27 | decision in *Giglio v. United States,* broadly seeking all evidence of any benefits or inducements
28 | offered or given to any witness in the case, including specific demands for "witness protection"

12

COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983
CASE NO.

1 benefits, "housing relocation services," and any money provided to a witness for "food" or other
2 "necessities of life." The prosecution did not oppose the motion, and, in fact, Giannini admitted
3 both at his deposition and at the evidentiary hearing in Conley's habeas case both that
4 Bergerson's request was appropriate and that he was obligated to produce all such information
5 anyway. Following Bergerson's motion, on May 6, 1994, Giannini filed an equally broad
6 declaration with the court, attesting, without reservation and under penalty of perjury, that he had
7 "obtained and caused to be duplicated each and every police and District Attorney file
8 maintained in connection with this case." Giannini further explained to Bergerson and the court
9 what he meant, asserting that Conley had "been provided with every document, tape recording,
10 and videotape compiled by the San Francisco Police Department in connection with the
11 investigation into these homicides." As of the time he made that representation, Giannini hadn't
12 produced to Bergerson any evidence showing any benefits given to Polk in the Conley case.

13      34.     The court formally granted Conley's *Giglio* motion at a May 26, 1994 hearing. In
14 response to the court's ruling, Giannini, who had already affirmed under penalty of perjury that
15 he had produced every single document maintained by the State in connection with the case,
16 stated on the record that he had "no problem" with Bergerson's motion and would produce any
17 evidence of inducements or threats to any testifying witness, including Polk. Giannini
18 understood that, having stipulated to the *Giglio* motion, his obligation to produce evidence was
19 ongoing and applied equally to any new material discovered or created after the motion was
20 granted. In the weeks that followed, Giannini did not produce to Conley any evidence showing
21 any benefits given to Polk in connection with Conley's case.

22      35.     On July 13, 1994, the San Francisco television station KTVU aired an interview
23 with Sanders, during which Sanders bemoaned the lack of witness-protection funding available
24 from the State of California. Specifically, Sanders stated that the funding shortfall was affecting
25 his ability to protect a witness in Conley's case. Sanders told the Bay Area viewing audience
26 that a witness against Conley had feared for his safety and sought protection, but that Sanders
27 had been unable to help because funding had dried up. In light of Sanders's comments,
28 Bergerson again became concerned that the State was providing or offering benefits to Polk or

13

1  another witness in Conley's case. The next day, July 14, 1994, Bergerson wrote Giannini, noting

2  that Sanders's interview suggested evidence was being withheld and reminding Giannini that he

3  had both agreed and been ordered to turn over all evidence of threats or inducements to any

4  witness in the Conley case. Bergerson followed this letter with another formal discovery motion

5  on July 18, 1994, again requesting that the State disclose all "offers and inducements in the form

6  of promises of or efforts to secure witness protection," along with any evidence of threats made

7  against testifying witnesses.

8      36.    The court held a hearing on Bergerson's motion on July 29, 1994. Giannini did

9  not oppose Bergerson's request for witness-protection information. Giannini confirmed for the

10  court that Sanders had been talking about Polk during the KTVU interview. Bergerson

11  responded on the record by demanding production of all evidence of the threats and disclosures

12  of offers of inducements made to Polk. Giannini responded, "I do have a memo containing the

13  things that happened to Mr. Polk, and the fact that we did try to get him in the witness protection.

14  ... *He is not being relocated at this point.*" Giannini was describing a July 25, 1994 memo

15  written by Sanders to his superiors at the SFPD, in which S

16                                                                                                   The

17  memo included an

18          After the hearing, Giannini produced the memo to Bergerson, confirming the State's

19  failed attempt to secure witness-protection funding for Polk.

20      37.    Based on (1) Giannini's statements to the court that Polk was not being relocated

21  and that every document in the SFPD file relating to Polk had been produced; (2) Sanders's

22  statements to KTVU that he had been unable to provide witness protection to Polk due to lack of

23  funding; and (3) the fact that the court had ordered disclosure of all witness-protection evidence

24  and nothing had been produced in response—Bergerson understood that Polk was not receiving

25  any benefits or inducements in connection with his testimony against Conley. As Judge Miller

26  concluded, "as of the pretrial hearing on July 29, 1994, defense counsel was left with the

27  unequivocal statement by the trial prosecutor that Polk was not in witness protection. Nor were

28  any benefits to Polk of any type disclosed by the State." Ex. A at 25. As Judge Miller noted,

1   because of defendants' suppression, "defense counsel's impression was completely wrong." *Id.*

2                       **Suppressed Evidence of Payments to Polk**

3          38.     Starting on June 18, 1994, almost a month before Sanders spoke to KTVU about

4   the lack of California State funding to protect Polk, he began giving Polk benefits through the

5   SFPD's own Witness Protection Program. And, as Judge Miller recognized, on July 29, 1994,

6   the same day Giannini told the court Polk was not receiving witness-protection benefits,

7                                              Ex. A at 25. Sanders's request for funding

8   for Polk was approved by Sanders's superiors at the SFPD. Although the ostensible purpose of

9   the funding was witness protection, and Sanders and his superiors at the SFPD arranged for Polk

10  to be paid from funds earmarked for the SFPD Witness Protection Program, in reality the

11  payments to Polk were nothing of the sort. Polk was not under any kind of protective custody or

12  guard. He was neither sequestered in a particular location nor restricted from traveling freely

13  wherever he pleased. The funding he received was not held by SFPD personnel and spent only

14  on the necessities of life. Instead, Sanders served as a virtual ATM for Polk. Whenever Polk

15  needed spending money, he had free rein to page Sanders, who would then meet him outside the

16  homicide detail at the Hall of Justice, in downtown San Francisco and in plain view of anyone

17  who might be in that building. Sanders would then give Polk cash, generally in the range of $40

18  to $80 per visit. Sanders placed no controls on what Polk, a recidivist drug dealer with pending

19  narcotics cases against him, could do with the money. At his deposition in Conley's habeas case,

20  Sanders admitted Polk could have spent the money on whatever he wanted. In addition, Sanders

21  later testified at his deposition in Conley's habeas case that Polk had been physically relocated

22  by July 29, 1994. None of that was disclosed to Bergerson, and all of these facts contradicted the

23  express representations by Giannini to the court at the July 29, 1994 hearing.

24         39.     By August 30, 1994, Sanders had paid Polk nearly ▮▮▮▮ during the previous two

25  and a half months. In addition, bank records show that, on August 12, 1994, Sanders received

26  the first of several checks made out to him from the SFPD for ▮▮▮▮, the exact amount of

27  monthly witness-protection funds budgeted for Polk in his July

28                                              Documents show, and Sanders confirmed in his

15

COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983
CASE NO.

1    deposition, that this money came from the SFPD Witness Protection Program.

2    40.    Despite Giannini's assurances at the July 29, 1994 hearing, Bergerson insisted on

3    being able to question Sanders directly about the KTVU interview and possible payments to

4    Polk.  At a subsequent hearing on August 30, 1994, Bergerson finally got the chance to do that,

5    but the results did Conley and Bergerson little good.  Once he got on the stand, Sanders further

6    misled Bergerson and the Court.  Rather than disclosing that he had secured witness-protection

7    funds for Polk from the SFPD, just as he had requested in his July 25, 1994 memo, and had been

8    actually distributing those funds to Polk since the middle of June 1994, Sanders testified only

9    that Polk "sought protective housing from [the SFPD], but [the SFPD was] unable to provide it."

10   Sanders made no mention of the cash and other benefits he had been providing to Polk.  Sanders

11   admitted at his deposition in the habeas case that, under SFPD "policy," he should have

12   "mentioned [the Polk payments] to the court and given them documentation" of those payments.

13   But he did not.  Judge Miller concluded that the "fact that Sanders testified under oath on August

14   30, 1994 and failed to disclose that payments were already being made to Polk causes me to

15   believe that he knew the payments were material, and to question [Sanders'] credibility."  Ex. A

16   at 26.

17   41.    In the weeks that followed, Giannini failed to disclose the continuing payments to

18   Polk, but did make other written disclosures of alleged "threats" to Polk.  On September 5, 1994,

19   in compliance with his May 26, 1994 promise to the Court to turn over all evidence of anything

20   that could be construed as a threat to a witness, Giannini sent a brief letter to defense counsel

21   reporting that Inspector Sanders had called him that afternoon: "[Sanders] says Clifford Polk

22   called him.  Mr. Polk says that your client called him from jail.  Sanders says the tenor of the

23   conversation was that your client asked Polk not to testify."  The letter indicates that Giannini

24   would fax over Sanders's notes of the call, as well as other discovery regarding another witness.

25   The fact that Giannini made this disclosure pursuant to the May 26, 1994 order, but failed to turn

26   over any evidence of any benefits to Polk, further reinforced to Bergerson and Conley the State's

27   prior representations that Polk was receiving no benefits.

28   42.    Meanwhile, Sanders continued to give cash to Polk, as proven by more "witness

16

COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983
CASE NO.

1   protection" voucher forms completed                          . When jury

2   selection in Conley's case began on September 12, 1994, no one from the prosecution team had

3   ever disclosed anything about the ongoing course of benefits to Polk. It was not until October 1,

4   1994, a week into trial, and the Saturday before the Monday when Polk took the stand, that

5   Giannini sent Bergerson a letter disclosing that Polk was being "temporarily relocated to an out

6   of town location and will be receiving *room and board while the trial lasts*." This October 1,

7   1994 letter from Giannini was the only disclosure of any kind, written or oral, made by anyone

8   from the State about the benefits given to Polk in connection with his testimony against Conley.

9   Understandably, Judge Miller found that this disclosure was "incomplete and misleading." Ex.

10   A at 28. As of October 1, 1994, Sanders had been giving Polk benefits for three and a half

11   months that had nothing to do with "a place to stay and meals." Most troubling, Sanders had met

12   with Polk on                   to provide him with direct cash payments. Based on

13   the receipts Sanders kept, these cash payments totaled at least     at the time of Giannini's

14   limited disclosure. Further, as discussed already, these cash payments were not consistent with

15   any reasonable definition of "witness protection"; they were simply cash payouts to an essential

16   testifying witness.

17         43.     Compounding the injury to Conley from Sanders's nondisclosure, when Polk took

18   the stand on October 3, 1994, he testified unequivocally that, although he'd been a protected

19   witness during the Green case, "I'm not in the witness protection program now." This suggested

20   to the jury that, while Polk had previously been a paid witness in another case, he was testifying

21   against Conley as a matter of conscience. This was patently false. Based on the evidence

22   adduced at the evidentiary hearing, Judge Miller concluded that by October 3, 1994, Polk had

23   already received at least     in benefits from the SFPD Witness Protection Program. Ex. A at

24   9. Sanders, who had requested and obtained the money and doled it out to Polk, sat next to

25   Giannini at counsel table while Polk lied. Judge Miller found "Sanders actually knew that Polk's

26   testimony was false," but "did nothing to correct it." *Id.* Neither did Giannini or anyone else

27   from the prosecution attempt to correct Polk's false testimony. Finally, because defendants had

28   both suppressed, and made false statements denying the existence of, obvious impeachment

evidence, Bergerson was unable to impeach Polk's false testimony himself.

44. Given the few facts he knew, Bergerson focused his cross-examination of Polk on Polk's unusually close relationship with Sanders, including the many hours the two spent together talking and the fact that Sanders paid Polk for odd jobs around Sanders's house. On re-direct, the State elicited testimony that Sanders was simply a mentor to Polk who was attempting to help a good kid turn his life around, with no intention of influencing Polk's testimony against Conley. Bergerson also cross-examined Sanders and Polk about the undisputed fact that Sanders had intervened with the San Francisco Superior Court on Polk's behalf and persuaded the court to sentence Polk to diversion rather than jail time for Polk's serial drug offenses, including possession with intent to sell. Sanders admitted helping Polk in his purported role as a mentor, but denied his intervention had anything to do with Polk's status as a critical witness against Conley. To further bolster Polk's and Sanders's credibility on this issue, the State took the extraordinary step of calling John Farrell, the District Attorney who had prosecuted Polk for the narcotics violations. Farrell testified that there was no connection between Polk's light sentence for his drug crimes and his status as a linchpin witness in a notorious murder prosecution.

45. During closing arguments, Giannini held Polk out as the most important witness for the State, and further argued that "the defense simply has no evidence that Clifford Polk is being less than truthful or that he ever was ... there is no doubt about it." Bergerson attacked Polk's credibility with the information he had, but even he had to acknowledge that "Clifford Polk, if you believe him, does, in fact, link Caramad Conley to the crime." When the jury retired to deliberate, Conley's fate depended entirely on the jurors' mistaken impression that Polk had no motivation to testify falsely. The jury ultimately believed Polk and convicted Conley.

**Undisclosed Benefits to Polk**

46. Polk's benefits commenced on June 18, 1994—three months before trial began—when Sanders bought Polk almost $50 worth of food. Sanders continued to make payments until August 1, 1995, over nine months after the October 18, 1994 jury verdict. In those 13 and a half months, Sanders and the SFPD gave Polk at least ▮▮▮▮ worth of benefits from the SFPD Witness Protection Program. The majority of the benefits Sanders provided to Polk, ▮▮▮▮,

18

COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983
CASE NO.

1    were made in cash.  None of those benefits was ever disclosed to Conley or his defense counsel.

2        47.    Once Polk's testimony was safely on the record, the pace of payments picked up.

3    Judge Miller found that Polk received ██████████████████████████████ after

4    he took the stand on October 3, 1994.  Ex. A at 29.  On October 14, 1994, three days after

5    closing arguments, Polk executed a six-month lease on a ████████████████

6    ████████████████████████████████████  Once Polk was installed in his

7    new house, Sanders and the SFPD paid Polk's rent and utilities.  Judge Miller concluded that this

8    "lease and all expenses paid housing, arranged by Sanders, were never disclosed to Conley's

9    counsel."  *Id.*  The cash payments to Polk likewise increased in size and frequency; between

10   closing argument on October 11, 1994 and November 10, 1994, Polk received ███ in cash.  All

11   told, Polk received a total of nearly ████ in the five weeks after testifying against Conley.  Ex.

12   A at 29.  Right in the middle of that period—on October 18, 1994—the jury convicted Conley of

13   multiple counts of first-degree murder.

14       48.    The SFPD Witness Protection Program was the source of all the money and other

15   benefits that Sanders provided to Polk.  As Judge Miller found, this was not an ad hoc program;

16   rather, "[o]fficial San Francisco Police Department policy formally established the program well

17   before Conley's trial, with guidelines and procedures."  Ex. A at 10.  Sanders requested, and the

18   SFPD approved, at least $1,030 a month for Polk, which Sanders and Polk were free to use

19   however they saw fit.  Then Deputy Chief of Police Fred Lau, along with Lieutenant Gary

20   Pisciotto, the officer in charge of the Homicide Division, approved Sanders's request for funding

21   for Polk in the Conley case.  Contrary to its constitutional obligations and its own written

22   policies, the SFPD policymakers failed to properly monitor how Sanders distributed the money

23   to Polk, permitting Sanders to disregard settled witness-protection protocol and simply give Polk

24   cash that Polk could use for any purpose.  Similarly, the SFPD policymakers failed to ensure that

25   Sanders fulfilled his obligation to disclose this exculpatory evidence to the prosecutor so that it

26   could be disclosed to the defense.

27       49.    Equally as striking, and potentially as significant to the jury, as the mere fact that

28   the defendants were paying the linchpin prosecution witness against Conley is the way in which

19

540970.07

1    it was done, with Polk paging Sanders whenever he needed cash and then meeting Sanders at the

2    Hall of Justice to pick it up.  Polk obtained cash from Sanders ▬▬▬▬▬ in the two

3    months leading up to Conley's trial, and ▬▬▬▬▬ during the trial itself, all presumably

4    at the Hall of Justice through the usual arrangement.  Although Sanders's July 25, 1994 memo

5    ▬▬▬▬▬▬▬▬▬▬ and the SFPD's official policy emphasized that

6    witness-protection funds should be used only to protect the lives of witnesses, Sanders evidently

7    saw nothing wrong with meeting Polk in a busy public building where Polk might be spotted by

8    any number of people, including associates of the people who had purportedly threatened him.

9        50.    Had the State not suppressed all of this evidence, Conley would have been able to

10   convince the jury that the State's "witness protection" rationale for giving Polk money was all a

11   sham designed to procure Polk's testimony.  To begin with, at the time Sanders began giving

12   Polk money on ▬▬▬▬▬ there had been only one purported threat to Polk, which occurred

13   ▬▬▬▬▬▬▬▬▬▬ There had been no additional attacks on or threats

14   against Polk in the interim, even though he presumably was still living in the same

15   neighborhood.  After slipping Polk his first installment of cash at t▬▬ Sanders also

16   purportedly secured Polk a place to live.  After that, in concert with Giannini, Sanders deceived

17   Bergerson and the court by representing Polk was not being relocated, when Polk had been

18   relocated and was on a weekly retainer.  This arrangement of Sanders meeting with Polk at the

19   Hall of Justice to pick up his weekly allotment of cash continued up to the trial in the absence of

20   any further threats to Polk.  *Immediately after Polk  testified favorably to the prosecution,* the

21   pace of benefits picked up dramatically.  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

22   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

23   ▬▬▬▬▬▬▬▬▬▬ Conley's trial was still ongoing at that point, and the jury

24   certainly would have been interested in hearing about Polk's reward for a job well done.  In all,

25   in the five weeks after testifying, Polk received ▬▬ in cash—more than he had been given prior

26   to trial—plus a six-month lease on a single-family house ▬▬▬▬▬ All this happened prior

27   to the next concrete threat against Polk—a November 13, 1994 shooting at Polk's mother's

28   house—so the State cannot claim the increase in benefits had any relation to concerns about

1   Polk's safety.

2   51.   In sum, the record reflects that, far from being confined in protective custody due
3   to some imminent threat to his safety, Polk was free to live a normal life, coming and going to
4   San Francisco as he pleased, with ready access to regular cash payments from Sanders and a
5   place to stay in Richmond. The obvious conclusion is Polk was a *salaried employee* of the
6   SFPD, not a protected witness, and the cash payments were inducements to testify. In addition,
7   there is no evidence that Conley was connected in any way to either of the threats against Polk.
8   The only evidence connecting either of the threats to Polk's status as a witness is the timing in
9   relation thereto, but, as discussed above, that is far from convincing. The first threat occurred
10  more than five months before Polk testified, and the second threat occurred five weeks after Polk
11  testified. In the middle of that period, Polk had free reign to roam the streets of the Bay Area,
12  periodically paging Sanders for cash payouts. That is not witness protection.

13              **Discovery Revealed Additional Suppressed Impeachment Evidence**

14  52.   On top of the above-described suppressed evidence, discovery in Conley's habeas
15  action revealed numerous other pieces of exculpatory evidence that Sanders suppressed from the
16  prosecutor and Conley. Each item was obvious impeachment material that Sanders was required
17  to disclose, in that it would have impeached Polk and Sanders at Conley's trial.

18  53.   *First,* Sanders suppressed evidence of cash payments and loans made by Sanders
19  to Polk in 1991 and 1992, long before the Conley case. Conley knew that Giannini had applied
20  to the CWPP in November 1991, proposing a budget of $6,335 for the subsequent six months,
21  and that Polk had been enrolled in that program. But it turns out that Sanders actually began
22  loaning Polk small amounts of cash in July 1991. Sanders documented those loans with self-
23  styled IOUs prepared by Sanders and signed by Polk. Further, after enrolling Polk in the CWPP
24  in November 1991, Sanders arranged for Polk to receive additional money from local sources,
25  either the SFPD or the San Francisco District Attorney's office ("SFDA"). In all, Polk received
26  at least *$9,000* before, during, and after the Green case, only $2,547.37 of which was reimbursed
27  by CWPP. That left the SFPD or SFDA to cover the remainder, at least *$6,400*. As discussed, at
28  a December 8, 1993 preliminary hearing in Conley's case, Sanders testified that he could not

21

540970.07

1    recall ever "interfac[ing] with any other bureaucracy, financial institution, or anything like that"
2    to give benefits to Polk. Yet that was precisely what he had done to secure Polk's benefits
3    through the SFPD or SFDA and their witness-protection programs. Had defendants disclosed
4    these documents, as they were constitutionally required to do, Conley could have used the
5    evidence of the IOUs and Sanders's active involvement in ensuring Polk was well-funded during
6    the Green case to expose Sanders's and Polk's false testimony minimizing the nature and extent
7    of their relationship.

8        54.    *Second,* Sanders suppressed an intimate letter written by Polk to Sanders on July
9    10, 1992, two months after the conclusion of Green's trial. In that letter, Polk wrote Sanders
10   from Los Angeles, introducing himself as Sanders's "son in law" and offering repeated, effusive
11   thanks for everything Sanders and Sanders's partner Napoleon Hendrix had done for him. He
12   stated that he looked forward to "maintain[ing] the same relationship we have now and a little bit
13   more." Polk asked Sanders to take him fishing on Sanders's boat. He closed by telling Sanders,
14   *"I still love you,"* and asking for $200 for clothes, which he conceded was "a lot of money."
15   Bank statements show that, in the two weeks after Polk's request, Sanders withdrew $600 in four
16   installments from the same bank account he had used to provide witness-protection funds to Polk
17   in connection with the Green case. Had the defendants not suppressed this information, Conley
18   would have been able to use it to eviscerate Polk's and Sanders' credibility and the prosecution's
19   basic trial narrative.

20       55.    *Third,* the defendants and the prosecution team conspired to suppress an October
21   6, 1994 probation report containing objectively damning statements about Polk's character and
22   bombshell secret facts about Polk's financial dependence on the SFPD and Sanders. To put this
23   report in context, October 6, 1994 was the day before the final day of testimony at Conley's trial
24   and five days before closing arguments. The information in the report almost certainly had been
25   available to the defendants and the prosecution team long before October 6 but had gone
26   undisclosed despite the court's *Giglio* order. In any event, Polk's probation officer reported that
27   Polk was *currently on salary with the SFPD to the tune of $480 per month* for unspecified
28   "services provided." Further, the report stated that Polk had worked in the past at "Sanders

1 Security Firm" in South San Francisco, where he answered phones and performed typing.

2 (Sanders owned and operated a private consulting business known as Sanders Security Systems

3 out of his home in South San Francisco during this time period.) The report also labeled Polk an

4 "unrepentant" criminal who was "not sorry for what he had done," but only "sorry that he ha[d]

5 been caught," a statement which directly contradicted Polk's and Sanders's testimony that Polk

6 was a good kid trying to get his life together. None of this information had ever been disclosed

7 to Conley. Had the defendants disclosed this information rather than suppressing it, Conley

8 would have been able to use it to eviscerate Polk's and Sanders' credibility and the prosecution's

9 basic trial narrative.

10      56.    Giannini admitted that the October 6, 1994 probation report contained obvious

11 impeachment material and that he had an obligation to disclose it to the defense. Giannini

12 testified at the evidentiary hearing that, although he had no specific memory of disclosing the

13 probation report to defense counsel, and although nothing in the trial record corroborated any

14 disclosure, he believed he had disclosed the report to Bergerson. After reviewing the entire

15 record, Judge Miller concluded that the report "was never disclosed" to Conley. Ex. A at 34.

16 <div align="center">**Undisclosed Benefits to John Johnson**</div>

17      57.    In addition to the reams of suppressed impeachment evidence which would have

18 destroyed Polk's credibility, Sanders and the other defendants also suppressed critical

19 impeachment evidence related to their second most important witness, John Johnson. As

20 discussed above, Johnson was an admitted accomplice in the Hughes and Johnson murders who

21 testified that shortly before the shooting he saw Conley get into one of the cars that was used in

22 the shooting. Aside from Polk, Johnson provided the only evidence linking Conley to these

23 murders. But in addition to his severe credibility problems, Johnson was a reluctant witness who

24 repeatedly balked at testifying for the State. After his initial interrogation by Sanders and

25 Hendrix during which he implicated Conley, Johnson gave a taped interview to a defense

26 investigator in which he stated that everything he had told Sanders and Hendrix about who was

27 involved in the shooting was a "lie." Johnson told the investigator that he had simply parroted

28 back the information provided to him by Sanders and Hendrix so that he could leave the

23

1   interview room, and he had no intention of testifying against anyone. When Johnson was first

2   called as a witness in front of the grand jury in connection with the earlier prosecution of Paul

3   Green, he flat out refused to testify to any of the information he had provided to Sanders and

4   Hendrix. Johnson also refused to testify when he was initially called as a witness at Paul Green's

5   trial, but ultimately changed his mind and agreed to testify against both Green and Conley.

6       58.    Unbeknownst to Conley or his counsel, Sanders and Hendrix were able to procure

7   Johnson's testimony at Conley's trial by arranging for Johnson to have private sexual encounters

8   with a female inmate of the San Francisco County Jail. On numerous occasions—both in 1992

9   when Johnson was being housed at 850 Bryant Street in anticipation of his testimony against

10  Paul Green and then again in 1994 when Johnson was being housed at 850 Bryant Street in

11  connection with his testimony against Conley—Sanders and Hendrix arranged for a young

12  woman with whom Johnson had a romantic relationship to be brought to the SFPD Homicide

13  Division and placed in a private room with Johnson. Sanders and Hendrix knew that Johnson

14  had a romantic relationship with this woman, and knew that Johnson and the woman engaged in

15  sexual activity during these private meetings at the SFPD. Even more shockingly, the 1994

16  encounters between Johnson and the woman occurred when the woman was herself incarcerated

17  at the San Francisco County Jail. Sanders and Hendrix not only arranged for the woman to be

18  brought from the jail to the SFPD in order to spend time alone with Johnson, on each occasion

19  when she was transported from the County Jail to the Homicide Division and then back again,

20  she was personally escorted by either Sanders or Hendrix.

21      59.    Sanders and Hendrix made clear to the woman that these private meetings were

22  designed to induce Johnson to testify favorably for the State at Conley's trial. Sanders and

23  Hendrix directly told both Johnson and the woman that their ability to meet privately was

24  conditioned on Johnson testifying favorably for the prosecution. These private sexual encounters

25  arranged for by Sanders and Hendrix were a material inducement for Johnson to testify against

26  Conley, and should have been disclosed to the defense pursuant to *Brady v. Maryland* and *Giglio*

27  *v. United States* and their progeny. None of this information was ever disclosed to Conley.

28  Instead, Sanders and Hendrix deliberately suppressed this information and made significant

---

24

COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983
CASE NO.

540970.07

1   efforts to conceal from the defense the fact that Johnson was meeting with this woman, including
2   by refusing to follow proper procedure and not signing the woman in as a visitor at the SFPD and
3   by instructing both her and Johnson not to discuss these facts with anyone. Had the defendants
4   disclosed this information rather than suppressing it, Conley would have been able to use it to
5   eviscerate the credibility of Johnson, Sanders, and Hendrix.

6       60.    In addition to suppressing this obviously material impeachment evidence—that
7   the lead homicide investigators procured Johnson's testimony by arranging for numerous private
8   sexual encounters between Johnson and a female inmate which took place in the SFPD's own
9   offices— Sanders also deliberately and maliciously concealed the details of these encounters by
10  false testimony under oath. During the Preliminary Hearing in Conley's case, Sanders testified
11  that, although he had allowed for Johnson to speak "casually" with a female acquaintance at the
12  SFPD's offices on a few occasions, it was purely incidental to the fact that Johnson was meeting
13  with the brother of this woman. Sanders further testified that he kept the door of the room open
14  and was able to observe Johnson at all times. Finally, Sanders denied having any knowledge that
15  Johnson and the woman had a romantic relationship, and testified that the woman was merely a
16  "friend" who had accompanied her brother to visit Johnson. This was all false. Sanders not only
17  knew about the romantic relationship between Johnson and this woman, and knew that Johnson
18  and the woman were engaging in sexual acts during these visits, but Sanders specifically
19  arranged for Johnson to have these private sexual encounters in order to induce Johnson to testify
20  against Conley. Sanders knew that Johnson was reluctant to testify against Conley, and knew
21  that arranging for Johnson (who at that time was serving a prison sentence of life without the
22  possibility of parole) to have private sexual encounters with this woman would serve as a
23  significant inducement for him to testify. Contrary to his sworn testimony, on each of these
24  visits Sanders allowed Johnson to spend several uninterrupted hours alone with this woman in a
25  room at the SFPD with the door closed, and Sanders used these visits as an inducement to coerce
26  Johnson to falsely implicate Conley in the murders.

27              **Sanders Suppressed All This Critical Impeachment Evidence**

28       61.    During the Conley investigation and at all times relevant to this dispute, Sanders

25

1  was fully aware of his constitutional obligations to disclose to the prosecutor any exculpatory or

2  impeachment evidence. In particular, Sanders was aware of longstanding SFPD policies

3  governing his investigative conduct and, more importantly, requiring disclosure to the prosecutor

4  or defendant, prior to trial, of all material, exculpatory evidence, including all evidence of any

5  benefits given to a testifying witness. At least as early as October 1984, the SFPD adopted a

6  written policy regarding production of exculpatory evidence. The policy itself notes that it was

7  developed in response to "[a] recent judgment against the City and County of San Francisco,"

8  and provides that

9      [I]nformation tending to disprove or minimize a suspect's guilt should
       be included in incident reports (both initial and supplemental) or
10     chronological reports of investigations. ... Documentation of
       exculpatory evidence (e.g., evidence such as eyewitness statements,
11     alibi witness statements ...) is necessary to preclude ... dismissal,
       mistrial, or reversal of a case.
12

13     62.    This policy put officers on notice as of 1984 that "failure to include statements or

14  other exculpatory evidence may result in the civil liability of an officer or investigator, including

15  an award of punitive damages, which may not be paid for by the City but will be assessed against

16  the individual member."

17     63.    Likewise, a 1985 SFPD Investigative Bureau General Order on investigative case

18  file management made clear that "[e]xculpatory evidence shall also be documented" in the case

19  file. That order also required that each case file contain a "completed current Chronological

20  Report of Investigation form," which, among other things, must document "[a]ll pertinent

21  investigative activity," a broad category that included all "[s]tatements and interviews of victims,

22  witnesses and suspects," along with a "synopsis of the information" provided in all such witness

23  statements or interviews.

24     64.    Giannini's testimony under oath – both during discovery and later at the

25  evidentiary hearing in front of Judge Miller – confirmed beyond any doubt that Sanders

26  suppressed and never disclosed all of the impeachment evidence showing payments to Polk.

27  Judge Miller noted that Giannini "testified he has no recollection of ever seeing any of the

28  records documenting payments to Polk. He never saw receipts in the police file. He does not

1  recall anyone giving him receipts at any other time. They were not in the District Attorney's

2  case file." Ex. A at 19.

3      65.     Giannini testified at his deposition in the habeas case that he had never seen the

4  receipts memorializing Sanders's payments to Polk in either the Conley or Green cases or any

5  documents providing specific details of those payments. Giannini likewise admitted he had

6  never seen Polk's July 10, 1992 "I love you" letter to Sanders or any of the IOU's showing loans

7  made to Polk by Sanders. Giannini's testimony that he had never seen any of these documents is

8  consistent with a May 22, 2009 declaration under penalty of perjury submitted by Giannini in

9  support of the State's Return to Conley's habeas petition, in which Giannini stated he did *"not*

10 *recall either receiving from inspectors or providing to the defense specific details regarding*

11 *the 'room and board' or any cash disbursements given to Clifford Polk."*

12     66.     At the evidentiary hearing, Giannini testified that he either had never seen, or

13 could not recall ever being aware of, at least the following information: (1) the dozens of receipts

14 showing thousands of dollars of cash payments to Polk in the Conley and Green cases over a

15 period of nearly four years; (2) the arrangement between Sanders and Polk whereby Polk could

16 page Sanders and meet him to pick up weekly cash disbursements; (3) how much money the

17 State spent on Clifford Polk in the Conley case, where the funds came from, when Polk started

18 receiving money, or the frequency and reason for the cash disbursals to Polk; and (4) that the

19 SFPD had independently approved Sanders's                 request for witness-protection funds

20 for Polk, and allocated $1,030 a month to Sanders to give to Polk for the Conley case. All of this

21 information was suppressed by Sanders. Obviously, having never seen or known of these

22 documents, Giannini could not have produced them to Conley.

23     67.     The circumstances in which the suppressed evidence came to light, both before

24 and during Conley's habeas case, along with Giannini's admitted lack of knowledge of almost all

25 of the exculpatory evidence at issue, confirms that Sanders deliberately suppressed this material

26 from both the prosecutors and Conley, in violation of his constitutional obligations and

27 established SFPD policy. To begin with, none of these critical impeachment documents were

28 ever found in the SFPD or SFDA case files, even though SFPD policy required all case materials

1  to be maintained in a single, consolidated case file. Rather, this exculpatory material was
2  deliberately segregated from the SFPD's case file for the Conley case and was suppressed from
3  the prosecutor and from Conley. Sanders testified in deposition that he placed all of the
4  documents showing payments to Polk in the SFPD case file for the Conley case, and that he
5  made that entire case file available to the prosecutor. Sanders stated that he did not segregate the
6  receipts, or other documents showing benefits to Polk, into a separate file for administrative
7  documents. But when the SFPD and SFDA produced their respective case files for the Conley
8  case pursuant to Conley's subpoenas, neither set of files contained *any* of this impeachment
9  evidence. Eventually, after discovery closed in the habeas case, the documents showing
10  payments to Polk in 1994 and 1995 turned up in the SFPD offices in a box of assorted folders
11  from various other cases. Neither Sanders nor the SFPD claims to know how or when the
12  documents got there, or who put them there. The documents from during and after the Green
13  case in 1991-92, including the IOU's and the letter from Polk to Sanders, also surfaced after the
14  close of discovery, and apparently by pure chance. They were found in a folder in an unmarked
15  box buried under a pile of debris in an SFPD cold-case storage facility. The SFPD and SFDA
16  designees deposed during Conley's habeas case had no idea how or when any of the documents
17  got there, or who put them there.

## Polk Recants

19  68.  On December 13, 2005, Polk executed a declaration under penalty of perjury in
20  which he recanted his testimony implicating Conley in the Hughes and Johnson murders. In the
21  declaration, Polk admitted he never spoke to Conley about the shooting and never had any reason
22  to believe that Conley was involved in the crime. Polk explained that Sanders and Hendrix
23  pressured him into testifying falsely by telling Polk at their very first meeting that they were after
24  Conley specifically and needed Polk to incriminate Conley. Over time, Polk came to spend more
25  and more time with Sanders and Hendrix, growing scared of both men and their power over his
26  life. This was consistent with the fact that Sanders had helped Polk receive diversion, rather than
27  prison time, for his narcotics convictions. Polk admitted that this fear eventually led him to
28  falsely implicate Conley: "I lied on the witness stand because I was afraid of what Inspectors

28

1  Sanders and Hendrix would do if I didn't say what they wanted me to say."   Under penalty of

2  perjury, Polk admitted that his testimony implicating Conley in the shooting was false.  *"All the*

3  *things they told me to say about Caramad were lies.  What I said in court were lies."*  Polk

4  stated that he is recanting now because he "can no longer live with the knowledge" that his false

5  testimony sent "an innocent man" to prison for life.  Polk's recantation reveals the truth about his

6  flawed trial testimony and confirms that Conley did not receive a fair trial.  Polk further stated

7  that Giannini was also present at several meetings between Polk and Sanders, and was aware that

8  Polk was planning to—and did—testify falsely at Conley's trial.

9               **The San Francisco Superior Court Grants Conley's Habeas Petition**

10              69.    In her Order, Judge Miller expressly found that Polk had committed perjury when

11  he testified at Conley's criminal trial that he was "not in the witness protection now."  Judge

12  Miller found that Polk's denial "was false, the prosecution knew or should have known that it

13  was false, and the prosecution did nothing to correct it." Ex. A at 8-9.  Judge Miller noted the

14  "voluminous evidence" that establishes that statement's falsity, that Polk knew his own

15  testimony was false, and that "Sanders knew the testimony was false and did nothing to correct

16  it." *Id*. at 9.  Judge Miller found that:

17              Polk's false testimony went to the heart of his credibility as a
              witness.  By contrasting his status in the Green case (as to which
18              the jury heard that he received benefits from the witness protection
              program), with his status in the Conley trial (where he was
19              supposedly unconstrained by any witness protection), Polk
              bolstered his credibility, giving the jury the false impression that
20              he was testifying against Conley as a matter of conscience and
              despite potential risks. This was not true.

21

22  *Id.* at 11.  Noting that Sanders was sitting next to Giannini at counsel table when Polk made his

23  false statements, Judge Miller wrote that "Sanders should have prompted the trial prosecutor to

24  correct the misstatement for the jury.  But Sanders sat silently and allowed Polk to testify to facts

25  that were not true." *Id*. at 14-15.  Based on the above-described reasoning, Judge Miller granted

26  Conley's habeas corpus claim under *Napue v. Illinois,* which prohibits a prosecutor from relying

27  at trial on testimony the prosecution team knows or should know to be false.

28              70.    Judge Miller also independently granted Conley's habeas claim for suppression of

29

1   material, exculpatory evidence, in violation of *Brady v. Maryland* and *Giglio v. United States*
2   and their progeny. Judge Miller determined that the State suppressed all evidence of the cash
3   payments to Polk, as well as a lease on an apartment, in connection with his testimony against
4   Conley in 1994 and 1995, along with: (1) the IOUs by Polk to Sanders in 1991; (2) the July 10,
5   1992 letter from Polk to Sanders referring to himself as Sanders' "son in law," telling Sanders he
6   "still loved him," and requesting $200; and (3) the October 6, 1994 probation report. Judge
7   Miller further noted that this wholesale suppression took place despite the fact that the "pretrial
8   record in the Conley case [wa]s replete with discovery motions and accusations that materials
9   were not being turned over." Ex. A at 22.

10       71.    Judge Miller also found that Sanders had intentionally misled Conley and the trial
11   court, and had wrongly withheld impeachment evidence even from Giannini, concluding that the
12   "fact that Sanders testified under oath on August 30, 1994 and failed to disclose that payments
13   were already being made to Polk causes me to conclude that he knew the payments were
14   material, and to question the credibility of his videotaped deposition testimony admitted in
15   evidence in this proceeding." Ex. A at 26.

16       72.    Judge Miller found that the suppressed evidence was prejudicial to Conley and
17   that without the unconstitutional errors, "there is a reasonable probability that the outcome of
18   Conley's trial would have been different." Ex. A at 47. She noted that, had the evidence been
19   turned over as it should have been, Conley's trial counsel might have countered the State's trial
20   narrative and that the jury should have made its decision based on a complete record.

21                       **Municipal Liability**

22       73.    In 1963, the United States Supreme Court decided *Brady v. Maryland,* explaining
23   that police and prosecutors had an unqualified obligation in criminal cases to produce all
24   material, exculpatory evidence to the defense. Since then, myriad state and federal courts have
25   followed and expanded on *Brady,* including by making clear that police and prosecutors also are
26   obliged to produce to defense counsel all evidence tending to materially impeach the credibility
27   of prosecution witnesses. The rules set forth in *Brady* and its progeny were well known to, and
28   routinely applied by, police departments and prosecutors' offices throughout the United States,

1 │ including by the SFPD and SFDA.

2 │ 74.     For over a decade prior to Conley's trial, the City, and its policymakers generally
3 │ and within the SFPD in particular, had actual knowledge not only of the SFPD's obligations
4 │ under *Brady* and its progeny to disclose all potential exculpatory and impeachment evidence in
5 │ criminal cases to the SFDA so that the SFDA could disclose all such evidence to the defense, but
6 │ also that SFPD officers had in the past failed to follow *Brady* procedures, resulting in wrongful
7 │ convictions, civil rights lawsuits against the City, and personal civil liability against SFPD
8 │ officers. In light of this knowledge, the City, and its policymakers generally and within the
9 │ SFPD in particular, had actual knowledge of the need for express policies defining SFPD
10 │ officers' *Brady* obligations and the need to explain to SFPD officers how those policies must
11 │ guide their behavior in particular factual circumstances. The City and its policymakers generally
12 │ and within the SFPD also had actual knowledge of the need for continuing training of SFPD
13 │ officers regarding their *Brady* obligations and how to inform them of particular factual
14 │ circumstances likely to occur during investigations. The City and its policymakers generally and
15 │ within the SFPD in particular had actual knowledge of the overwhelming likelihood that, absent
16 │ clear policies and continuing training of SFPD officers on *Brady* obligations, SFPD officers
17 │ would continue to violate the due-process rights of criminal defendants in the City by
18 │ unconstitutionally withholding material exculpatory and impeachment evidence, thereby denying
19 │ such defendants a fair trial and potentially sending innocent people to prison and subjecting the
20 │ City and individual officers to civil liability.

21 │ 75.     Evidencing the City's knowledge of the predictable consequences of establishing
22 │ policies that violated the constitutional rules of *Brady* and its progeny, and of failing to
23 │ implement clear policies defining its officers' *Brady* obligations and training those officers on
24 │ those obligations, is an October 17, 1984 training bulletin ("the Training Bulletin") circulated by
25 │ SFPD policymakers to all SFPD officers. The Training Bulletin is attached as Exhibit B hereto.
26 │ The Training Bulletin expressly explained that strict adherence to the *Brady* requirement that all
27 │ exculpatory or impeachment evidence be produced by the SFPD to the SFDA was "necessary to
28 │ preclude the possibility that a dismissal, mistrial, or reversal of a case will be based on the fact

31

1   that evidence favorable to a defendant was withheld from the defense." Indeed, the Training

2   Bulletin highlighted "a recent judgment" resulting in money damages from a civil-rights lawsuit

3   against the City and County of San Francisco, and stated that the judgment "*reiterated* the need

4   to insure that all material facts are presented to the District Attorney" and "further illustrated that

5   failure to include statements or other exculpatory evidence may result in the civil liability of an

6   officer or investigator, including an award of punitive damages." In other words, over a decade

7   prior to Conley's wrongful conviction, SFPD policymakers actually knew, and directly and

8   unambiguously informed SFPD personnel, that the SFPD previously had failed to create

9   appropriate policies regarding *Brady* evidence and that the SFPD failed to train its personnel to

10   strictly follow those policies, and that those failures had directly caused unconstitutional

11   convictions and resulting civil-rights litigation against the City.

12       76.     Yet despite knowledge of the importance of clear policies on *Brady* and robust

13   training on its requirements, the SFPD not only failed to implement adequate *Brady* policies and

14   training, but also established official policies directly contrary to its *Brady* obligations and its

15   representations to all SFPD personnel in the Training Bulletin that strict adherence to *Brady* was

16   essential to avoid constitutional violations and wrongful convictions. In particular, when the

17   SFPD established its Victim/Witness Protection/Relocation Program ("the SFPD Program")

18   through a June 11, 1992 Unit Order ("the Unit Order"), and its official policy regarding payment

19   of witness-protection money to testifying witnesses, it failed to establish the necessary

20   safeguards to prevent *Brady* violations. The Unit Order, which was authored by SFPD

21   policymaker and Deputy Chief Reed and, on information and belief, approved by the Chief of

22   Police, is attached as Exhibit C hereto. Although the Unit Order made clear that its "overall

23   goal" was "to set forth procedures for protection and relocation of vital witnesses whose lives are

24   immediately threatened," Ex. C at 1, nothing in the Unit Order discussed, much less provided

25   any guidelines regarding, the disclosure to the District Attorney or defense counsel of

26   information regarding benefits paid to a testifying witness through the SFPD Program. The Unit

27   Order specified that a case investigator wishing to provide witness-protection benefits to a

28   witness would have to obtain clearance from the Deputy Chief and submit original receipts to the

32

1   commanding officer of the Special Investigations Division, who would maintain records of the

2   payments. *Id.* at 2-3. But the Unit Order did not establish any guidelines under which case

3   investigators, or anyone else at the SFPD, were obligated to provide those receipts, or any other

4   information regarding disbursements, to the District Attorney in order to ensure the appropriate

5   disclosure of impeachment evidence to defense counsel. *Id.*

6       77.   Sanders testified during his deposition in Conley's habeas case that he received a

7   copy of the June 11, 1992 Unit Order. Sanders further testified that the SFPD Program was the

8   source of the funds he used to pay Polk in connection with his testimony against Conley. The

9   official City and SFPD policy embodied in the Unit Order gave Sanders no mandate or guidance

10  regarding whether and how to make sure the salient details of benefits given to a testifying

11  witness through the SFPD Program were communicated to defense counsel as required by the

12  Constitution. On information and belief, even apart from the official SFPD policy permitting

13  SFPD personnel to disburse cash payments to testifying witnesses without disclosing those

14  payments to the SFDA, Sanders and other investigators maintained their own unofficial custom

15  and practice of unconstitutionally using the SFPD Program as a slush fund to funnel money to

16  compliant testifying witnesses absent any legitimate witness-protection purpose, and then failing

17  to inform the SFDA of those payments. That unofficial custom and practice was made possible

18  by the SFPD's unconstitutional official policy governing the SFPD Program and by the SFPD's

19  failure to train investigators in the proper uses of witness-protection funds and disclosure of

20  witness-protection payments to the SFDA.

21      78.   In Conley's case, the SFPD's unconstitutional official policy governing the SFPD

22  Program, the unofficial custom and practice of SFPD investigators in using the SFPD Program to

23  funnel money to compliant testifying witnesses absent any legitimate witness-protection purpose,

24  and the SFPD's failure to train investigators enabled Sanders to use the SFPD Program not for its

25  intended purpose of providing essential funds necessary to protect and relocate witnesses whose

26  lives were in imminent danger, but as his own personal slush fund to funnel cash to Polk outside

27  the context of witness protection. As discussed above, Sanders confirmed under oath that the

28  SFPD Program was the source of the funds Sanders used to pay Polk in connection with Polk's

1    testimony against Conley. As already discussed, Polk was not sequestered, under protective
2    custody, or even monitored by police personnel, as he would have been had he actually been a
3    protected witness. Although Sanders's payments to Polk were purportedly in response to an
4    attack Polk suffered in San Francisco, Sanders took no steps to meet Polk in a secure location
5    outside San Francisco, instead simply having Polk come to Sanders's workplace at the Hall of
6    Justice, where Polk would be accessible to the general public, including accused criminals and
7    their families. Neither did Sanders place any controls on how Polk could use the money Sanders
8    provided him from the SFPD Program. Polk could have used the money Sanders gave him for
9    anything he wanted, including to further his career as a drug dealer. Sanders was able to use
10   funds taken from the SFPD Program in this way because the City, through its policymakers at
11   the SFPD, had established an official policy delegating plenary authority over the use and
12   documentation of witness protection to individual case investigators, whom the SFPD also failed
13   to train and supervise in their use and documentation of witness-protection funding.

14          79.     SFPD policymakers, including then-Deputy Chief Fred Lau and then-Lieutenant
15   Gary Pisciotto, approved Sanders's request for funding for Polk. In the face of the obvious risks
16   highlighted in the Training Bulletin but in keeping with the SFPD policy set forth in the Unit
17   Order, the SFPD did not properly monitor how Sanders used the money that was earmarked for
18   Polk, nor did it take other appropriate measures to ensure that Sanders fulfilled his obligation to
19   disclose this exculpatory evidence to the prosecutor so that it could be provided to the defense.
20   For example, a December 12, 1994 memo written by Officer Sandy Bargioni states that as of the
21   date of that memo—almost two months after Conley was convicted of murder but before he had
22   been sentenced—the SFPD still had not received any receipts from Sanders showing what he had
23   done with the money that was earmarked for Polk. On notice that Sanders was very likely
24   misusing SFPD Program funds, the SFPD should have taken steps to monitor how Sanders was
25   spending this money, and knew or should have known that Sanders was not complying with his
26   constitutional obligation to disclose to the prosecutor all exculpatory evidence. The fact that the
27   SFPD failed to take any steps to investigate Sanders's use of SFPD Program funds is further
28   evidence that the SFPD maintained a custom and practice of delegating plenary control over the

1   use and documentation of witness-protection funding to individual officers despite the obviously
2   foreseeable likelihood, as the Training Bulletin explicitly predicted, that the SFPD would violate
3   the constitutional rights of criminal defendants as a result.

4        80.    Similarly, SFPD policymakers failed to provide adequate training and supervision
5   to Sanders as to the appropriate and constitutional use and documentation of witness-protection
6   payments. This failure to train Sanders allowed Sanders, as discussed above, to misuse funds
7   intended to be used only for protection of witnesses whose lives were in imminent danger, by
8   funneling those funds, with no supervision or strings attached, to recidivist cocaine dealer
9   Clifford Polk. The City's failures further enabled Sanders to neglect adequately to document the
10  circumstances under which he was improperly providing witness-protection funds to Polk. Not
11  only was it clearly foreseeable that these failures of training and supervision would contribute to
12  a defendant's wrongful conviction, but also the City was already on notice that prior failures to
13  ensure SFPD officers complied with their *Brady* duties had resulted in constitutional violations,
14  unfair trials, wrongful convictions, and judgments against the City and individual officers.
15  Nevertheless, the SFPD chose to ignore that misconduct and the obvious consequences of its
16  failures to train and supervise case investigators. Those failures, which directly led to Conley's
17  wrongful conviction by way of false testimony from Polk and Sanders and the suppression from
18  Conley's trial counsel of the evidence necessary to impeach that false testimony, amount to
19  deliberate indifference to Conley's constitutional rights.

20       81.    Sanders was able to suppress the evidence of payments to Polk in connection with
21  Polk's testimony implicating Conley in the Hughes and Johnson murders as a direct and
22  proximate result of (1) the SFPD's official policy establishing the SFPD Program but providing
23  no requirements regarding disclosure of witness payment information to the District Attorney or
24  defense counsel; (2) the SFPD's unofficial custom and practice of delegating plenary control
25  over the use and documentation of witness-protection funding to individual case investigators;
26  (3) the SFPD's failure to supervise Sanders's and other investigators use and documentation of
27  witness-protection funding, as evidenced by Sanders's use of the SFPD Program to provide cash
28  with no strings attached to a recidivist cocaine dealer, Sanders's failure to document the

1  circumstances under which he was providing that cash, and the SFPD's failure to discover

2  Sanders's misuse of funds and suppression of documentation in the Conley case, even after

3  sending its December 12, 1994 memo regarding the lack of documentation of Sanders's

4  payments to Polk. The suppression of such evidence allowed Polk to give credible false

5  testimony regarding Conley's guilt and robbed Conley's counsel of his constitutionally mandated

6  opportunity to impeach Polk with evidence of the many payments Polk received before, during,

7  and after his testimony. The suppression of the evidence of payments likewise permitted both

8  Polk and Sanders to give material false testimony about Polk's participation in a witness-

9  protection program, motivation for testifying against Conley, and general truthfulness. Because

10  Polk was the linchpin of the prosecution's case against Conley, and because the State could not

11  even have prosecuted much less convicted Conley without Polk's testimony, the above-described

12  SFPD policy, custom and practice, and failures to train and supervise resulted in Conley's

13  unlawful murder conviction and his 18 years of wrongful imprisonment.

## Officer Liability

15  82.  Sanders orchestrated the suppression of material exculpatory and impeachment

16  evidence that paved the way for Conley's conviction. But for Sanders's suppression of this

17  mountain of exculpatory evidence, Conley would not have been convicted and would not have

18  been unlawfully incarcerated for more than 18 years. In addition, Sanders testified falsely as a

19  witness at a pre-trial hearing, which false testimony was designed to and did have the effect of

20  concealing Sanders's suppression of exculpatory evidence and the deprivation of Conley's

21  constitutional rights. Sanders admitted that pursuant to SFPD "policy," he had an obligation to

22  disclose exculpatory material to the court and provide documentation of, but he did not and no

23  one from the SFPD monitored his failure. Further, when Giannini elicited perjured testimony

24  from Polk against Conley at trial, Sanders, who was seated at counsel table, failed to correct that

25  testimony despite knowing it to be false when Polk gave it.

26  83.  At the time of Conley's trial, it was clearly established under longstanding United

27  States Supreme Court case law that due process under the Fifth and Fourteenth Amendments to

28  the United States Constitution (1) requires the disclosure of any material, exculpatory evidence

36

COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983
CASE NO.

1    to the defense, including all evidence which may be used to impeach a witness; and (2) forbids

2    the knowing presentation of false testimony to the jury.  No reasonable officer could have

3    entertained the notion that the suppression of exculpatory evidence or the knowing presentation

4    of false testimony were consistent with or permitted under the Constitution.  To the contrary, any

5    reasonable officer would have known such actions would violate due process.

6         84.    Sanders was actually aware of his constitutional obligation to disclose to defense

7    counsel any exculpatory evidence that was unearthed during an investigation, including all

8    evidence of any benefits given to a testifying witness.  Indeed, Sanders repeatedly confirmed this

9    fact during his deposition taken in Conley's habeas case.  Because he knowingly and willfully

10   withheld impeachment evidence from the SFPD case file and from the prosecutor in violation of

11   Conley's clearly established due-process rights, knowingly and willfully testified falsely at a pre-

12   trial hearing, and knowingly and willfully allowed a witness to testify falsely at trial, Sanders is

13   not entitled to qualified immunity from suit.

14        85.    Because Sanders was at all times relevant to this case acting in his capacity as an

15   SFPD case investigator, and never as an advocate, neither is he entitled to absolute immunity.

16                                    **CLAIM FOR RELIEF**

17         **Violation of the Fourteenth Amendment to the United States Constitution**
                                  **42 U.S.C. § 1983**
18

19        86.    Conley incorporates by reference the allegations in paragraphs 1 through 83, as if

20   set forth fully herein.

21        87.    At all times relevant to this case, defendants had an obligation to comply with the

22   due-process requirements set forth in the Fifth and Fourteenth Amendments to the United States

23   Constitution.  Defendants failed to meet their due-process obligations with respect to Conley.

24        88.    By the conduct described above, Sanders acted willfully, wantonly, maliciously,

25   oppressively, and with conscious disregard for and deliberate indifference to Conley's

26   constitutional due-process rights.  By intentionally suppressing material impeachment evidence

27   and suborning perjured testimony, Sanders violated Conley's clearly established due-process

28   rights guaranteed by the Fourteenth Amendment.

                                            37

1    89.    At all times herein mentioned, Sanders acted or purported to act within the course
2    and scope of his employment with the SFPD and under color of California state law as a sworn
3    police officer.

4    90.    At all times herein relevant, Sanders was an SFPD employee and thus an agent of
5    defendant City and County of San Francisco.

6    91.    In a Training Bulletin dated October 17, 1984, the SFPD acknowledged it actually
7    knew that SFPD officers had violated *Brady,* in part due to an actual lack of adequate training,
8    and moreover that more *Brady* violations would occur unless the SFPD stringently trained and
9    supervised its officers. In the Training Bulletin, the SFPD explained that clear policies and
10   robust training on *Brady* were required to avoid unconstitutional convictions and civil rights suits
11   seeking money damages. Despite this acknowledgement, and the past history of *Brady*
12   violations by SFPD officers, in or around 1992, the SFPD created the SFPD Program pursuant to
13   an official department policy that not only failed to comply with the SFPD's *Brady* obligations,
14   but effectively ensured future *Brady* violations would occur.

15   92.    The SFPD Program was the source of the funds used by Sanders to pay Polk in
16   connection with his testimony against Conley. In their June 11, 1992 Unit Order, SFPD
17   policymakers established a written policy for use and documentation of funds from the SFPD
18   Program that was constitutionally inadequate on its face, because it did not require officers using
19   SFPD Program funds to pay testifying witnesses to provide documentation or information
20   regarding such payments to the SFDA, much less provide any specific guidance regarding how
21   to communicate such information to the SFDA to ensure appropriate disclosures of benefits to
22   testifying witnesses were made to defense counsel. To the contrary, the City, through the SFPD
23   and its policymakers, followed an unconstitutional unofficial custom and practice of delegating
24   plenary authority to case investigators regarding the use and documentation of SFPD Program
25   funds, including cash payments to testifying witnesses.

26   93.    Similarly, the City, through the SFPD and its policymakers, failed to provide
27   adequate training of its case investigators regarding the appropriate and constitutional uses and
28   required documentation of witness-protection funds generally and SFPD Program payments

38
COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983
CASE NO.

1  specifically, despite notice of past *Brady* violations stemming from inadequate training and
2  supervision of its officers. The City, through the SFPD and its policymakers, also failed to
3  provide adequate supervision of its case investigators in their use and documentation of SFPD
4  Program funds, even in instances such as Conley's case, where Sanders had failed to provide to
5  the Special Investigations Division even the limited internal SFPD documentation required under
6  the official written SFPD policy.

7      94.    The City's and its policymakers' failure to train and supervise its case
8  investigators amounts to deliberate indifference to Conley's constitutional rights. The City knew
9  or should have known that its failures to train its investigators and provide them with reasonable
10 oversight would likely result in a violation of the due-process rights of persons in Conley's
11 situation. Had the City put official policies or unofficial customs and practices in place to
12 oversee the use and documentation of such payments as the United States Constitution requires,
13 either (1) Sanders would not have been able to use the SFPD Witness Protection Program as his
14 personal slush fund to funnel cash to Polk; or (2) the payments to Polk would have been timely
15 disclosed to Conley's counsel. In either case, Polk's false testimony would have been impeached
16 at trial and Conley would not have been convicted and wrongly imprisoned for over 18 years.

17     95.    As a direct and proximate result of defendants' policies, custom and practices, and
18 deliberate indifference, as described in this complaint, Conley was denied his constitutional
19 rights and falsely imprisoned for over 18 years, suffering physical confinement, personal
20 physical injuries and physical sickness, and emotional distress flowing therefrom. As a result of
21 his incarceration, he suffered a loss of physical freedom, was denied the opportunity to seek
22 gainful employment, was separated from his family and loved ones, and was physically confined
23 in a small cell. While incarcerated in prison, he suffered serious physical injuries and emotional
24 distress flowing therefrom. For example, in 1995 Conley was ambushed and stabbed several
25 times in an unprovoked attack by three white supremacist inmates, suffering serious injuries. In
26 2010, following the evidentiary hearing on his habeas claim, and while awaiting a transfer from
27 San Quentin State Prison, Conley witnessed the brutal murder of a fellow inmate from ten feet
28 away. In addition to his physical confinement, physical injuries, and resulting distress, while in

39

1 | prison Conley was routinely subjected to non-consensual touching and control of his movements

2 | by prison staff. Because of all these things, Conley suffered and today continues to suffer mental

3 | and emotional distress. Defendants' malicious misconduct justifies an award to Conley of

4 | compensatory and punitive damages in an amount to be determined at trial, and of reasonable

5 | attorneys' fees.

6 | <div align="center">**PRAYER FOR RELIEF**</div>

7 | WHEREFORE, Conley prays that the Court, as to all defendants and each of them jointly

8 | and severally:

9 | 1.      Award compensatory and general damages against all defendants and each of

10 | them, for Conley, in an amount to be determined according to proof;

11 | 2.      Award exemplary and punitive damages against all defendants in an amount to be

12 | determined according to proof;

13 | 3.      Award Conley his costs, expenses, and reasonable attorneys' fees pursuant to 42

14 | U.S.C. § 1988; and

15 | 4.      Grant such other and further relief as the Court may deem just and proper.

16 | <div align="center">**DEMAND FOR JURY TRIAL**</div>

17 | Conley hereby demands a trial by jury for all issues so triable.

18 |

19 | Dated: January 27, 2012                          KEKER & VAN NEST LLP

20 |

21 |                                                 By: _____

22 |                                                      DANIEL PURCELL

23 |                                                      Attorneys for Plaintiff
                                                         CARAMAD CONLEY

24 |

25 |

26 |

27 |

28 |

<div align="center">40</div>

<div align="center">COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983
CASE NO.</div>

# EXHIBIT A

ENDORSED
F I L E D
San Francisco County Superior Court

DEC 1 4 2010

CLERK OF THE COURT
BY: _____ CLARK BANAYAD _____
Deputy Clerk

## SUPERIOR COURT OF CALIFORNIA

### County of San Francisco

**CARAMAD CONLEY,**

    Petitioner,

      v.

**MIKE KNOWLES,**

    Respondent.

_____

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

    Real Party in Interest.

Writ No.: 5891
Court Number: 2447917

**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL**

**SEALED PURSUANT TO SUPREME COURT ORDER DATED DECEMBER 23, 2008 and SUPERIOR COURT ORDER DATED NOVEMBER 3, 2010**

## PUBLIC VERSION

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No. 2447917

1

1    On October 18, 1994, Petitioner Caramad Conley ("Petitioner") was convicted of

2    conspiracy to commit first degree murder, two counts of first degree murder, and eleven counts

3    of attempted murder in the killings of Charles Hughes and Roshawn Johnson. (People of the

4    State of California v. Caramad Conley, San Francisco Superior Court Case Number 153756.)

5    On January 25, 1995, the Superior Court sentenced Petitioner to life without the possibility of

6    parole, plus 22 years, in prison. Petitioner's conviction was affirmed on appeal. Petitioner is

7    currently incarcerated in California state prison.

8    This petition for writ of habeas corpus involves allegations of misconduct by the State in

9    connection with Conley's trial and conviction. Petitioner contends that the judgment of

10   conviction is unlawful and unconstitutionally imposed in violation of his constitutional due

11   process rights as guaranteed by the Fifth and Fourteenth Amendments to the United States

12   Constitution and Article 1, section 7 of the California Constitution. At issue is whether the State

13   failed to disclose material impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83

14   (1963), Giglio v. United States, 405 U.S. 150 (1972) and their progeny; and whether the State

15   knowingly presented false testimony in violation of Napue v. Illinois, 360 U.S. 264 (1959) and

16   its progeny. At the heart of the factual issues in this proceeding are the timing and amount of

17   payments and benefits to Clifford Polk, the State's key witness at Petitioner Caramad Conley's

18   murder trial. Polk is now deceased.

19   Clifford Polk was a prosecution witness at the murder trial of defendant Paul Green in

20   1992 ("Green case"), a criminal prosecution for the same murders charged in Conley's trial in

21   1994. At the time of the Green case, Polk was in the State of California witness protection

22   program. (Ex. 102 at 2634.[1])

23

24   [1] Unless otherwise noted, references to exhibits are to those introduced at the evidentiary hearing
     held in this matter beginning on June 28, 2010. The evidentiary hearing transcript is cited as

25

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No.
2447917

2

1    Subsequently, Polk became the linchpin witness in the State's prosecution against

2    Conley. It is undisputed by the State that the case against Conley could not even have proceeded

3    without Polk's testimony. (Ex. 1.) Polk testified that Petitioner confessed to him that he had

4    fired shots at the murder victims. Polk was not an eyewitness or at the scene. There was no

5    physical evidence tying Conley to the crimes. The only eyewitness who placed Petitioner at the

6    scene was an accomplice to the murders; he was able to testify at Conley's trial only because of

7    Polk's alleged corroboration.

8    In July 1994, Inspector Prentice Earl Sanders ("Sanders"), the co-lead San Francisco

9    Police Department inspector in both the Green and Conley cases, gave a televised interview to

10   KTVU news stating that a witness in Conley's then-upcoming trial had requested protection and

11   relocation assistance from the State, but Inspector Sanders was unable to provide it due to budget

12   cutbacks. *See* Ex. 5. Shortly thereafter, at pre-trial hearings, the trial prosecutor and Sanders

13   confirmed that the witness to whom Sanders was referring was Clifford Polk. *See* Exs. 7 & 9.

14   The State repeatedly represented that Polk was not in a witness protection program, and

15   disclosed no information of inducements, benefits, or payments to Polk. As set forth below more

16   fully in Section IV.A, despite repeated requests by defense counsel, the prosecution suppressed

17   evidence that, among other things, Polk was receiving substantial cash payments and benefits

18   from Inspector Sanders in connection with his testimony in the Conley case, as early as June,

19   1994. The only disclosure regarding payments to Polk occurred in a letter dated October 1,

20   1994, two days before Polk testified, in which the trial prosecutor wrote that Polk has been

21   "relocated temporarily to an out of town location, and is receiving room and board while the trial

22   lasts." (Ex. 10.) This disclosure was incomplete and misleading.

---

24   "RT". I granted Petitioner's unopposed request for judicial notice of the records in the Green
     case and in Conley's trial. Transcripts and pleadings from those trials have been identified as

25                                                                                                      3

1    At Conley's trial in 1994, the trial prosecutor, Assistant District Attorney Albert Giannini

2  ("the trial prosecutor"), affirmatively elicited testimony from Clifford Polk that Polk had been in

3  witness protection during the Green case. (Ex. 11 at 756.) Polk then testified under oath that he

4  was not in witness protection in the Conley trial. The alleged falsity of this testimony and the

5  State's failure to correct this false testimony, are central issues in Petitioner's *Napue* claims

6  about the knowing use of false testimony at Conley's trial.

7    I. PROCEDURAL BACKGROUND

8    Petitioner filed a petition for writ of habeas corpus in the California Supreme Court on

9  November 22, 2006 arguing that newly-discovered evidence shows that the State denied him a

10  fair trial because the prosecution suppressed material, exculpatory impeachment evidence, the

11  prosecution knowingly relied on the false testimony of Clifford Polk, and when taken together,

12  the cumulative effect of the constitutional violations deprived Petitioner of his right to a fair

13  trial.[2] Petitioner requested an evidentiary hearing and pre-evidentiary hearing discovery, and

14  asked the Court to set aside Petitioner's convictions and order a new trial.

15    On May 18, 2007, the California Supreme Court directed the State to file an informal

16  response to the Petition. After requesting and receiving extensions of time, the State filed its

17  informal response to the Petition on August 30, 2007. After requesting an extension of time,

18  Petitioner filed a reply on October 4, 2007.

19    On December 23, 2008, the California Supreme Court issued an order to show cause,

20  ordering the Director of the Department of Corrections and Rehabilitation "to show cause before

21  the San Francisco County Superior Court, when the matter is placed on calendar, why the relief

22  prayed for should not be granted." The State was ordered to file a return on or before January

23  _____

24  exhibits for this proceeding, and are referred to by exhibit number and page reference.

25    4

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No.
2447917

1   22, 2009. After requesting and receiving multiple extensions of time, the State filed its return to

2   the petition on May 29, 2009. Petitioner filed a traverse on August 28, 2009. The Superior

3   Court, Judge Charles Haines, presiding, subsequently found good cause pursuant to Rule of

4   Court 4.551(h) to extend the time for ordering an evidentiary hearing and/or ruling on the

5   petition, up to and including December 9, 2009. (Orders filed October 7, 2009 and October 29,

6   2009.)

7        On December 9, 2009, this Court ordered an evidentiary hearing to be held on February

8   1, 2010. Petitioner subsequently requested to take discovery in advance of the evidentiary

9   hearing, and to continue the evidentiary hearing date to March 29, 2010. These requests were

10   granted. (Order Setting Evidentiary Hearing and Permitting Pre-Hearing Discovery, filed

11   December 22, 2009.) Subsequently, each side made requests to continue the evidentiary hearing,

12   which were granted for good cause.[3] An evidentiary hearing was held before me on June 28

13   through July 2, 2010. The parties filed substantial post-hearing briefs in August and September.

14   Closing arguments were held on September 24, 2010.

15     II. LEGAL STANDARDS

16        Conley makes two habeas claims: (1) suppression of material impeachment evidence in

17   violation of *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150

18   (1972), and their progeny; and (2) knowing presentation of false testimony in violation of *Napue*

19   *v. Illinois*, 360 U.S. 264 (1959) and its progeny.

20        To prevail on a habeas claim under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v.*

21   *United States*, 405 U.S. 150 (1972), a petitioner must establish that: (1) "[t]he evidence at issue

22  

---

23   [2] Petitioner also made a claim of actual innocence, which claim was voluntarily dismissed by
      him later in the proceedings before me.

24  

25  

1   must be favorable to the accused, either because it is exculpatory or it is impeaching"; (2) "that

2   evidence must have been suppressed by the State, either willfully or inadvertently"; and (3)

3   "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see People v.*

4   *Salazar,* 35 Cal. 4th 1031, 1043 (2005)(quoting same language from *Strickler*).

5   For a *Brady/Giglio* claim, suppression is material where "'there is a *reasonable*

6   *probability* that, had the evidence been disclosed to the defense, the result of the proceeding

7   *would* have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995), *quoting United States*

8   *v. Bagley*, 473 U.S. 667, 682 (1985) (emphasis added). A "reasonable probability" does not

9   require showing by a preponderance that the outcome would have been different; instead, a

10   "'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of

11   the trial. *Bagley*, 473 U.S. at 682. *See Kyles*, 514 U.S. at 433-35. *Accord In re Sassounian,* 9

12   Cal. 4th 535, 544 (1995) *(quoting Bagley)*.

13   In *People v. Verdugo*, 50 Cal. 4th 263, 279 (2010), our Supreme Court recently described

14   the requirements of *Brady v. Maryland*: "'[t]he prosecution must disclose material exculpatory

15   evidence whether the defendant makes a specific request, a general request, or none at all.'

16   [internal citations omitted] 'For Brady purposes, evidence is favorable if it helps the defense or

17   hurts the prosecution, as by impeaching a prosecution witness....Evidence is material if there is a

18   reasonable probability its disclosure would have altered the trial result.... Materiality includes

19   consideration of the effect of the nondisclosure on defense investigations and trials strategies.'"

20   To prevail on a *Napue* claim that the State knowingly presented false evidence at trial,

21   Conley must establish that (1) there is a "reasonable likelihood that the false testimony *could*

22   have affected the judgment of the jury," *Agurs*, 427 U.S. at 103; and (2) the prosecution knew or

23

24   [3] These motions were made and granted because of the repeated discovery of additional relevant
    documents. (See Ex. 119.) Real Party's last motion for continuance, filed June 23, 2010, was

25

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No.
2447917

1  should have known that testimony was false. *See Giglio*, 405 U.S. at 153 (emphasis added).

2  "[I]f there is any reasonable likelihood that the false testimony could have affected the judgment

3  of the jury," the conviction must be set aside. *United States v. Agurs*, 427 U.S. 97, 103 (1976);

4  *see also Giglio v. United States*, 405 U.S. 150, 154 (1972), *quoting Napue v. Illinois*, 360 U.S.

5  264, 271 (1959). "This standard is functionally equivalent to the 'harmless beyond a reasonable

6  doubt' standard in *Chapman v. California*, 386 U.S. 18[,]" *People v. Dickey*, 35 Cal. 4th 884, 909

7  (2005).

8  Thus, if the prosecution knowingly permitted a witness to give false testimony at trial,

9  Conley's conviction cannot stand unless the Court can conclude beyond a reasonable doubt that

10  the false testimony could not have affected the judgment of the jury.

11  In tracing the rationale underlying the *Napue* and *Brady* doctrines, the United States

12  Supreme Court in *Agurs* wrote that "As long ago as *Mooney v. Holohan*, 294 U.S. 103, 112

13  (1935) [citations omitted], this Court made clear that deliberate deception of a court and jurors

14  by the presentation of known false evidence is incompatible with 'rudimentary demands of

15  justice,' [citation omitted]…In *Napue v. Illinois* [citation omitted], we said, '(t)he same result

16  obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it

17  appears.' [citations omitted] Thereafter *Brady v. Maryland* [citations omitted] held that

18  suppression of material evidence justifies a new trial 'irrespective of the good faith or bad faith

19  of the prosecution.'" *Agurs*, 427 U.S. at 104.

20  Where a habeas petitioner brings a petition with both *Brady/Giglio* and *Napue* claims,

21  the court should analyze the State's alleged misconduct in a particular order, because the two

22  claims have different standards for materiality. *Jackson v. Brown,* 513 F.3d 1057, 1076 (9th Cir.

23

24  denied.

25

7

1 | 2008). Given these differences, a court considering a claim (such as this case) with both

2 | *Brady/Giglio* and *Napue* claims should:

3 |   first consider the Napue violations collectively and ask whether there is 'any reasonable likelihood' that the false testimony *could* have affected the judgment of the jury.' If so, habeas

4 | relief must be granted. However, if the *Napue* errors are not material standing alone, we consider all of the *Napue* and *Brady* violations collectively and ask whether 'there is a

5 | reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings *would* have been different.'

6 |

7 | *Jackson*, 513 F.3d at 1076 (*quoting Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (en banc))

8 | and *Bagley*, 473 U.S. at 682). In determining whether the evidence is material, the court

9 | considers the "cumulative impact of all of the evidence the government suppressed." *United*

10 | *States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003) (*citing Kyles v. Whitley*, 514 U.S. 419,

11 | 420 (1995)).

12 |   III. THE *NAPUE* CLAIMS

13 |   A. Polk's Trial Testimony.

14 |   The Court finds that Petitioner has established there was knowing presentation of false

15 | testimony by Clifford Polk at Conley's trial. The trial prosecutor called Clifford Polk as a

16 | witness in its case-in-chief. Towards the end of the direct examination of Polk, the prosecutor

17 | asked if Polk "had previously testified against Green." Polk responded "yes." (Ex. 84 at 755.)

18 | The questioning continued:

19 |   "Q: And at that time were you given room and board and some living expenses during the trial?

20 |   "A: Yes.
  "Q: Is that part of the witness protection program?

21 |   "A: Yes. *But I'm not in the witness protection program right now*." (Ex. 84 at 755-56) (emphasis added).

22 |

23 | The prosecution then questioned Polk about immunity, and his prior arrests and convictions.

24 |

25 |

1    I find that Polk's last answer about witness protection was false, the prosecution knew or

2    should have known that it was false, and the prosecution did nothing to correct it.

3    Voluminous evidence establishes that the testimony was false. Since July 1994 at the

4    latest, Sanders had been giving Polk cash and benefits through the San Francisco witness

5    protection program. By the time Polk testified at Conley's trial, he had already received at least

6    ████ in benefits in the Conley case alone.[4] Polk's practice was to go to the police department's

7    centrally located offices and meeting with Sanders personally to receive the cash. Polk signed

8    forms acknowledging his receipt of these benefits. (Ex. 116 at 238:7-20; Sanders's testimony.)

9    The████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   between July 1994 and the time of his testimony. (Ex. 18 at SFPD 2273-2277; 2278-2286; Ex.

12   61.) I conclude Polk knew the testimony was false.

13   I find that Sanders knew the testimony was false and did nothing to correct it. The

14   Conley trial record shows that Sanders was sitting in the courtroom at counsel table when Polk

15   testified against Conley. Immediately before asking Polk this line of questions quoted above,

16   the trial prosecutor directed Polk's attention to Sanders's presence in the courtroom and asked

17   him to confirm that Inspector Sanders was sitting at counsel table.[5] Sanders actually knew that

18   Polk's testimony was false and that Polk was "in the witness protection program" because it was

19   Sanders himself who acted as the conduit through whom the San Francisco witness protection

20   benefits were given to Polk. Sanders received lump sum payments from the police department to

21

22   [4] By order dated December 23, 2008, the California Supreme Court placed certain exhibits filed
     in connection with the petition for habeas corpus under seal ("December 23, 2008 order"). This
23   order is discussed in the order filed November 3, 2010 that I issued in this proceeding after Real
     Party made application to seal portions of the record. Pursuant to the December 23, 2008 order,
24   certain portions of this Order are redacted.

25                                                                                            9

1    disburse for Polk's "witness protection." (Ex. 38, showing receipt of three checks for $1030

2    each; Ex. 116 at 268-269.) (*See* n. 18, *infra*.)  Sanders testified at this proceeding that he created

3    receipts documenting disbursal of funds for Polk to initial, and that these receipts stated that they

4    were for disbursement of witness protection funds. (Ex. 116 at 238:7-20.) Sanders maintained a

5    substantial "witness protection" file for Clifford Polk in the Conley case. (Ex. 61, Ex. 119 at

6    ¶¶9-11.)  Moreover, the San Francisco witness protection program was not an ad hoc program

7    designed to protect only Polk.  Official San Francisco Police Department policy formally

8    established the program well before Conley's trial, with guidelines and procedures. (Ex 16.)

9    Sanders was aware of the program and these policies. (Ex. 116 at 260-261.)

10           Sanders admitted at his videotaped deposition taken in this habeas proceeding in 2010

11   that, at the time Polk testified in the Conley trial, Polk was receiving witness protection funds

12   that Sanders had received from the San Francisco Police Department. (Ex. 116 at 238.)

13           Real Party, however, takes the position that Polk's testimony was not false. This

14   argument is based on Sanders's testimony in this proceeding that, when Polk testified, he must

15   have been making an unstated distinction in his own mind between the California Witness

16   Protection Program ("CWPP"), which he was in at the time of the Green trial, and the local

17   witness protection program he was in during the Conley trial. (Ex. 116 at 236-237.)  CWPP was

18   no longer a funded program at the time of the Conley trial. Real Party contends that when Polk

19   testified that he wasn't in witness protection "now," he was merely truthfully denying that he

20   was in the CWPP.  The trial prosecutor testified to the same effect.  (*See* RT 303-304.)

21           This position is without merit. There is no evidence that Polk knew that the CWPP was

22   unfunded at the time of the Conley trial.  Even Sanders, who paid witness protection benefits to

23

24   [5] Q: "And is that Inspector Sanders who is seated here at counsel table?"  A: "Yes." (Ex. 84 at
      755.))

25                                                                                                    10

1   Polk in the Green and Conley cases, admitted that he did not know how Polk would make a

2   distinction between the benefits he received in the Green and Conley cases. (Ex. 116 at 236:12-

3   237:6.[6])  Further, the jury in the Conley trial had never heard any evidence about the CWPP.

4   The prosecution did not ask about the existence of a state or a local witness protection program,

5   let alone any differences between the two.  In light of these facts, I give no credit to Real Party's

6   argument that, although the trial prosecutor made no mention at Conley's trial of the CWPP, the

7   trial prosecutor must have "clearly referenced that program" in his question to Polk.  To the

8   contrary:  Polk's answer left the distinct impression that he was not in *any* witness protection

9   program.

10        Even if Clifford Polk was mistaken, and not intentionally lying, the prosecution may not

11   present testimony that the prosecution knows is false, whether the witness knows it or not.

12   *Hayes v. Brown*, 399 F.3d 972, 980-981 (9th Cir. 2005) (*en banc*) ("[i]t is reprehensible for the

13   State to seek refuge in the claim that a witness did not commit perjury, when the witness

14   unknowingly presents false testimony at the behest of the State").

15        Real Party also contends that if the trial prosecutor thought Polk's statement was false,

16   he would have said something at the time; because he didn't, he did not believe Polk's statement

17   was false.  Whether the trial prosecutor actually knew the statement was false is irrelevant to the

18   *Napue* claim here, because a member of the State's prosecution team actually knew that the

19   statement was false. *Napue* forecloses any argument based on the prosecutor's ignorance,

20   holding that "a conviction obtained through use of false evidence, known to be such by

21   representatives of the State, must fall under the Fourteenth Amendment."  360 U.S. at 269.

22   _____

23   [6] Sanders was asked at this proceeding whether he had "any understanding of why Mr. Polk
     would make a distinction between the witness protection benefits he received in the Green case
24   and the witness protection benefits he received in the Conley case?"  Sanders testified: "I don't

25                                                                                        11

1    Sanders knew that Polk was being paid because he was the one who paid him. Sanders's

2    knowledge is imputed to Giannini.[7]   Because prosecutors bear the "duty to investigate and

3    disclose favorable evidence known only to the police, [a prosecutor] 'should know' when a

4    witness testifies falsely about such evidence." *Jackson*, 513 F.3d at 1075. Even where the

5    falsehood is known only to the police officers investigating the case, "'the prosecution should

6    have known of the false and misleading nature of the [lying witness's] testimony, and therefore

7    'the prosecution [i]s under a constitutional obligation to correct that testimony." *Id. (quoting In*

8    *re Jackson,* 3 Cal. 4th 578, 597 (1992). The State remains accountable for Polk's false testimony

9    given Sanders's undisputed knowledge. If Sanders truly kept the trial prosecutor apprised of

10   every development in the case, as he testified in this proceeding that he did, including payments

11   to Polk, the prosecutor would have known this as well. (*See* Part IV.A.) But Sanders's

12   knowledge is enough.

13       To the extent that Real Party argues that Conley's trial counsel knew the testimony was

14   false, and could have cross-examined Polk on the issue, I give no credit to this argument. As set

15   forth more fully below in the discussion of the *Brady/Giglio* claim in Part IV, I find that the State

16   failed to disclose that Polk was receiving witness protection benefits and payments.

17       Having found that the testimony was false, and that the State knew or should have

18   known that it was, the next issue is materiality. For the reasons set forth below, I find that

19

20   _____

21   know, Counsel. I don't know – I don't know how he'd come up with that idea." (Ex. 116 at
     236:24-237:2; 237:5-6.)

22   [7] As the United States Supreme Court has stated, "any argument for excusing a prosecutor from
     disclosing what he does not happen to know about boils down to a plea to substitute the police

23   for the prosecutor, and even for the courts themselves, as the final arbiters of the government's
     obligation to ensure fair trials." *Kyles*, 514 U.S. at 438; *see also Hayes*, 399 F.3d at 983-984

24   (same).

25                                                                                           12

1 | Petitioner has met his burden of showing that there is a "reasonable likelihood that the false

2 | testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103.

3 |     Polk was the linchpin prosecution witness against Conley. It is undisputed that the case

4 | against Conley could not have proceeded without Polk. (Ex. 1 at 393.) No physical evidence or

5 | eyewitness testimony linked Conley to the crime. The only proof tying Conley to the murders

6 | was the testimony of two witnesses, John Johnson and Clifford Polk. John Johnson, a convicted

7 | murderer and crack user, was an admitted accomplice to the murders. He confessed to driving

8 | one of the two cars involved in the shooting and claimed Conley had been a passenger in the

9 | other car. Under long-established law, no conviction for any crime can be based on the

10 | uncorroborated testimony of an accomplice. *See* Cal. Penal Code Section 1111. The trial

11 | prosecutor confirmed at the evidentiary hearing that Johnson's testimony, by itself, could not

12 | have convicted Conley. (RT 136-139.) Sanders, too, understood that, without Polk as a witness,

13 | he could not even bring the case against Conley to the District Attorney for prosecution. (Ex.

14 | 115 at 105-107.) At trial, the prosecution presented no other witness or evidence to corroborate

15 | Johnson besides Polk. (RT 138-139.) The prosecuting attorney argued in closing that as

16 | between Johnson and Polk, Polk "*is the more important*" of the two witnesses. (Ex. 86 at

17 | 1238)(emphasis added).

18 |     Polk's credibility was a key issue in closing arguments. Conley's defense counsel

19 | stressed that Polk was unbelievable. He argued vigorously that Polk lied ("Look at Clifford. He

20 | slides down into the chair and slides lower and lower and lower each time he's caught in a lie.

21 | What lies was he caught in? A number of them.") (Ex. 86 at 1224:21-24), and gave inconsistent

22 | testimony ("Every time you ask Clifford Polk a question, he gives a different answer. ... From

23 | one sentence to another, from one question to another his answers change and vary and shift. ...

24 | He changes the story each time because he's making it up as he goes along.") (Ex. 86 at 1225:10-

25 |

13

1   24.). The Conley trial prosecutor stressed Polk's purported honesty and candor. In his rebuttal

2   closing argument, the prosecutor argued that *"the defense simply has no evidence that Clifford*

3   *Polk is being less than truthful or that he ever was...there is no doubt about it."* Ex. 86 at

4   1239:23-25) (emphasis added).

5        Polk's false testimony went to the heart of his credibility as a witness. By contrasting

6   his status in the Green case (as to which the jury heard that he received benefits from the witness

7   protection program), with his status in the Conley trial (where he was supposedly unconstrained

8   by any witness protection), Polk bolstered his credibility, giving the jury the false impression that

9   he was testifying against Conley as a matter of conscience and despite potential risks. This was

10  not true. *See Banks v. Dretke*, 540 U.S. 668, 675 (2004) (internal citations omitted) ("instead of

11  correcting the informant's false statements, the prosecutor told the jury that the witness 'ha[d]

12  been open and honest with you in every way' and that his testimony was of the 'utmost

13  significance.'") (internal citations omitted)] *See Bagley v. Lumpkin*, 798 F.2d 1297, 1301 (9th

14  Cir. 1986) ("Evidence of bias and prejudice is certainly material for impeachment, but lies under

15  oath to conceal bias and prejudice raise the impeachment evidence to such a level that it is

16  difficult to imagine anything of greater magnitude that would undermine confidence in the

17  outcome of any trial.") (citation omitted); *Jackson v. Brown*, 513 F. 3d 1057, 1071 (9th Cir.

18  2006) (vacating conviction where witness testified that no one promised him anything in

19  exchange for testimony, but where prosecutor had in fact promised to help him serve his

20  sentence closer to his family, and prosecutor "knew that the testimony was false because he

21  himself had made the promise").

22        I find that in Conley's case, the prosecution team knew the falsity of Polk's statement.

23  Sanders had personally enrolled Polk in the SFPD program. Sanders sat with the trial prosecutor

24  at counsel table during trial. Even if the trial prosecutor was completely in the dark, Sanders

25

                                                                                          14
ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No.
2447917

1  should have prompted the trial prosecutor to correct the misstatement for the jury. But Sanders

2  sat silently and allowed Polk to testify to facts that were not true.

3      On this record, I find there is a reasonable likelihood that the false testimony "could

4  have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976).

5

6      B. Farell's Trial Testimony  Petitioner contends that the trial testimony of Assistant

7  District Attorney John Farrell constituted *Napue* error. For the reasons stated below, I find this

8  claim is without merit.

9      Polk testified at Conley's trial about his prior and pending narcotics cases, and the

10 dispositions he had received and expected to receive. Sanders also testified at the Conley trial

11 about the role he played in Polk receiving diversion in one of the narcotics cases. Over objection

12 by Conley's trial attorney, Donald Bergerson ("defense counsel" or "Conley's trial counsel") that

13 the testimony would be irrelevant and prejudicial, the trial prosecutor subsequently called

14 Assistant District Attorney John Farrell to testify. Farrell was then a narcotics prosecutor and

15 had familiarity with Polk's pending narcotics cases.

16      The *Napue* claim regarding Farrell's testimony was not raised in Petitioner's petition for

17 writ of habeas corpus, in any pre-hearing proceedings or briefs, or directly at the evidentiary

18 hearing itself. The claim was raised for the first time in Petitioner's post-evidentiary hearing

19 brief. In his post-hearing reply brief, Petitioner identified the specific testimony that is allegedly

20 false.[8]

21

22 [8] Petitioner cites these pages and lines from re-direct examination of Farrell at Conley's trial:
   "Q: Did anybody ask you to do anything differently with this case?" (Defense counsel objected:
23 "Objection, your honor. Different from what?.") "A: No. The only effect of Clifford Polk
   testifying in this case on my decision was that instead of making him go to jail, I let him do time
24 in the sheriff's work program so there wouldn't be a security danger issue for him or for the
   sheriff to have to handle. That's the only difference. ..." (Ex. 85 at 949-950.)

25                                                                                      15

1    Petitioner contends that handwritten notes on the outside of a District Attorney case file

2  folder (Ex. 62) contradict Farrell's testimony that no one asked him to "take it easy on Polk," as

3  Petitioner's post-hearing brief describes the import of his testimony.  (This terminology was not

4  used at Conley's trial.)

5    The handwritten notes are on written on a San Francisco District Attorney file for a

6  narcotics case entitled "People v. Clifford Polk," San Francisco Superior Court Case Number

7  151961.  The handwritten notes at issue are next to the date "11-22-93" and read: "(awaiting

8  confirmation from Insp. Sanders of Homicide re D's cooperating in a pending murder case)(if D

9  has cooperated fully & truthfully—okay to amend to 11350(a)[MTS issues/no prior record] +

10  allow DV – w/condition during DV of s/a from V)."

11    There are many handwritten entries all over Exhibit 62, and they appear to be in many

12  different handwritings, over a time period from August 26, 1993 through October 6, 1994.

13  Petitioner argues that the above quoted notes on Exhibit 62 are "presumably written by Farrell

14  himself," and that the district attorney referred to in the notes was "again presumably Farrell"

15  (Petitioner's Post-Hearing Brief at 32), but there is insufficient evidence to support this

16  presumption.  Petitioner did not call Farrell as a witness at the evidentiary hearing or, apparently,

17  in pre-evidentiary hearing discovery.  Petitioner did not present evidence as to who wrote the

18  entry or what it specifically refers to.

19

20
_____

21  On direct examination, Farell responded to a series of questions about Polk's new case for which
     he was about to be sentenced to 30 days work detail, rather than 84 days in jail.  Farell testified
22  in the passage cited by Petitioner, "[n]either you [trial prosecutor Giannini] or Inspector Sanders
     spoke with me other than Inspector Sanders a long time ago confirming that Mr. Polk was going
23  to testify," and that Farell "would have done the same thing if [Polk] had never had to testify."
     *Id.* at 943:6-10.

24

25                                                                                                 16

1    Polk was prosecuted for a narcotics violation in 1993. The charge was reduced to

2  simple possession, and he was placed on diversion. Sanders testified at the Conley trial about his

3  role in placing Polk on diversion, which included speaking to the judge in Polk's first case about

4  Polk and the fact that Polk had testified in the Green case. (Ex. 85 at 925:2-11; 929-931.)

5  Farrell, too, testified at the Conley trial that it was his "understanding" that Sanders was present

6  in chambers and made a representation to the judge about Polk when Polk's first case resulted in

7  diversion. (Ex. 85 at 939:7-10.)

8    A few weeks after being placed on diversion, Polk was arrested on another narcotics

9  case for sale of rock cocaine. *Id.* at 939-940. The second case resulted in the termination of

10  diversion as unsuccessful and the reinstatement of the first charges. Sanders testified at the

11  Conley trial that after Polk was charged with another narcotics case (in December 1993), Sanders

12  did nothing to assist Polk or to interfere in the prosecution, nor did he approach any judge or

13  district attorney about the case. *Id.* at 926. Farrell testified at Conley's trial that after Polk was

14  arrested on the second case, no one from the police department or the district attorney's office

15  approached him about helping Polk with the second case. *Id.* at 940.

16    Petitioner has adduced insufficient evidence to suggest otherwise. The handwritten

17  notes cited by Petitioner on Exhibit 62 dated August 26, 1993, appear to relate to the first case,

18  before Polk was placed on drug diversion. When Farrell's trial testimony is read in context, the

19  particular testimony cited by Petitioner in its post-hearing reply brief as false refers to the second

20  case. Based on all of the evidence and the inferences fairly to be drawn from it, I find that

21  Petitioner has not met his burden of establishing that this witness's testimony was false under

22  *Napue*.

23    IV.    *BRADY/GIGLIO* CLAIMS

24

25                                                                      17

1    For the reasons set forth below, the Court finds that Petitioner has established that

2  evidence was suppressed; that the suppressed evidence was favorable to Conley; and that,

3  considering the totality of the evidence suppressed, had the evidence been disclosed, there is a

4  reasonable probability that the result of the proceeding would have been different. *Kyles*, 514

5  U.S. at 433-436.

6    A. Was the evidence suppressed?

7    There are five categories of evidence allegedly suppressed. I address each of them

8  below.

9    1. Receipts showing payments to Polk from Inspector Earl Sanders between June 18,

10  1994 and August 1, 1995 through the SFPD Victim/Witness Protection/Relocation Program, and

11  evidence that most of these benefits were in the form of direct cash payment from Sanders to

12  Polk, who admitted that Polk could use the money for anything.

13    At the outset, there is no factual dispute that substantial sums of money and benefits were

14  provided to Polk in connection with Conley's case. From the voluminous records of receipts,

15  invoices, cancelled checks, vouchers, bills, and other records of payment, and handwritten

16  notations on some of those records, it is not possible to state 16 years later the exact dollar amount

17  of benefits. In its post-hearing brief, Real Party concedes that it amounts to⬛⬛⬛in cash

18  directly to Polk from approximately July 29, 1994 until March 29, 1995;⬛⬛⬛in other payments

19  on Polk's behalf and for his benefit made by cash, check or credit card payments. Petitioner

20  contends the benefits totaled at least⬛⬛⬛. In addition, Sanders testified at this proceeding

21  that he arranged to have a six-month lease provided to Polk at no cost. (Ex. 115 at 198-203.)

22  Whether the number is⬛⬛⬛or⬛⬛⬛, or somewhere in between, the difference is immaterial to

23  the outcome of this proceeding; neither party has argued otherwise.

24

25                                                                                    18

1    There is no dispute that ▇▇▇ separate cash payments were made by Sanders to Polk

2  between ▇▇▇ and ▇▇▇ totaling at least ▇▇ (Ex. 61.) There is a factual

3  dispute as to whether benefits to Polk began in the Conley case as early as June 18, 1994, as

4  reflected by a grocery receipt for about $50.00 found in the witness protection file for Polk that

5  Sanders maintained in the Conley case. (Ex. 61 at SFPD553-554.) I find there is sufficient

6  evidence to believe this receipt reflects purchases made for Polk's benefit.[9]  Even if Petitioner

7  could not sustain its burden as to this particular benefit on June 18, 1994, my decision on the

8  merits of this petition would not change.

9    I find that—other than the October 1, 1994 letter from the trial prosecutor to defense trial

10  counsel which is discussed below— records of payments or the fact of payments to Polk or for

11  his benefit from June 1994 through August 1995 were never disclosed to Conley's trial counsel.

12  The basis for these findings is set forth below.

13    First, Conley's trial counsel testified at the evidentiary hearing that, other than the

14  October 1, 1994 letter, he never received any documents or records indicating the Polk had been

15  paid from June, 2004 through August 2005, or was told about the existence of such payments or

16  benefits. I credit this testimony in light of all of the evidence in this proceeding which

17  corroborates it.

18    Second, the trial prosecutor testified he has no recollection of ever seeing any of the

19  records documenting payments or benefits to Polk. He never saw receipts in the police file. He

20  does not recall anyone giving him receipts at any other time. They were not in the District

21  Attorney's case file. The trial prosecutor testified they were not the kind of documents he would

22  _____

23  [9] The receipt was found in the Polk witness protection file and in close proximity to the records
of all of the other benefits to Polk. (Ex. 61.) Providing food or groceries to Polk is consistent

24  with the benefits Sanders testified he provided during to Polk this time. The groceries were paid

25                                                                                                    19

1    keep in his files. This testimony is corroborated by the fact that, during pre-evidentiary hearing

2    discovery, records of payments and benefits to Polk at issue in this proceeding were not found in

3    either the District Attorney's file or the San Francisco Police Department homicide investigatory

4    file. (Ex. 119, ¶¶9-11.) They were found later in this proceeding (in late March-early April

5    2010), in a separate witness protection file for Clifford Polk maintained in 1994 and 1995 by

6    Sanders. (*Id.* ¶9; Ex. 61.)

7           Third, the trial prosecutor does not recall whether he ever had a conversation with

8    Inspector Sanders about the amount of money being paid to Polk in the Conley case. This is

9    consistent with the trial prosecutor's testimony that even if he had seen records of payment and

10   benefits, he wouldn't likely turn over receipts to defense counsel. The trial prosecutor testified

11   that it was his practice to seek out only "generic" information from the inspectors about details of

12   Polk's status, because he believed details, including the magnitude of the disbursals, could

13   indicate Polk's whereabouts and jeopardize his safety. RT 180-181.[10]

14          Inspector Sanders, however, in direct contradiction to the trial prosecutor, testified at

15   length in this proceeding that he turned over or made available everything to the trial prosecutor

16   – including receipts reflecting payments to Polk. (Ex. 115 at 71-75.)[11]  According to Sanders,

17   he held nothing back from the prosecutor, with whom he was in "constant communication" about

18   the case. *Id.* at 178. Sanders testified that he updated the trial prosecutor as new receipts were

19   added to the case file. (*Id.* at 141.) Sanders testified that it was his practice to inform the

---

21   for with a personal check, which is also consistent with the evidence that established that Sanders
     had access to a checking account that he used to pay for benefits to Polk.

22   [10] To the extent this is proffered as a justification for non-disclosure, it is unavailing. Moreover,
     the contemporaneous record in the Conley case shows that the trial prosecutor did disclose dollar

23   amounts when he produced a November 4, 1991 CWPP application for Polk from the Green case
     (Ex. 1), and the July 25, 1994 memo, which had a ▮▮▮▮▮▮▮▮▮▮(Ex. 8).

24   [11] The State did not call Sanders as a live witness at the evidentiary hearing, relying instead on
     his videotaped deposition testimony. (RT 87:15-89:1.)

25                                                                                            20

lol

1  prosecutor promptly of what was being provided to Polk, even including benefits paid to Polk on

2  October 14, 1994, after Polk's testimony was completed but while the Conley trial was still

3  going on. (Ex. 116 at 228-229.)[12]

4      The complete dichotomy between the police inspector's testimony and the trial

5  prosecutor's testimony cannot be explained. However, it need not be resolved for purposes of

6  determining that this evidence was suppressed because it is undisputed that only the trial

7  prosecutor—not Sanders or anyone in the SFPD—produced discovery and made disclosures to

8  Conley's trial counsel. Regardless of Sanders' testimony on this issue, because the trial

9  prosecutor testified he never saw the receipts reflecting payments to Polk or for his benefit,

10  Conley's trial counsel could not have received them.

11      Real Party contends nonetheless that the information evidencing payments to Polk was

12  not suppressed. This contention is based on the trial prosecutor's testimony in this proceeding

13  that he understood his obligations under *Brady* and *Giglio*, and that it was his practice in all

14  cases, including this one, to keep defense counsel apprised of discovery. The trial prosecutor

15  contends that he would have made *oral* disclosures of benefits to Polk in generic form to

16  Conley's trial counsel. I do not find this argument persuasive. The trial prosecutor's May 22,

17  2009 declaration, filed in connection with the State's return in this proceeding, does not mention

18  any supplemental oral disclosures to defense counsel. (Ex. 12.) The declaration asserts that the

19  trial prosecutor did "not recall receiving from inspectors or providing to the defense specific

20  details" regarding "any cash disbursements" to Polk. (*Id.* at ¶19.) Further, the trial prosecutor

23  [12] Sanders amplified what he meant by "constant communication:" "This is how it worked. I
would tell him, 'Hey, Polk came by today and I' – 'He's stashed over in [location] and I gave

24  him 50, 60 bucks to survive on until' – 'when do you need him again?' That kind of – so the DA
was apprised of the fact that we were helping the guy." (Ex. 115 at 178.)

1    testified in this proceeding that he has no actual specific recollection of orally disclosing any

2    matters pertaining to benefits to Polk. (RT 167-169.)

3         Further, the record in the Conley case and the evidentiary record developed in this

4    proceeding support the finding that—other than the October 1, 1994 letter, which did not give a

5    complete or accurate disclosure—benefits and payments to Polk in Conley's case were never

6    disclosed to Conley's trial counsel orally or in writing.

7         The evidence shows the following, most of which is undisputed. The trial prosecutor

8    testified that discovery issues in the Conley case had been so contentious that he believed

9    defense counsel was trying to build a record for appeal; as a result, for months before the trial

10   started, the trial prosecutor resorted to putting all disclosures in writing. (RT 144-145; see, e.g.,

11   Ex. 8, 10, U, V.) By the time of trial, the trial prosecutor testified he was so wary of defense

12   counsel that he put everything in writing. (RT 166-167.) These writings included the July 25,

13   1994 memo (Ex. 8), and written disclosures about a phone call that Conley allegedly made to

14   Polk on September 5, 1994 (Ex. U.) Yet it is undisputed that the trial prosecutor made *no* record

15   of disclosing that payments and benefits were being given to Polk during this same time frame.

16        The absence of a written record of disclosure of payments and benefits to Conley is more

17   striking because defense counsel had been relentlessly asking the prosecution for disclosures for

18   months leading up to Conley's trial. The pretrial record in the Conley case is replete with

19   discovery motions and accusations that materials were not being turned over. *Brady* and *Giglio*

20   were topics of discussion at hearings before the trial judge.[13] Benefits and payments to Polk

21   were not disclosed on the record in the Conley case. The impression was conveyed that Polk

22

23

[13] And not just as to Polk. On August 25 and 26, 2004 there were pretrial hearings and a motion

24   for a preclusion sanction because of an alleged Brady violation involving another witness. (Ex.

     79, at 37-39, 43-61.) The motion was denied without prejudice.

25                                                                                              22

1   was not in witness protection and was receiving no benefits for his testimony. The transcripts of

2   the Conley pre-trial proceedings make this clear, as I set forth below.

3          On March 28, 1994, about six months before trial, Conley's counsel filed a motion for

4   discovery under *Giglio*, broadly asking for all evidence of any benefits or inducements offered or

5   given to any witness, including specifically demanding "witness protection" benefits, "housing

6   relocation services," and money provided to a witness for "food" or other "necessities of life."

7   (Ex. 4.) The trial prosecutor did not oppose the *Giglio* motion at the time. At the evidentiary

8   hearing before me, the trial prosecutor testified that defense counsel's request was appropriate,

9   and the District Attorney was obligated to produce such information in any event. (RT 147:17-

10  24.)

11         On May 6, 1994, the trial prosecutor filed a broad declaration in the Conley case that he

12  had obtained and caused to be duplicated each and every police and District Attorney file

13  maintained in connection with the case. (Ex. 118 at 208-210.) He reiterated this statement in

14  open court at a pre-trial hearing in 1994. *Id.* ("every document, tape recording and videotape

15  compiled by the San Francisco Police Department in connection with the investigation of these

16  homicides").

17         When the *Giglio* motion was granted on May 26, 1994, the prosecutor stated on the

18  record that he had "no problem" with the motion and would produce all evidence of inducements

19  or threats to testifying witnesses. (Ex. 76 at 5:5-17.) At the evidentiary hearing in this case, the

20  trial prosecutor testified that he understood his obligation was ongoing and applied to new

21  material discovered or created after the *Giglio* motion was filed. (RT 149.)

22         The issue of discovery of benefits and inducements to witnesses came into even sharper

23  focus in July, 1994. Inspector Sanders gave a televised interview to KTVU news stating that a

24  witness in Conley's then-upcoming trial had requested protection and relocation assistance from

25                                                                                          23

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No.
2447917

1  the State, but Inspector Sanders was unable to provide it due to budget cutbacks. (*See* Ex. 5.)

2  Conley's defense counsel immediately wrote a letter to the trial prosecutor after learning about

3  the interview, specifically referred to the *Giglio* motion that had just been decided, and requested

4  a description of offers made to the witness Sanders was referring to in his interview.[14]

5        I find credible Conley's trial counsel's testimony in this proceeding that, at the time he

6  wrote this letter, he did not know of any witness protection or witness relocation benefits being

7  offered to Polk in connection with Conley's case. (RT 355-356.)

8        On July 18, 1994, Conley's defense counsel followed up with a formal written "Motion

9  to Disclose Confidential Informant (Part II) and For Other Discovery," seeking the identity of the

10  witness referred to in the KTVU interview and requesting, among other things, "that the

11  prosecution disclose all offers and inducements in the form of promises or of efforts to secure

12  witness protection offered to any witness in this case." (Ex. 6.)

13        The court held a hearing on defendant's motion on July 29, 1994. The trial prosecutor

14  did not oppose defense counsel's request for witness protection information. (RT 155-157.) He

15  confirmed that Sanders had been referring to Clifford Polk in the KTVU interview. (Ex. 7 at

16  3:11-4:18.) Conley's defense counsel again demanded production of all evidence of threats and

17  offers of inducement, because there appeared to have been a discussion of these issues with Polk.

18  (*Id.* at 4.) The trial prosecutor then stated at the hearing: "I do have a memo containing the

19  things that happened to Mr. Polk and the fact that we did try to get him in the witness protection.

20  . . . *He is not being relocated at this point.*" (*Id.* at 4:11-16) (emphasis added).

21

22

23  [14] The letter said, in part: "There was a *Giglio* motion granted in this case which, as I interpret it,
    required you to disclose offers of protection given to prosecution witnesses. You have failed to
24  do so. Please provide me with a description of offers made to this witness, or I will have to seek
    sanctions." (Ex. 5.)

25                                                                                    24

1    The trial prosecutor was describing a memo dated July 25, 1994, from Sanders to his

2    superior in the police department regarding ███████████████████████████████████.

3    ████████████." The memo cites an██████████████████████████████████████████

4    ████████████████████' (Ex. 8.) Sanders recommended that Polk███████████████

5    ████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ████████Id. The memo included███████████████████████████████████████████

8    ████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████

10   ████████████████████████████ The memo also recommended██████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████

13   Thus, I find that as of the pretrial hearing on July 29, 2004, defense counsel was left with

14   the unequivocal statement by the trial prosecutor that Polk was *not* in witness protection. Nor

15   were any benefits to Polk of any type disclosed by the State.

16   I further find that defense counsel's impression was completely wrong. It is undisputed

17   that on███████████ Sanders paid Polk cash for food, money and transportation. (Ex. 18, at p.

18   624.) Clifford Polk███████████████████████████████████████████████████████████

19   ████████████████████. This was the first of more than ███cash payments to Polk, ending in

20   mid-1995. (Ex. 61 at SFPD 582.)

21   The subject of Clifford Polk and witness protection came up yet again at a pretrial

22   hearing a month later on August 30, 1994. Defense counsel was permitted to question Sanders

23   under oath about who he had been referring to in his KTVU interview. (Ex. 9 at 119-123.) On

24   August 30, 1994, Sanders testified—as the trial prosecutor had represented to the court and

25

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891: COURT No.
2447917

1   counsel at an earlier pre-trial hearing – that the witness was Clifford Polk. (Ex. 9 at 119.)

2   Sanders was asked whether he had "logs, notes or other memoranda concerning the interviews

3   you had with Mr. Polk with regard to the threats and/or with regard to his request for protective

4   housing." Sanders testified at the pre-trial hearing, "I did make a note. And you've been

5   provided with that document." (Ex. 79 at 120.) Sanders was referring to the July 25, 1994

6   memo. (Ex. 115 at 163.)

7        *Neither Sanders nor the trial prosecutor disclosed at the hearing on August 30, 1994 that*

8   *Polk had already received direct cash payments from Sanders.* (Ex. 61 at SFPD 554, 582-585.)

9   I find that on ▮▮▮▮▮▮▮▮, Sanders gave Polk▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 8 at p 625.) On August 12, 1994,

11  Sanders received a lump sum check from the SFPD witness protection program for $1030 (Ex.

12  61 at SFPD 638), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮ (Exs. 16, 38 & Ex. 116 at 238, 261.) By August 31, 1994, the day after

14  Sanders' pre-trial hearing testimony, the recordkeeping for the payments became even more

15  formalized; now when▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮" (Ex. 18 at p. 628.)

20        The fact that Sanders testified under oath on August 30, 1994 and failed to disclose that

21  payments were already being made to Polk causes me to conclude that he knew the payments

22  were material, and to question the credibility of his videotaped deposition testimony admitted in

23  evidence in this proceeding. Real Party attempts to excuse Sanders's failure to disclose to the

24  Court and counsel on August 30, 1994 that payments were being made to Polk by arguing that

25                                                                                    26

1 | the purpose of this particular hearing was limited by the trial judge to the issue of who Sanders

2 | was referring to in his KTVU interview. (Ex. 9 at 118.) Even so, that did not excuse the

3 | prosecution's obligation to make its disclosures under *Brady* and *Giglio*, which existed

4 | independently of the August 30, 1994 hearing.

5 |     Furthermore, Sanders himself knew that it was his obligation to disclose payments to

6 | Polk on August 30, 1994, and that it was Police Department policy to do so. At his deposition in

7 | this proceeding, Sanders testified that if witness protection funds had been provided to Polk as of

8 | August 30, 1994, he would have mentioned it to the Court and provided documentation; he even

9 | volunteered that this "was the policy." (Ex. 115 at 163:24-164:10.) Yet six weeks after Sanders

10 | made these statements under oath at his deposition, he made a written correction to his

11 | deposition testimony, stating that "I would have mentioned that in court at this hearing if I had

12 | been asked a question about it. I was not asked any question about witness protection funds at

13 | this hearing. …I would not just blurt out facts in court that were not responsive to the questions I

14 | was asked in court." (Ex. 115, correction for 164:3-6.)

15 |     I find this correction, and Real Party's argument about the limited scope of the August

16 | 30, 1994 hearing, not credible and unpersuasive. I further find that Sanders's attempt to

17 | backpedal from his obligation to disclose, and Real Party's reliance on his corrected testimony,

18 | weaken the State's position that "the record is clear" that Sanders told the trial prosecutor about

19 | the money he was giving to Polk during the Conley prosecution and that the trial prosecutor

20 | disclosed it in a "generic" way to Conley's counsel.

21 |     The record of non-disclosure in the pretrial record continued. On September 5, 1994, in

22 | compliance with his May 26, 1994 promise to the Court to turn over all evidence of anything that

23 | could be construed as a threat to a witness, the trial prosecutor sent a brief letter to defense

24 | counsel reporting that Inspector Sanders had called him that afternoon: "[Sanders] says Clifford

25 |

27

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No.
2447917

1   Polk called him. Mr. Polk says that your client called him from jail. Sanders says the tenor of

2   the conversation was that your client asked Polk not to testify." (Ex. U.)[15] The letter indicates

3   that the trial prosecutor will fax over Sanders's notes of the call, as well as other discovery

4   regarding another witness. (Ex. U.) Notably, the trial prosecutor made no mention of any

5   benefits given to Polk related to Conley's alleged phone call, or otherwise.

6       Meanwhile, Sanders continued to give money to Polk, as evidenced by more █████

7   ████████████ completed for█ separate dates in█████████ (Ex. 61.)

8       By the time testimony in Conley's trial began on September 26, 2004 (Ex. 80 at 276,

9   311), both the trial prosecutor and the lead police inspector had directly and by implication told

10   Conley's counsel that Polk was not receiving any witness protection benefits in Conley's case.

11       On October 1, 1994, the Saturday before the Monday that Polk testified in Conley's case,

12   the trial prosecutor sent defense counsel a letter stating, *"Clifford Polk has been relocated*

13   *temporarily to an out of town location and is receiving room and board while the trial lasts."*

14   (Ex. 10; emphasis added.) At the evidentiary hearing in this proceeding, the trial prosecutor

15   defined "room and board" as "a place to stay and meals." (RT 172:22-26.) I find this letter is

16   incomplete and misleading. By October 1, 1994, Sanders had been giving Polk benefits for three

17   and a half months. Based on Sanders' receipts, these cash payments totaled at least█ by the

18   time of the trial prosecutor's October 1, 1994 letter. (Ex. 61.)

19       Further, the October 1, 1994 letter did not refer to witness protection or threats, or to any

20   earlier relocation of Polk in connection with Conley's case. After the trial prosecutor had

21   disclosed Sanders's July 25, 1994 memo requesting witness protection funding for Polk, both the

22   trial prosecutor and Sanders had told defense counsel and the trial judge that the State had *not*

23

24   [15] Sanders's notes, made after he got off the telephone with Polk, state that Conley reportedly
     asked Polk, "Why are you telling all those lies about me?" (Ex. V.)

25                                                                                    28

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No.
2447917

1  been able to provide witness protection benefits for Polk. Nothing in the October 1, 1994 letter

2  contradicted these statements. Defense counsel had no reason to link the July 25 and October 1

3  letters, or assume that the October 1 letter was connected to formal witness protection. The

4  October 1 letter contained none of the specific information contained in the July 25 letter about

5  ███████████████████████████  Similarly, the September 5, 1994 letter describing a

6  phone call from Conley disclosed nothing about action taken in response. On the state of the

7  record, I find it was not unreasonable for defense counsel to believe that Polk was receiving a

8  hotel room and meals as a witness convenience, not for witness protection, "while the trial lasts."

9  (RT 374-375.)

10  By October 3, 1994, when he testified against Conley, Polk had received at least ███ in

11  benefits over the preceding three month period. Immediately after he testified favorably to the

12  prosecution, the pace of benefits increased. Polk received ████████████████████████

13  ██████████, and ████████████████████████████, for a total of ████

14  ███████████ after testifying against Conley. (Ex. 61.)

15  Witness testimony was completed on October 7, 1994. Closing arguments were

16  completed on October 10, 1994.

17  Sanders testified in this proceeding that he arranged for a six month lease on a single

18  family house for Polk's benefit, and Polk moved in on October 14, 1994. (Ex. 115 at 198-199.)

19  (Ex. 18 at SFPD 2314-2315.) Sanders testified in this proceeding that Polk was living with a

20  relative out of town during the trial. (Ex. 115 at 202-203.) The lease and all expenses paid

21  housing, arranged for by Sanders, were never disclosed to Conley's counsel. (RT 312:8-12.)

22  In the five weeks after testifying against Conley, Polk also received approximately ████

23  in cash from Sanders. (Ex. 61.) None of these benefits were disclosed to Conley's counsel. (RT

24  312:8-12.) The six-month lease was entered into and the cash payments were made after Polk

25

29

1  testified and *prior* to the next concrete threat against Polk – the November 13, 1994 shooting at

2  Polk's mother's house in San Francisco. Polk continued to receive cash disbursements and/or

3  payments for his benefit until approximately August 1995. (Ex. 61.)

4  In an effort to avoid the consequences of the non-disclosure here, Real Party contends

5  that the July 25, 1994 memorandum████████████████████ sufficiently

6  disclosed the nature and amount of benefits that were eventually provided to Polk or that Polk

7  "stood to receive." (Real Party's Post Hearing Brief at 49, 51.) This argument fails for several

8  reasons. The State repeatedly informed Conley's counsel that Polk was *not* in witness

9  protection. Sanders testified under oath to this effect. When the State produced the memo to

10  which Sanders had referred (the July 25, 1994 memo), it was in the context of attesting that the

11  amounts███████████████ were *not* being provided to Conley. The State cannot,

12  16 years later, rely on the July 25, 1994 as sufficient notice of benefits that *might* eventually be

13  given to Polk, just because the amount paid to Polk approximately matches up with the numbers

14  in the July 25 memo.

15  Real Party's legal authority does not support a contrary conclusion, in light of the

16  evidence of suppression that I find in the record. Real Party relies on *United States v. Schaffer*,

17  789 F.2d 682 (9th Cir. 1986) in asserting that the State did not suppress evidence because

18  Conley's defense counsel failed to ask for details regarding relocation assistance and cash

19  benefits to Polk. *Schaffer* provides no support for this position. In *Schaffer*, as here, defense

20  counsel made a specific discovery request for, among other things, promises the government

21  made to key witnesses in exchange for cooperation. In *Schaffer*, the government responded with

22  benefits given to a witness in defendant's case, but withheld information about benefits given to

23  the witness by the government in another case. The Ninth Circuit rejected the argument that

24  suppression was excusable because, since defense counsel knew about benefits to the witness in

25  30

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No.
2447917

1   connection with the defendant's case, counsel could have asked about additional benefits on

2   cross-examination. *Id.* at 690. The court in *Schaffer* held the suppressed evidence was material

3   notwithstanding the other disclosures, and reversed the conviction.

4       Real Party's reliance on *Maharaj v. Sec'y for Department of Corrections*, 432 F.3d 1292

5   (11th Cir. 2005) to argue that there was no suppression of evidence here is also unavailing. In

6   *Maharaj*, the prosecutor wrote to defense counsel and disclosed the existence of a polygraph

7   report, advised that the witness had made material corrections and additions to his previous

8   testimony, and invited defense counsel to re-depose the witness. On the facts of that case, it was

9   not a *Brady* violation not to have produced the report itself. Here, however, the prosecution

10  repeatedly denied that Polk was in witness protection, and stood by silently even at trial when

11  Polk testified under oath that he was not in witness protection in the Conley trial. On the facts of

12  this case, *Maharaj* does not excuse the State from its obligations under *Brady/Giglio* over the

13  entire pretrial and trial period in the Conley case simply because Conley's counsel did not press

14  for details about how much money was involved in providing Polk "room and board while the

15  trial lasts," as stated in the prosecution's October 1, 1994 letter. In fact, the pretrial record in the

16  Conley prosecution shows that defense counsel asked about benefits and inducements to

17  witnesses in this case again and again.

18      2. **Three IOU's by Polk to Sanders dated in July 1991, eight months before the**

19  **March 1992 trial of Paul Green for the same murders. (Ex. 45.)** These IOU's totaling $41

20  show that Sanders made loans to Polk outside the context of any witness protection program. I

21  find that this evidence was suppressed. Defense counsel never received these documents. The

22  trial prosecutor testified he had never seen them before the habeas petition was filed and they

23  were not in his case file. (RT 197.) As noted above, only the trial prosecutor provided discovery

24  in the Conley case.

25                                                                      31

1       3.  **A July 10, 1992 letter from Polk to Sanders, where Polk called himself Sanders's**

2   **"son in law" and told Sanders "I still love you," before signing off with a request for $200**

3   **for clothes.  (Ex. 48.)**  The trial prosecutor testified at this proceeding that he does not recall any

4   personal correspondence from Polk to Sanders, and does not remember ever seeing this letter.

5   (Ex. 48.)  I credit this testimony, as well as defense counsel's testimony that he never received the

6   July 10, 1992 letter during Conley's trial, and conclude it was not disclosed.  The handwritten

7   letter from Polk is personal, affectionate, and expresses appreciation "for everything you [sic]

8   done for me as far as guiding me from destruction to learning about life."  It expresses Polk's

9   hope that "when I come home I really want to maintain the same relationship we have now and a

10  little bit more."  It states, "I still love you ..."  The letter closes with a "PS" asking for $200 for

11  some clothes, which Polk acknowledges is "a lot of money."  *Id.*

12      4.  **A report prepared by the San Francisco Probation Department dated October 6,**

13  **1994 regarding Clifford Polk's upcoming sentencing for narcotics violations.  (Ex. 49).**

14  October 6, 1994 was the day before the last day of testimony in the Conley trial.  The San

15  Francisco Probation Department prepared a presentencing report regarding Polk's then pending

16  narcotics cases.  The report states that Polk was receiving "*$60 every three or four days or*

17  *approximately $120 a week or $480 month*" and that Polk "believes it is from the San Francisco

18  Police Department *for services provided to them*." (emphasis added)  The report also states that

19  Polk had previously been employed at "Sanders Security Firm of South San Francisco."  The

20  probation officer described Polk as an "unrepentant" criminal, a conclusion that directly

21  contradicted Sanders's efforts at Conley's trial to portray Polk as a decent and credible young

22  person.  The trial prosecutor agreed at the evidentiary hearing before me that the probation report

23  contained several damaging statements and had to be disclosed to Conley's trial counsel.  (RT

24

25                                       32

1   207-208; 299.)  There is a factual dispute as to whether this report was disclosed.  For the reasons

2   set forth below, I find that it was not disclosed.

3         First, Conley's defense counsel is emphatic that he never saw the probation report and

4   "could not have forgotten it" if he had.  (RT 396-397.)  It is undisputed that no copy of the

5   probation report was found in the San Francisco Police Department's or the District Attorney's

6   files for the Conley case during pre-evidentiary hearing discovery in this proceeding.  (Ex. 119,

7   ¶4.)  The copy found by the State and produced to Conley in connection with pre-evidentiary

8   hearing discovery in this proceeding was found in the District Attorney's file for a separate

9   narcotics case against Polk filed in 1999, five years after Conley's conviction.  (*Id.* ¶5.)  These

10  facts support the finding that the probation report never made its way to Conley's defense counsel

11  at all.

12        Further, I credit Bergerson's testimony that he could not have forgotten about the report

13  if it had been disclosed to him.  (RT 396.)  By October 6, 1994, Bergerson had filed multiple

14  motions seeking disclosure about inducements for Polk's testimony in an effort to impeach the

15  credibility of the State's linchpin witness.  The probation report contained information that had

16  *never* been disclosed:  Polk's receipt of weekly payments from the Police Department, which

17  gave the impression that Polk was actually working for the Police Department; Polk's

18  employment with an entity called "Sanders' Security Systems";[16] and the description by the

19  probation officer of Polk as a recidivist criminal who was a "marginal candidate for probation"

20  without remorse.  (Ex. 49.)  I credit Bergerson's testimony that had this been turned over to him

21  during Conley's trial, he would have, at a minimum, recalled Polk and Sanders to the stand and

22  asked about Polk's weekly "salary" from the Police Department, his employment with Sanders

23

24

25                                                                                              33

1 Security Systems, and the fact that Polk's probation officer described him in such unfavorable

2 terms. (RT 399-401.) The fact that these witnesses were not recalled corroborates that the report

3 was not disclosed.

4      In addition, the Conley trial record is completely silent regarding this probation report,

5 either in front of the jury or outside its presence.

6      The trial prosecutor, on the other hand, believes he disclosed the probation report during

7 Conley's trial, although he has no specific recollection of doing so. There is nothing to

8 memorialize that the disclosure occurred. The evidence and inferences drawn from the evidence

9 lead me to conclude it did not happen. As noted above, the trial prosecutor testified that

10 discovery issues had been so contentious that the trial prosecutor put everything in writing by the

11 time of trial. Judging from the date of the probation report, it would have been disclosed, if at all,

12 during the period of time when the trial prosecutor would have made a record of disclosures. Yet

13 it is undisputed that the trial prosecutor made no record of disclosing the probation report, either

14 orally or in writing. Given the admitted contentious relationship between counsel on discovery

15 issues, the absence of any written record corroborates defense counsel's position, and my finding,

16 that it was never disclosed.

17      5. **Handwritten notes that appear on a San Francisco District Attorney file folder**

18 **for one of Polk's narcotics cases. (Ex. 62.)** The evidence at issue is the same evidence that

19 forms that factual basis for one of Conley's *Napue* claims, which I have found to be without

20 merit. *See* Part III.B, *supra*. There is a factual dispute as to whether this evidence was

21 suppressed. I conclude it was not.

22

23

24 [16] At the evidentiary hearing, it was established that Sanders owned a business called Sanders Security Systems. (Ex. 108; RT 705.) Other than the probation report for Polk, there was nothing in the trial record to connect Polk with ever having worked for a business by that name.

25

34

1    Petitioner assumes that the file folder in question (Exhibit 62) was in Assistant District

2   Attorney Farrell's hands when he testified at Conley's trial. The trial record indicates that this

3   file was handed over to defense counsel at the trial itself, upon his request; that he asked for an

4   opportunity to review it, which was granted; and that defense counsel had seen the file before.

5    This is what the record shows on this point: At the Conley trial, defense counsel's first

6   question to Farrell on cross-examination was "[c]ould I see the files?" (Ex. 85 at 943:14-15),

7   referring to the "two files that go to Mr. Polk's narcotics cases" that had been the subject of the

8   direct examination of Farrell. (*Id.* at 938:4-9.) Farrell handed the files to Conley's defense

9   counsel, who then said, "If I could just have a moment, Your Honor. I've never seen these

10  before except for one second with Mr. Giannini." (*Id.* at 943:16-18.) The request was

11  apparently granted without comment by the trial judge, and defense counsel then resumed his

12  questioning. On this record, Petitioner has not met his burden of establishing that the evidence

13  was suppressed; Conley's defense counsel not only acknowledged at the trial that he had seen

14  the files before, but then had further opportunity to look at them during the trial. The Court is

15  not persuaded by defense counsel's testimony at the evidentiary hearing in this proceeding that

16  he had not seen Exhibit 62 before. (RT 532-539.) Defense counsel's testimony on this point was

17  inconsistent, speculative, and ultimately not persuasive. On this record, the Court cannot state

18  that Exhibit 62 was suppressed.

19       B. Was the suppressed evidence favorable to the excused?

20   All of the evidence that was suppressed (the records of payment, the IOU's, the "I still

21  love you letter" to Sanders and the October 6, 1994 probation report) was favorable to Conley

22  because it could be used to impeach the testimony of Polk and Sanders. Real Party does not

23  dispute that evidence of payments and benefits to a witness comes within the purview of material

24  that must be disclosed to defense counsel. So, too, there is no dispute that the close personal and

25                                                                                      35

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT NO. 5891; COURT NO.
2447917

1   financial relationship between Sanders and Polk, including Polk's employment at Sanders's

2   security company, and the IOU's had to be disclosed to defense counsel. I find that the totality

3   of the suppressed evidence helps the defense and hurts the prosecution by casting doubt on the

4   credibility and reliability of Polk – the State's linchpin witness – and Sanders, the co-lead

5   investigator in the case to whom Polk came forward with evidence against Conley.

6           C. Is there a reasonable probability that if the evidence had been disclosed the result of

7   the proceeding would be different?

8           I have already concluded in Part III that there was material *Napue* error in connection

9   with the presentation of Polk's false testimony, sufficient to warrant a new trial. As set forth

10  above in Part II, if a *Napue* error is not material standing alone, the court is to "consider all of the

11  *Napue* and Brady violations collectively" and ask whether there is a reasonable probability that,

12  but for the errors, the result of the proceedings would have been different. *Jackson v. Brown*, 513

13  F.3d at 1076. Thus for purposes of the analysis in this section, I consider Polk's false testimony

14  as part of the collective series of errors in this case, and as if it were not material standing alone,

15  and apply the *Brady/Giglio* standard of materiality to all of them.

16          For the reasons set forth below, I conclude that there is a reasonable probability that if the

17  evidence had been disclosed, the result of Conley's trial would have been different.

18          The case against Conley depended on the testimony of Clifford Polk. It is undisputed

19  that the prosecution could not have been brought without Polk's testimony. (Ex. 1 at 373.)

20          As set forth above in connection with the analysis of the Napue claim (*see* pp. 12-13,

21  *supra*), no physical evidence or eyewitness testimony linked Conley to the crime. The only

22  proof tying Conley to the murders was the testimony of two witnesses, John Johnson and

23  Clifford Polk. John Johnson, a convicted murderer and crack user, was an admitted accomplice

24  to the murders. He confessed to driving one of the two cars involved in the shooting and claimed

25                                                                                              36

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No.
2447917

1   Conley had been a passenger in the other car.  Under long-established law, no conviction for any

2   crime can be based on the uncorroborated testimony of an accomplice.  *See* Cal. Penal Code

3   Section 1111.  The trial prosecutor confirmed at the evidentiary hearing that Johnson's

4   testimony, by itself, could not have convicted Conley.  (RT 139-139.)  Sanders, too, understood

5   that, without Polk as a witness, he could not even bring the case to the District Attorney for

6   prosecution.  (Ex. 115 at 105-107.)  At trial, the prosecution presented no other witness or

7   evidence to corroborate Johnson besides Polk.  (RT 138-139.)  The prosecuting attorney argued

8   in closing that as between Johnson and Polk, Polk "is the more important" of the two witnesses.

9   (Ex. 86 at 1238.)

10       Polk's credibility was thus central to the case.  So, too, was the credibility of Inspector

11   Sanders.  Sanders was the co-lead investigator in the Green and Conley cases.  Sanders conveyed

12   to the jury that he viewed Polk as a good young man in unfortunate circumstances who was

13   worth the investment of Sanders's considerable effort and time.  Sanders's stature and experience

14   gave Polk an additional aura of credibility.  (Ex. 85 at 907:6-22.)

15       The fact that Clifford Polk was apparently testifying without any benefits to himself

16   whatsoever further enhanced Polk's credibility.

17       Polk testified falsely.  He was in the San Francisco witness protection program, according

18   to Sanders, contemporaneous internal police department records, and the multiple receipts for

19   cash vouchers signed by Polk and maintained by Sanders.  Had these facts been disclosed to

20   Conley's defense counsel, he could have impeached Polk for testifying untruthfully about the

21   benefits he was receiving.  Had the ▮▮▮▮▮▮▮▮▮▮ receipts been disclosed and not

22   suppressed, Polk could have been impeached with documents showing his signature accepting

23   payment again and again for witness protection in connection with Conley's trial.  (Ex. 116 at

24   238:7-20.)  (Ex. 61; Ex. 18.)

25                                                                                          37

1    The State argues that there is no reasonable probability that the outcome of the trial

2  would be different if the evidence had not been suppressed, because Conley's trial counsel would

3  not have sought to use evidence that Polk was in a witness protection program. This argument

4  ignores the fact that, had the evidence not been suppressed, Conley's counsel might have argued

5  to the jury that the payments and benefits to Polk weren't ordinary witness protection at all,

6  notwithstanding that Sanders funded the payments through the San Francisco Police Department.

7  Conley's counsel might have argued that the unorthodox arrangements suggest the payments

8  were benefits being paid so that Polk would testify favorably for the prosecution.   Sanders

9  admitted that Polk was free to come and go as he pleased, that he was not kept under guard or at

10  a secure location, and that Polk came to the centrally located police department offices to pick up

11  his cash payments, apparently on demand. If Polk's safety were truly an issue of concern to

12  Sanders and the prosecution, Conley's attorney might argue why Sanders would permit an

13  arrangement where Polk could come freely to the Hall of Justice to pick up his payments.

14  Sanders conceded that Polk, still a criminal defendant with pending narcotics charges, could

15  have spent the cash on anything Polk wanted. (Ex. 115 at 142.) Conley's trial counsel might

16  have argued that, for a recidivist drug dealer without a regular place to stay, ▓▓▓ in cash with no

17  strings attached was a significant amount of money, giving Polk an incentive to implicate

18  Conley. (RT 378-379; 383-387.) Polk's statements to the San Francisco Probation Department

19  in the suppressed October 6, 1994 report that he was receiving money from the police

20  department for "services provided" raised another serious question as to the true nature of the

21  payments to Polk and his relationship to the law enforcement officers in this case. (Ex. 49.)

22  What were the "services provided" by Polk to the San Francisco Police Department?   The

23  suppressed evidence suggests Polk was a salaried employee and/or receiving a reward or an

24  inducement to testify, all of which would impeach Polk's and Sanders's credibility. The

25                                                                                    38

1 | suppression of all of this evidence denied Conley's counsel the opportunity to present the full

2 | factual record and to argue that the jury draw its conclusions based on that record.

3 | In addition, defense counsel would have been able to use evidence of benefits to Polk

4 | before and after the Green trial, including the IOU's to Polk in Sanders's handwriting and Polk's

5 | July 10, 1992 "I still love you" letter to Sanders. It is true that at Conley's trial, defense counsel

6 | examined Polk and Sanders about the nature of their relationship with the evidence defense

7 | counsel then knew.[17] But Polk would not admit to being anything more than "just friends" with

8 | Sanders. (Ex. 84 at 769-770.) The July 10, 1992 letter, however, with its request for cash, was

9 | impeachment evidence in Polk's own handwriting, and filled with sentiment and statements that

10 | were much more vivid than describing Sanders as a "step father" or "uncle." Also, Polk

11 | described the $200 he requested in the July 10, 1992 letter to Sanders as "a lot of money." (Ex.

12 | 48.) This description would have allowed defense counsel to use "Polk's own words against

13 | [him] if he claimed" that the cash Sanders was giving him in the Conley case – in excess

14 | by the time Polk testified – was trivial or just for incidental expenses. (RT 414.) Had defense

15 | counsel learned about the cash and housing benefits Polk received after his testimony but before

16 | the jury returned a verdict, he could have recalled Polk and Sanders to the stand. (RT 388-389.)

17 | If the jury knew that Polk had expressly denied being in witness protection, but had received

18 | cash and housing benefits, this would, in defense counsel's words, have "made this a different

19 | case." (RT 388-389.)

20 | But because of the State's suppression of evidence, the jury did not hear this evidence.

21 | They knew only that Polk had a friendship with Sanders, did odd jobs at Sanders's house from

22 |

23 | [17] Conley's trial counsel had a March 13, 1992 report from Paul Green's investigators in the Green case which stated that Polk described "Sanders as his step-father." (Ex. PP.) At Conley's

24 | trial, Polk denied numerous statements Green's investigators said he had made to them. *(See, e.g.*, Ex. 84 at 767-768; 823-824.)

25 |

39

1  time to time, and had been enrolled in the State Witness Protection program in the Green case.

2  Defense counsel knew in addition that Polk was receiving "room and board while the trial

3  lasted" – a fact he deemed insignificant in the context of the disclosures made to him by the

4  prosecution at Conley's trial.

5      The State thus created the impression that Sanders was a good-hearted police officer

6  trying to help a young man who was caught in a bad situation, and who had some run-ins with

7  the law himself. (Ex. 85 at 922-927.) The State emphasized that Sanders had no intention of

8  influencing Polk's testimony. *Id.* The State's narrative at trial would have been very different if

9  the jury knew that Sanders had obtained a lump sum of cash and was handing it out regularly to

10  Polk during the months leading up to and during the Conley trial.[18]  In addition, one week after

11  Polk testified, he was given a lease on a house and continued to receive cash or benefits up to

12  approximately through August 1995, over six months after Conley was sentenced.

13      The State relies on *Elloqui v. Superior Court*, 181 Cal. App. 4th 1055 (2010) to argue that

14  post-trial payments to Polk cannot be material under *Brady*. *Elloqui* does not support this

15  position.  In *Elloqui*, the Court held that later occurring misconduct by a law enforcement officer

16  in unrelated cases – which would have been reflected in complaints in the officer's personnel file

17  – was not material under *Brady*, since any misconduct would not have occurred at the time of

18  Elloqui's trial. *Id.* at 1068.  Here, however, the issue is not officer misconduct occurring in

19  unrelated cases after trial; the issue is the continued and accelerated payment of benefits to the

20  state's linchpin witness, which began pretrial, continued during trial, and resulted in undisclosed

21  housing and other benefits after trial.

22

23

[18] In 1994, Sanders received three checks for $1030 each in connection with his request for
24  "witness protection" for Polk from the San Francisco Police Department program. (Ex. 116 at
268-269; Ex. 38.)

25
                                                                                              40

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No.
2447917

1    The State relies heavily on *People v. Verdugo*, 50 Cal. 4th 263 (2010) to argue that that

2    even if the details of the cash payments and benefits to Polk had been suppressed, there is no

3    reasonable probability the disclosures would have altered the trial result. Implicit in Real Party's

4    argument is that suppression of witness protection evidence can never be prejudicial for

5    *Brady/Giglio* purposes. This argument is without merit given the evidence in Conley's case.

6        As an initial matter, the fact that some information may have been inculpatory does not

7    mean that *Brady* was not violated. *In re Sodersten*, 146 Cal. App. 4th 1163, 1226 n.39 (2007)

8    ("that portions of [evidence] may have been inculpatory, or at least unfavorable to petitioner,

9    does not mean there was no *Brady* violation").

10       Moreover, *Verdugo* is distinguishable from the facts of this case. In *Verdugo*, the former

11   prosecutor made an ex parte application to the court for relocation expenses for a witness to

12   cover first and last month's rent ($1098), activation of phone ($46) and gas ($25) and incidental

13   expenses to move out of town ($149). *Id.* at 284-85. The witness was defendant's sister-in-law.

14   The former prosecutor's declaration in support of the ex parte application stated that the witness

15   reported that defendant's uncle had, prior to defendant's arrest, told her that he knew someone

16   was "snitching" and would "take care of it" when he found out who; that the uncle, who had

17   taken to carrying a handgun, was present when the witness testified at preliminary hearing; that

18   the witness was fearful that defendant's gang associates or his relatives would seriously injure

19   her if she did not move out of town; and that defendant might kill her. *Id.* The witness then

20   actually testified at trial that the defendant's father had "threatened her, urging her to 'keep

21   quiet.'" *Id.* at 825. The relocation assistance to this witness was not disclosed to defense

22   counsel until after trial; the prosecutor who tried the case was personally unaware of the ex parte

23   application submitted by the former prosecutor. The trial court denied a motion for new trial

24   based on the failure to disclose the relocation assistance, and, on these facts, the Court in

25

41

1   *Verdugo* found no Brady error was "apparent" on habeas review. The *Verdugo* Court concluded

2   that even if "in isolation" some of the undisclosed information was favorable to defendant "such

3   as the financial assistance [the witness] received," there was no reasonable probability that its

4   disclosure would have changed the result of the trial. *Id.* at 285. As the Court wrote, if the

5   defense had attempted to present the evidence to undermine the witness's credibility, the

6   prosecution would have been entitled to present evidence explaining why the witness had been

7   relocated. *Id.* The Verdugo Court concluded on the facts of that case that this evidence would

8   have "effectively countered" the defense argument that the witness was benefitting, and it would

9   have enhanced her credibility. *Id.*

10      This case is factually quite different from *Verdugo*. First, there was no dispute in

11   *Verdugo* that the $1300 was used for witness protection (primarily first and last month's rent) to

12   move a witness who was threatened by the defendant's family members. There was no

13   suggestion that the protection given to the witness there was anything but genuine witness

14   protection. The threat occurred, the former prosecutor made an ex parte application to the court

15   under penalty of perjury, and relocation funds were provided. The witness in *Verdugo* received

16   relocation and payment of partial rent—not handwritten IOU's, a personal relationship with

17   police officers, or weekly cash payments on demand that were picked up without supervision at

18   the police department. On the facts in *Verdugo*, there was no advantage to the defendant to

19   present evidence of witness protection. Indeed, the jury already heard that Verdugo's father had

20   threatened the witness.  Here, by contrast, the history and the nature of the cash payments to

21   Polk were unorthodox and raised questions. Polk was permitted to come and go as he pleased

22   and received periodic payments of cash from the police inspector. Plus, Polk had a long history

23   of being taken special care of by the same police officer who was paying him the undisclosed

24

25                                                                                      42

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No.
2447917

1   benefits, including providing him with part-time employment and taking Polk to the police

2   inspector's home.

3        Second, the disadvantage to Verdugo's case in using the witness protection evidence was

4   enormous. Multiple family members had threatened the witness. Here, there were no threats

5   that were directly connected to Conley himself.[19] The trial prosecutor admitted at the evidentiary

6   hearing that he could not prove a connection between Conley himself and the April 21, 1994

7   attack. (RT 194-195.) Further, there was a factual issue as to whether the threats were

8   connected in time to when the alleged witness protection payments to Conley began. According

9   to Real Party's reconstruction of past events, it was as a result of the April 21, 1994 attack that

10   Sanders wrote his July 25, 1994 memo ███████████████████████ (RPI Post-

11   Hearing Br. at 10.)   There were no additional attacks on Polk between those two dates that were

12   ever disclosed to Conley's counsel.

13        No threats against Polk came in evidence at Conley's trial. The pretrial record shows a

14   purported threat, made on███████████████████████████████████

15   ████████████████████████████████████that apparently did not

16   result in Sanders relocating Polk in Conley's case. (Ex. 8.)

17

18

19

20 [19] The State characterizes Conley's phone call to Polk in early September as a threat, based on
Sanders's notes of a conversation with Polk (Ex. V). These notes, however, were offered in
evidence by Real Party not for their truth, but rather as evidence of the state of mind of Conley's

21   defense counsel. (RT 485:13-16.) Even in Sanders's notes, Polk never mentioned any threat,
though he purportedly told Sanders he thought Conley's tone of voice was hostile. (Ex. V.)

22   Conley's defense counsel testified at the evidentiary hearing that asking someone "why are you
lying about me," as Conley allegedly asked Polk, could also suggest a defendant's belief in his

23   innocence. (RT 485-486.) Further, there was no direct evidence of any connection between
Conley and Sunnydale gang members allegedly driving past Polk's mother's house. (Ex. V.) At

24   Conley's trial, Bergerson moved to exclude evidence of alleged witness intimidation unless the
State could actually connect it to Conley, which it never did.

25                                                                      43

1    Third, *Verdugo* does not suggest that the protected witness was the essential witness

2    without whom the prosecution could not have been brought.  By contrast, the State in Conley's

3    case concedes that the prosecution could not have proceeded without Polk.

4    Fourth, the process surrounding witness protection in *Verdugo* was straightforward and

5    authorized by the court.  The former prosecutor made an ex parte application for funds,

6    supported by a declaration substantiating the need for witness protection.  There was no effort to

7    obscure the nature of the payments.  The funds sought were itemized for the trial court's review.

8    Here, by contrast, the record is obscured.  Sanders gave an interview to KTVU about the lack of

9    state witness protection funds, and yet wrote a memo on July 25, 1994

10                                                                  Soon thereafter, Sanders

11   started paying money to Polk from a San Francisco police department witness protection

12   program.  These payments were not disclosed, despite repeated requests for discovery which the

13   prosecutor understood were ongoing requests.  The written disclosure on October 1, 1994 of

14   "room and board while the trial lasts" could not fairly be read to disclose the history of cash

15   payments in the months before (and then following) Conley's trial.  Polk then testified falsely on

16   the witness stand about not being in witness protection in the Conley trial, and, with Sanders

17   sitting in the courtroom, Polk's testimony was allowed to go uncorrected.

18   In sum, even if the evidence of payments to Polk opened up the door to admission of

19   alleged threats to Polk, the suppression of evidence in this case was still prejudicial to Conley.

20   The possibility that the State could attempt to cast these facts in a different light does not entitle

21   the State to have withheld them from Conley's counsel in the first place.  Conley was entitled to

22   know about these benefits so he could argue their significance to the jury or to the court in post-

23   trial proceedings.

24

25                                                                                      44

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No.
2447917

1    Real Party also argues that the some of the suppressed evidence was cumulative (the "I

2    still love you" letter to Sanders and the October 6, 1994 probation report) because Conley's trial

3    counsel already knew that Sanders and Polk had a close personal relationship, that Sanders had

4    employed Polk to do work around Sanders's house, that Sanders had recommended that Polk be

5    placed in a diversion program on his first narcotics arrest, and that Polk had a criminal record.

6    This argument is not convincing. The prosecution at the Conley trial attempted to

7    *minimize* Sanders's relationship with Polk, and characterize it as nothing out of the ordinary. For

8    example, Sanders testified at Conley's trial that he met Polk when Polk was about 17 (Ex. 85 at

9    922), that he paid Polk to do "odd jobs from time to time," and continued to "see him and

10   counsel him and advise him," — but that Sanders would do this with "other young men that [he]

11   came into contact with in the course of [his] work." (*Id.* at 923.) Although Sanders

12   recommended diversion for Polk on his first narcotics offense, Sanders volunteered that the

13   purpose of the diversion statute "was to give young adults a chance. A first chance on their first

14   contact with selling or possession of cocaine. So, it *wasn't unusual* that [Polk] would be

15   recommended for diversion. ..." (Ex. 85 at 930:9-14)(emphasis added)

16   By contrast, the suppressed evidence brings Sanders's relationship with Polk into a

17   wider and sharper focus.[20] The affectionate handwritten letter to Sanders requesting "a lot of

18   money," the suggestion that Polk was working for the Police Department or perhaps on a salary,

19   the fact that Polk was working for a company called "Sanders Security Systems" were

20   qualitatively different from Sanders's matter-of-fact testimony about his relationship with Polk.

21   _____

22   [20] In the three weeks following the July, 1992 letter, Sanders withdrew $600 in four
     installments from an account he had previously used to pay Polk. (Ex. 61.) Because the letter
23   itself was suppressed, there was no way for Conley's counsel to explore the letter or the
     purchases.

24

25                                                                                              45

(Cf. Ex. 73 at 22303; Sanders's testimony at preliminary hearing where he testified Polk performed "general labor work" from time to time, including lawn mowing.) Because of the suppression of evidence, Conley's defense counsel was limited in trying to impeach Polk on such topics as his occasional yard work for Sanders, which Polk and Sanders denied had any connection to Polk's testimony. (Ex. 84 at 764:3-767:5; 824:24-826:10 (Polk); Ex. 85 at 923:3 – 924:5 (Sanders)).

Finally, to the extent that Real Party argues that the petition is without merit because Conley's defense counsel had the October 1, 1994 letter and chose not to use it at trial, this argument is also not persuasive. The October 1, 1994 letter was inherently misleading as to the nature and magnitude of the benefits that had been given to Polk. "Room and board while the trial lasts" does not begin to hint at the fact that Polk had, since June or July of 1994, received hundreds of dollars of direct cash payments with no apparent restrictions on the use of that money. Defense counsel at the Conley trial vigorously cross-examined Conley with the evidence that was then available to him, including what he knew about the relationship between Sanders and Polk. The fact that, in isolation, "room and board while the trial lasts" seemed like an insignificant benefit to Conley's defense counsel at the time of trial, and not worth potentially opening the door to questions about the April 21 alleged threat by "Sinister" does not lead to the conclusion that the suppressed evidence was immaterial or that prejudice did not ensue. Conley's defense counsel was constrained in making this decision at trial based on the limited information before him. *See Bagley v. Lumpkin*, 798 F.2d 1297 (9th Cir. 1986),[21]

---

[21] *Bagley v. Lumpkin*, 798 F.2d 1297 (9th Cir. 1986) involved a prosecution for firearms and controlled-substance violations. As here, Bagley asked the prosecution to disclose any "deals, promises or inducement" provided to witnesses in connection with their testimony. *Id*. at 1298. As here, the prosecution disclosed nothing. At a bench trial, the prosecution relied entirely on two law-enforcement officers, both of whom testified that Bagley sold them controlled substances. In affidavits prepared pre-trial, the officers stated they gave their

## V. CONCLUSION

As the Supreme Court stated in *Kyles v. Whitley*, 514 U.S. 419, 433 (1995),

"the touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" (*quoting* Bagley, 473 U.S. at 678).

Viewed collectively, the cumulative effect of the material suppressed evidence and the *Napue* error in letting Polk testify falsely about benefits he received undermines confidence in the jury's verdict in this case. Without these errors and had the evidence been disclosed, there is a reasonable probability that the outcome of Conley's trial would have been different. The State built its case on the credibility of its linchpin witness, without whom the prosecution could not have been brought. The cumulative effect of the errors denied Conley a fair trial and rendered his convictions unconstitutional. Conley's petition for a writ of habeas corpus is granted, his convictions are vacated, and a new trial is ordered.

/

/

/

/

/

---

testimony "freely and voluntarily without any threats or rewards, or promises of reward." *See id.* at 1298-99. On cross-examination, one officer denied the government had threatened him or pressured him if he would not cooperate. *Id.* at 1299. With no documents showing otherwise, Bagley's counsel did not pursue the issue of bias or self-interest with either officer. *See id.* Only after Bagley was found guilty of narcotics crimes did Bagley learn that the State had promised the officers additional compensation and reimbursement for expenses if they provided information leading to a conviction. *See id.* In granting Bagley's habeas petition, the Ninth Circuit held that the suppressed impeachment evidence and the false testimony violated Bagley's right to a fair trial.

47

1    This matter is set for further hearing in Department 22 of this Court at 9:00 a.m. on

2    December 15, 2010 for further proceedings consistent with this Order.

3        IT IS SO ORDERED.

4

5    Dated: December 14, 2010



6

7                                            Marla J. Miller
                                            Judge of the Superior Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                                                        48

ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL, WRIT No. 5891; COURT No.
2447917

**SUPERIOR COURT OF CALIFORNIA**
County of San Francisco

CARAMAD CONLEY,

      Petitioner,

          vs.

MIKE KNOWLES,

      Respondent.

THE PEOPLE OF THE STATE OF CALIFORNIA,

      Real Party in Interest

Writ Number: 5891
SCN: 2447917

**CERTIFICATE OF MAILING**
(CCP 1013a (4) )

I, Clark Banayad, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

On December 14, 2010, I served the attached **ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS AND NEW TRIAL – PUBLIC VERSION** filed on December 14, 2010 by placing a copy thereof in a sealed envelope, addressed as follows:

Allison G. Macbeth, Esq.
Angela M. Lyddan, Esq.
OFFICE OF THE DISTRICT ATTORNEY
850 Bryant Street, Rm. 322
San Francisco, CA  94103

Daniel Purcell, Esq.
Eric H. MacMichael, Esq.
Zachary F. Bookman, Esq.
KEKER & VAN NEST
710 Sansome Street
San Francisco, CA  94111

and, I then placed the sealed envelopes in the outgoing mail at 400 McAllister Street, San Francisco, CA. 94102 on the date indicated above for collection, attachment of required prepaid postage, and mailing on that date following standard court practices.

                            **MICHAEL YUEN, Clerk**

          **By:** _____

                  **Clark Banayad, Deputy Clerk**

# EXHIBIT B

# TRAINING BULLETIN

**84 – 08**          **SAN FRANCISCO POLICE DEPARTMENT**          **10/17/84**

## EXCULPATORY EVIDENCE

A recent judgment against the City and County of San Francisco has reiterated the need to insure that all material facts are presented to the District Attorney when arrest warrants or search warrants are sought.

Members are reminded that information tending to disprove or minimize a suspect's guilt should be included in incident reports (both initial and supplemental) or chronological reports of investigations. Opinions, theories, or conclusions of the officer or investigator should not be included. Documentation of exculpatory evidence (e.g. evidence such as eyewitness statements, alibi witness statements or other evidence which tends to disprove or minimize criminal responsibility) is necessary to preclude the possibility that a dismissal, mistrial, or reversal of a case will be based on the fact that evidence favorable to a defendant was withheld from the defense.

The judgment against the department in a recent civil case has further illustrated that failure to include statements or other exculpatory evidence may result in the civil liability of an officer or investigator, including an award of punitive damages, which may not be paid for by the City but will be assessed against the individual member.

#3906B



# EXHIBIT C

| **UNIT** | BUREAU INDEX NUMBER | . 92-04 |
|---|---|---|
| **ORDER** | DATE ISSUED | 06/11/92 |

| SUBJECT: VICTIM/WITNESS PROTECTION/RELOCATION PROGRAM | |
|---|---|
| ISSUED TO:   BUREAU OF INSPECTORS PERSONNEL | ISSUED BY: DEPUTY CHIEF REED |

I.   PURPOSE

   A.   The overall goal of this order is to set forth procedures for protection and relocation of vital witnesses whose lives are immediately threatened.

   B.   Witness protection and relocation shall be implemented at the discretion of the Deputy Chief of the Bureau of Inspectors.

II.   PROCEDURE

   A.   The program is intended to assist victims/witnesses who do not have the necessary resources to relocate themselves and whose lives are in imminent danger because they are an intricate part of a criminal prosecution.

   B.   When a determination is made during an investigation of a serious crime that the life of the victim/witness, or a member of their family is in immediate jeopardy, an assessment shall be made by the OIC of the investigating unit, as to the validity of the threat.

   Factors to be considered in this determination are:

     1.   The person to be protected is directly involved with the prosecution of a serious crime and will be testifying in a specific preliminary hearing, felony trial in process, or during/after a Grand Jury proceeding.

     2.   The case qualifies for assistance from the California Witness Protection Program or the United States Attorney General's Witness Security Program (this is only required in cases involving syndicated organized crime).

   C.   If relocation is deemed necessary, the investigating officer shall:

     1.   Notify the Deputy Chief of the Bureau of Inspectors, in writing, through channels, during business hours.

SFPD 408

Unit Order, continued:

---

2. At night and on weekends, when immediate relocation is needed, advise Operations Center to notify the Commanding Officer of the Special Investigations Division that protective procedures are being sought.

### III. RESPONSIBILITIES

A. The case investigators are responsible for the management of the victim/witness:

1. When a witness fits the criteria set forth, the case investigator shall advise the officer-in-charge of the unit who shall then prepare a memorandum to the Deputy Chief of the Bureau of Inspectors requesting implementation of the program.

2. Upon approval of the Deputy Chief of the Bureau of Inspectors, the case investigator shall contact the Commanding Officer of the Special Investigations Division, in order to secure the resource information needed to relocate their witness.

3. The case investigator must obtain a written waiver from the victim/witness acknowledging that they agree to comply with the policy set forth regarding their case.

4. The case investigator shall be responsible for determining the economic situation of the victim/witness prior to implementation of the program.

5. The case investigator shall be responsible for securing housing, transportation or any other accommodations necessary to secure safety for the victim/witness.

6. At no time shall the case investigator refer the victim/witness to Special Investigations Division personnel. All contact with the victim/witness shall be handled by the case investigator's unit.

7. The case investigator shall be responsible for providing original receipts on all expenditures to the Commanding Officer, Special Investigations Division.

B. The Special Investigations Division shall be responsible for the administrative aspects of the program:

1. The Commanding Officer, Special Investigations Division, shall notify the California State Department of Justice and obtain a file number.

Page 2 of 3

Unit Order, continued:

2. The Commanding Officer, Special Investigations
   Division shall be responsible for the mainten-
   ance of VWPP funds.

3. The Commanding Officer, Special Investigations
   Division, shall be responsible for the mainten-
   ance of all records pertaining to the program.

4. The Commanding Officer, Special Investigations
   Division, shall be responsible for providing
   resource information to the case investigator
   regarding available housing, moving expenditures,
   etc.

SFPD 410