UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARAMAD CONLEY,<br><br>     Plaintiff,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>     Defendants. | Case No.  12-cv-00454-JCS<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT.**<br><br>**Dkt. Nos. 88, 109.**<br><br>**PUBLIC VERSION** |

**TABLE OF CONTENTS**

I.     INTRODUCTION......................................................................3

II.    BACKGROUND......................................................................3

    A.  The Trial of *People v. Conley*.............................................4

        1.  Clifford Polk..............................................................5

        2.  John Johnson..............................................................7

        3.  Caramad Conley.........................................................9

    B.  Requests for Impeachment Evidence &<br>        Sanders's Understanding of the Duty to Disclose....................11

    C.  Information Disclosed to the Defense....................................12

    D.  Information Allegedly Not Disclosed to the Defense.................17

        1.  Conjugal Visits.........................................................18

        2.  IOU's......................................................................18

        3.  The "I still love you" Letter.......................................19

        4.  Six-month Lease & Associated Expenses.....................19

        5.  Cash Payments Provided to Polk..............................20

        6.  Manner of Payment..................................................23

    E.  Evidence Allegedly Indicating Sanders Concealed<br>        Impeachment Evidence....................................................25

    F.  Conley's Habeas Petition...................................................27

    G.  The Instant Lawsuit & Summary Judgment Motions.................29

III.    DISCUSSION...................................................................29
    A.  Legal Standard − Summary Judgment...........................29
    B.  Admissibility of Polk's 2005 Declaration.................. 29
    C.  The Law under *Brady*.......................................... 31
    D.  Defendants' Motion for Summary Judgment................... 32
        1.  Whether a Reasonable Jury could find that
            Sanders Violated Conley's Rights under *Brady*.............. 33
            i.  Whether Johnson's Conjugal Visits are
                *Brady* Material............................................ 33
            ii.  Analysis of the *Brady* Elements......................36
                a.  Favorability...................................... 36
                b.  Nondisclosure....................................37
                c.  Prejudice..........................................40
            iii.  Whether a Reasonable Jury could find
                that Sanders Acted with the Requisite Intent...........46
        2.  Whether Sanders is Entitled to Qualified Immunity...........50
            i.  The Law on Qualified Immunity....................... 50
            ii.  Whether Sanders Violated Conley's Clearly
                Established Rights......................................51
    E.  Plaintiff's Motion for Partial Summary Judgment.....................58
        1.  Color of Law...........................................58
        2.  Favorability............................................59
        3.  Prejudice............................................... 59
        4.  Whether Giannini Disclosed the Evidence to Bergerson......60
IV.    CONCLUSION................................................................61

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I. INTRODUCTION

Plaintiff Caramad Conley brings this action under 42 U.S.C. § 1983 against the City and County of San Francisco and Inspector Prentice Earl Sanders for violating his constitutional rights. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United Sates*, 405 U.S. 150 (1972). Plaintiff contends that Inspector Sanders violated his rights under *Brady* and *Giglio* while working as a homicide investigator in 1993 and 1994. After spending eighteen years in prison for a double homicide conviction, Conley was freed by the California Superior Court on writ of habeas in December of 2010. This action followed.

Conley alleges that Inspector Sanders deprived him of the rights accorded to him under *Brady* and *Giglio* by failing to inform the prosecutor that Sanders was providing inducements to the State's witnesses in the forms of sex and cash. Defendants move for summary judgment, contending Sanders did not violate Conley's constitutional rights, and even if he had, Sanders is entitled to qualified immunity because those rights had not been clearly established at the time of the events. Plaintiff moves for partial summary judgment on particular elements of his claim. The Court held a hearing on July 26, 2013, at 1:30 p.m. For the reasons explained below, Plaintiff's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part and Defendants' Motion for Summary Judgment is DENIED.[1]

## II. BACKGROUND

On April 8, 1989, Charles Hughes and Roshwan Johnson were killed and thirteen others were wounded in a drive-by shooting in the Bayview-Hunter's Point neighborhood of San Francisco. Joint Statement of Undisputed Facts on Defendants' Motion for Summary Judgment ("SF JSUF") ¶ 2. Sanders was one of the lead investigators on the case from the San Francisco Police Department ("SFPD"). *Id*. ¶ 3. The other lead investigator, Inspector Hendrix, is now deceased and is not a defendant in this lawsuit. *See id*. Assistant District Attorney Al Giannini was the lead prosecutor responsible for pursuing criminal charges arising from the April 8, 1989 shooting. *Id*. ¶ 4. Donald Bergerson was appointed as Conley's defense counsel. *Id*. ¶ 8.

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

### A. The Trial of *People v. Conley*

Conley's criminal trial began on September 26, 1994. The first witness to testify was the State's expert on gangs, Inspector Bob Davis. SF JSUF ¶ 35. Inspector Davis explained that there was a rivalry between a gang consisting primarily of people from Bayview/Hunter's Point and another gang consisting primarily of people from the Sunnydale neighborhood of San Francisco. Declaration of Vince Chhabria in Support of Defendants' Motion for Summary Judgment ("Chhabria Decl.") Ex. A at 312-41. Due to graffiti displayed in Hunter's Point, Inspector Davis believed Conley was a member of the Sunnydale gang, even though Conley lived with his father in Hunter's Point. *Id.* at 361-62. Conley later testified that he was "absolutely not" a member of the Sunnydale gang. Chhabria Decl. Ex. J at 1014.

Inspector Davis explained that in March of 1989, the conflict between the Hunter's Point gang and the Sunnydale gang escalated when Conley and two other members of the Sunnydale gang chased a Hunter's Point gang member Jeffrey Franklin and his mother by car, and hit the windshield of their car with a baseball bat. Chhabria Decl. Ex. A at 341-44. By the time of his trial for the April 8, 1989 murders, Conley had already been convicted of this crime. *Id.* at 343.

Inspector Davis testified that the attack on Franklin and his mother escalated the gang violence because "that was the first time that a parent had been … attacked or been part of an attack between the gangs." Chhabria Decl. Ex. A at 344:12-14. Later in the day after the Franklin attack, a Sunnydale gang member Edrick Carr—whose street name was "Peter Lee"—was shot and killed. *Id.* at 343-45. Inspector Davis explained that although Peter Lee's killer was not identified, gang graffiti showed that Sunnydale gang members principally blamed Hunter's Point gang member Ronnie Lane for the killing. *Id.* at 346-51, 355.

Julio Zayas, an eyewitness to the April 8, 1989 murders and shooting victim, testified at Conley's trial and provided a general background of the events. Chhabria Decl. Ex. D. Zayas explained that two cars of armed individuals wearing ski masks opened fire on the crowd in Hunter's Point. *Id.* at 569. Zayas testified that he saw one of the shooters, Paul Green, get out of the car without a ski mask on his face and chase Ronnie Lane while he yelled "I'm going to kill you" and "Sunnydale." *Id.* at 570. Zayas did not identify any other shooter other than Paul Green.

4

*Id*. Paul Green was the first suspect tried and convicted for the April 8, 1989 shooting.

The three most important witnesses to testify in Conley's trial were Conley himself, Clifford Polk and John Johnson. Polk testified, among other things, that Conley had told him he participated in the April 8, 1989 murders. Chhabria Decl. Ex. H at 750-51. Johnson testified that he drove one of the cars used in the shooting and that Conley was armed in the other car. Chhabria Decl. Ex. G at 590-98. Conley, testifying in his own defense, denied any participation in the shooting and claimed that Polk's and Johnson's testimony was "absolutely false." Chhabria Decl. Ex. J at 1031-33. The testimony of these three individuals, as well as subsequent developments relating to both Polk and Johnson, are discussed below.

### 1. *Clifford Polk*

Clifford Polk was the State's principal witness against Conley. The prosecutor wrote in 1991 that without Polk, it would not have had sufficient evidence to prosecute Conley. *See* Joint Statement of Material Facts Not in Dispute re Plaintiff's Motion for Partial Summary Judgment ("JSUF") ¶ 4. The only other witness linking Conley to the crime, Johnson, had participated in the shooting. Johnson's testimony alone was insufficient to sustain a conviction. *See* Cal. Penal Code § 1111 (providing that no conviction for any crime can be obtained on the uncorroborated testimony of an accomplice).

Polk testified that approximately a day or two after the homicides, Conley admitted to Polk that he had participated in the shooting. Chhabria Decl. Ex. H. at 750. Polk testified that he had "several" conversations about the shooting with Conley. *Id*. at 752. Polk also testified that Conley had told him he was associating with the Sunnydale gang. *Id*. at 735.

According to Polk, Conley told him that he and the other Sunnydale gang members opened fire when they saw Ronnie Lane, and that Paul Green got out of the car with a Mac-10. *Id*. at 754. Polk also testified that he saw a Mac-10 and a Mac-11 at Conley's house a week or two before the shooting, and saw Conley sell the Mac-11 and keep the Mac-10. *Id*. at 740-44. Polk knew the difference between the two guns because "a Mac 10 is much wider and heavier with a much smaller clip." *Id*. at 744:22-23.

Polk testified that two or three weeks before the shooting, he saw Conley borrow a .38

handgun from his friend Bautiste Richardson. *Id*. at 747. After the shooting, Polk heard Richardson ask Conley for the gun, and heard Conley tell Richardson: "You don't want that gun. It got Cheap Charlie written all on it." *Id*. at 747:27-28. "Cheap Charlie" is the street name of Charles Hughes, one of the shooting victims. *See id*.

Polk also testified that on April 8, 1989, before the time of the shooting, he was at Alzarita Hudson's house in Hunter's Point. *Id*. at 748. Hudson handed him the phone and Conley was on the line. *Id*. at 749. Conley asked who was outside and Polk told him that "everybody was slipping" because it was hot and people in Hunter's Point were outside having a water fight. *Id*. Both parties interpret Polk's comment to imply that the Hunter's Point gang had let their guard down after the attack on Peter Lee. *See* Chhabria Decl. Ex. KK at 3:3.

In 2005, more than ten years after Conley's conviction, Polk recanted his entire trial testimony in a sworn declaration. *See* Declaration of Daniel Purcell in Support of Plaintiff Caramad Conley's Motion for Partial Summary Judgment ("Purcell Decl.") Ex. 30 (December 13, 2005 Declaration of Clifford Polk) ("Polk's 2005 Declaration").[2] Polk wrote in the declaration that his "entire testimony" at Conley's trial "was false." *Id*. ¶ 2. Polk wrote that Conley had never told him that he participated in the April 8, 1989 shooting. *Id*. ¶ 18. Polk recanted specific facts of his testimony, writing that "contrary to [his] testimony at Caramad Conley's trial, [he] neither saw Caramad, nor spoke to him by phone [on April 8, 1989]." *Id*. ¶ 7. Polk also wrote that he never saw Conley with a Mac 10 and Mac 11, never saw Bautiste Richardson ask for the .38 handgun he had lent Conley, and never heard Conley tell Richardson "You don't want that gun. It got 'Cheap Charlie' written all on it." *Id*. ¶ 17. Polk wrote that the reason for his 2005 declaration was to clear his conscience because he could no longer live with the knowledge that he helped convict Conley by testifying at his trial. *Id*. ¶ 21.

Justine Schmollinger, a Staff Psychologist with the California Department of Mental Health and Salinas Valley Psychiatric Program, obtained this declaration from Polk while working for the Northern California Innocence Project. *See* Purcell Decl. Ex. 31 (Declaration of Justine

United States District Court
Northern District of California

---

[2] *See* Section III.B discussing the admissibility of Polk's 2005 Declaration.

6

Schmollinger in Support of Caramad Conley's Petition for Writ of Habeas Corpus) ¶ 3. Ms. Schmollinger wrote in her own declaration that all of Polk's conversations with her regarding his false testimony were consistent, and that at no time did she−or to her knowledge anyone else−pressure Polk into signing a declaration recanting his testimony. *Id*. ¶ 7. Rather, Polk told her that he was recanting his testimony because he wanted to clear his conscience. *Id.*

## 2. *John Johnson*

Johnson was the only eyewitness linking Conley to the April 8, 1989 murders. During Conley's habeas proceedings, Giannini, the prosecutor in Conley's case, testified that Johnson was an important witness because Polk was not an eyewitness. Purcell Decl. Ex. 4 at 137:13-18 (Giannini stated that "it would have been problematic to go against Mr. Conley without Mr. Johnson"). At the time Johnson testified for the State against Conley, he was incarcerated for an unrelated homicide. JSUF ¶ 35. Johnson is serving a sentence of life without parole. *See id*. ¶ 36; Chhabria Decl. Ex. G at 586:16-18.

Johnson testified that he drove one of the two cars used in the April 8, 1989 shooting. Chhabria Decl. Ex. G. at 597-600. Johnson drove three armed men in a stolen vehicle, and another man named Juan also drove three other men in his own car. *Id*. at 590-94. Two of the men in Juan's car were Conley and Green. *Id*. Johnson testified that they first drove to a school to pick up the weapons. *Id*. at 594-95. They next drove to Hunter's Point and opened fire when they spotted Ronnie Lane's car. *Id*. at 598. Afterwards, they drove back to Sunnydale and each car went its separate way. *Id*. at 601.

Johnson testified that he lied when the police first questioned him on April 26, 1989 about the murders. At first, Johnson denied any knowledge of the shooting. Purcell Decl. Ex. 33 at 624:13-17. Johnson, however, was a cocaine addict, and was eager to go home. *Id*. at 617. Johnson gave Sanders and Hendrix the name of seven men, including Conley, Deron Crowley and Paul Green, whom he said were involved in the murders. JSUF ¶ 37. At Conley's trial, Johnson testified that Deron Crowley was actually innocent, but Johnson had incriminated Crowley because he "[j]ust wanted to go home." *Id*. at 625:16; JSUF ¶ 38.

Unlike Polk, Johnson has not recanted his testimony against Conley. At his deposition

7

taken in connection with this lawsuit, Johnson invoked his Fifth Amendment privilege at the advice of his counsel and declined to discuss any previous testimony he had given in Conley's criminal proceeding.[3]  *See* Purcell Decl. Ex. 32 at 11:18-23.

Johnson did, however, testify at this deposition that in exchange for his testimony in both the *Green* and *Conley* trials, Sanders and Hendrix had allowed him to have sex with his then-girlfriend (current wife) Deann Rushing in the Homicide Detail of the Hall of Justice.  With respect to Conley's trial in particular, Johnson testified that Sanders allowed him to be alone with Rushing in the Homicide Detail with the door closed four or five times.  *Id*. at 36:7-13.  On each of these visits, Johnson and Rushing engaged in sexual acts.  *Id*. at 38:17-22.  Johnson said that he believed Sanders conditioned the conjugal visits upon his willingness to testify for the State against Conley.  *Id*. at 26:6-14, 27:12-22.

Deann Rushing also gave a deposition corroborating Johnson's testimony that they were permitted conjugal visits so Johnson would testify against Conley.  *See* Purcell Decl. Ex. 34 at 29:13-25.  Rushing explained that Johnson was very reluctant to testify against both Green and Conley, but was persuaded by the conjugal visits and Sanders's other promises to help Johnson and his family.  *Id*. at 40:11-25.  At the time before Conley's trial, Rushing was also incarcerated, so Sanders would check Rushing out of the women's jail on the sixth floor and bring her to the Homicide Detail.  *Id*. at 47:1 - 48:21.  On each occasion, Sanders would urge Rushing to persuade Johnson to testify.  *Id*. at 36:16-18.

Before Conley's trial, Conley's investigator Ken Heriot had heard rumors of unsupervised visits between Johnson and Rushing.  *See* Purcell Decl. Ex. 35 (April 30, 2013 Deposition of Ken Heriot) at 9:1-3.  Therefore, at the December 8, 1993 preliminary hearing, Conley's defense counsel, Bergerson, questioned Sanders and asked him whether Deann Rushing was ever allowed to visit Johnson at the Homicide Detail.  *See* Purcell Decl. Ex. 7.  Sanders testified that Johnson was able to speak with Rushing in the Homicide Detail only with the door open, and that Sanders could see in the room.  *Id*. at 22284:16-22.  Sanders also testified that he did not know if Johnson

---

[3] The Court does not draw an adverse inference from Johnson's assertion of his Fifth Amendment privilege.

had a sexual relationship with Rushing. *Id*. at 22285:16. This contradicted Rushing's deposition testimony that it was "obvious" Sanders knew Johnson and Rushing had a sexual relationship because he arranged the visits as an inducement for Johnson's testimony. Purcell Decl. Ex. 34 at 31:20.

The prosecutor, Giannini, was questioned about his knowledge of these conjugal visits in a deposition for this lawsuit. *See* Purcell Decl. Ex. 36. Giannini testified that the conjugal visits never happened because he "would have known" about them, and, in fact, "[e]very homicide inspector would have known." *Id*. at 56:14-21 ("It was not possible to have a liaison of that sort in the homicide detail and keep it private even if you were crazy enough to try and do it."). The parties have stipulated that the distance from the left wall to the right wall in the Homicide Detail was approximately 40 or 50 feet. JSUF ¶ 40. During the 1992 to 1994 time period, Sanders and Hendrix had the two desks closest to the interview rooms. *Id*. ¶ 41. Both interview rooms had peepholes that allowed someone from the outside to look inside the room. *Id*. ¶ 42.

Giannini was asked at his deposition for this lawsuit, assuming the conjugal visits *did* occur, whether he would disclose that information to defense counsel. Giannini responded:

> If I were told that or believed it to be true, I would not just disclose it, I would have to disclose it to the highest authorities in my office and the police department and it might end the prosecution of that particular case. So there wouldn't be a defense counsel to disclose it to. Because if they're doing something that moronic with one witness, *they are useless themselves as witnesses for any other part of this case.* It throws a shadow of suspicion on everything that they've said and done. It is so completely irresponsible, not to say criminal, *that it would have gutted that prosecution.*

Purcell Decl. Ex. 36 at 66:21 - 67:7 (emphasis added). Giannini also said that "[t]he inspectors would be subject to prosecution. They'd certainly be fired." *Id*. at 56:23-24.

### 3. *Caramad Conley*

Conley testified in his own defense at his trial. SF JSUF ¶ 43. Conley denied any involvement with the April 8, 1989 murders and denied ever telling Polk he had participated in the shooting. Chhabria Decl. Ex. J at 1013. Conley testified that at the time of the murders, he was asleep at his father's house. *Id*. at 1029-30. On cross-examination, Conley testified that only his

father was in the house with him. *Id*. at 1071. Conley's father was not called as a witness, even though he was present in the courtroom. Chhabria Decl. Ex. K at 1113; Ex. BBB at 1237-38.

Conley testified that Polk's and Johnson's statements implicating him in the crime were "absolute lies." Chhabria Decl. Ex. J at 1031-33. Conley said he did not "personally know John Johnson," and even though he had "seen him around, … as far as [he] knew [Johnson] was a drug addict." *Id*. at 1031:14-20. Conley testified that he knew Polk well because Polk became "attached" to his family when they took him in for a couple of months, but that since Polk "started to run the streets again," Conley had "stopped Polk from coming to his house." *Id*. at 1032:6-14.

On direct examination, Conley admitted that part of his statement to Sanders and Hendrix during their investigation of the April 8, 1989 murders had been false. Conley testified that he falsely denied knowing members of the Sunnydale gang because Sanders and Hendrix "made it perfectly clear that if I knew these people, I was a gang member and I committed this murder." *Id*. at 1028:2-3. Conley testified that this was also the reason he told Sanders and Hendrix he had not gone to a barbeque in Sunnydale the afternoon before the night of murders, even though he had. *Id*. at 1030:17-21.

Conley testified that he was not a member of the Sunnydale gang and that he was free to walk around Hunter's Point. *Id*. at 1014-16. Giannini impeached that testimony on cross-examination. *Id*. at 1036-37. Prior to the April 8, 1989 murders, Sanders and Hendrix interviewed Conley about Franklin attack and asked him where he had gone after the attack. Conley responded:

> A: Yeah, we got on the freeway and went home.
> Q: Alright, back to Sunnydale.
> A: Yea.
> Q: Alright, you didn't go back to your home to your father's house at 55…
> A: I can't go walk around there.
> Q: Huh.
> A: I can't …
> Q: You can't even go around there …
> A: No.
> Q: That's your father's home, you can't go there?
> A: I can go, if I go, I do go, that's where I live. I mean I can't be.
> Q: Just walking around.

A: Yeah, walking around out there.

Chhabria Decl. Ex. C at 15:9-23.

Giannini also elicited testimony from Conley that he was found to be in possession of narcotics while on probation for the Franklin attack. Chhabria Decl. Ex. J at 1039-43. Giannini questioned Conley about times he got in trouble while in jail, his false statements to Sanders and Hendrix regarding who he knew in the Sunnydale gang, his false statement that he was not at a barbeque in Sunnydale the afternoon of the murders, and other false statements casting doubt on Conley's credibility. *Id.* at 1044-65. In his closing argument at the end of Conley's trial, Giannini put great emphasis on Conley's lies to the police, his changing alibi, and his alleged lies on the witness stand. Chhabria Decl. Ex. BBB at 1189-94, 1237-38.

**B.** **Requests for Impeachment Evidence & Sanders's Understanding of the Duty to Disclose**

Long before Conley's trial began, Bergerson, Conley's defense attorney, sought discovery of all impeachment evidence against the State's witnesses. In response to Bergerson's requests for discovery, Giannini told the court on April 3, 1993 that "this is an open file case and it's not as if there's material I wish to protect." Purcell Decl. Ex. 41 at 20:17-18.

On March 28, 1994, Bergerson filed a formal, written motion for discovery under *Giglio.* Purcell Decl. Ex. 9; JSUF ¶ 7. Giannini did not oppose the *Giglio* motion. JSUF ¶ 8. On May 6, 1994, Giannini filed a declaration in response to Conley's *Giglio* motion, stating that he had "obtained and caused to be duplicated each and every police and District Attorney file maintained in connection with this case." JSUF ¶ 9. Giannini wrote that he was "informed and believe[d]" that "the Defense has been provided with every document, tape recording, and videotape compiled by the San Francisco Police Department in connection with the investigation into these homicides." Purcell Decl. Ex. 10:9-13; JSUF ¶10. At the May 26, 1994 hearing on the *Giglio* motion, Giannini told the court that he had "no problem" with Bergerson's motion and would produce all evidence favorable to Conley. Purcell Decl. Ex. 11 at 5:17; JSUF ¶ 11.

Sanders's deposition testimony from Conley's habeas proceeding reveals that Sanders was familiar with the State's obligation to provide discovery to a criminal defendant in a criminal trial,

11

including evidence that could be used to impeach a testifying witness. Purcell Decl. Ex. 2 at 32:16-19, 40:3-5. When asked to describe in his own words a police officer's duty under *Brady*, Sanders stated that his "understanding" was that he had an obligation to "turn everything over to the District Attorney." *Id*. at 33:24 - 34:1.

Sanders also testified that he recalled reviewing a Training Bulletin dated October 17, 1984 that was circulated in the SFPD's office. *Id*. at 49:12-14. The Bulletin reminded officers that "[d]ocumentation of exculpatory evidence (e.g. evidence such as eyewitness statements, alibi witness statements or other evidence which tends to disprove or minimize criminal responsibility) is necessary to preclude the possibility that a dismissal, mistrial, or reversal of a case will be based on the fact that evidence favorable to a defendant was withheld from the defense." JSUF ¶ 2; Purcell Decl. Ex. 3. The Bulletin further informed officers that a "judgment against the Department in a recent civil case has further illustrated that failure to include statements or other exculpatory evidence may result in the civil liability of an officer or investigator, including an award of punitive damages, which may not be paid for by the City but will be assessed against the individual member." Purcell Decl. Ex. 3.

### C.     Information Disclosed to the Defense

 At the time of Conley's trial, Bergerson was aware that Polk had been in the Witness Protection Program in connection with the *People v. Green* trial. JSUF ¶ 5. Around the end of 1992 or the beginning of 1993, during the pretrial proceedings for Conley's trial, Giannini disclosed to Bergerson several thousand pages of documents pertaining to the investigation of the April 8, 1989 shooting, as well as transcripts of the *People v. Green* trial. SF JSUF ¶ 9. Among those documents was a November 4, 1991 memorandum in which Giannini submitted a request to the California Witness Protection Program for funding to protect Polk. JSUF ¶ 3; SF JSUF ¶ 11. Giannini requested $6,335.00 for a period of six months ending April 1, 1992 to protect Polk during Green's trial. Purcell Decl. Ex. 5.

Bergerson was also aware that Sanders had spent time off the job with Polk, and paid Polk for landscaping work at his house. JSUF ¶ 6. On March 13, 1992, Bergerson's investigator, Ken Heriot, wrote a report about an interview he had with Polk before Polk testified in Green's trial.

12

Chhabria Decl. Ex. R.  In the interview, Polk described his relationship with Sanders, referring to Sanders at one point as his "stepfather":

> Most interestingly, Polk admitted to us that he has a personal relationship with Inspector Prentice E. Sanders.  He described Sanders as his "step father."  He informed us that since his interview with Sanders on 5/22/91, he stays in contact with Sanders on a regular basis.  He stated he has been to Sanders' home and has worked for Sanders as a handyman.  He says he has done landscaping, patio work, and minor home repairs for Sanders in Sanders' residence.  Sanders apparently put Polk in touch with a tutor such that Polk can study and prepare for his G.E.D. examination.

*Id*.

On December 8, 1993, at the preliminary hearing for Conley's trial, Bergerson questioned Sanders under oath about his relationship with Polk.  Sanders acknowledged that on occasion Polk would do yard work at his house.  Purcell Dec. Ex. 7 at 22306:7-13.  Sanders testified that "there is a number of young men that worked on my lawn," and that he would see Polk about once a month.  *Id*. at 22306:17-18, 22307:6.  Sanders estimated that he had paid Polk around $300 to $400 for the work he did on his house.  Chhabria Decl. Ex. S at 22303:18-20.

By the spring of 1993, Bergerson became suspicious about the relationship between Polk and Sanders.  On May 26, 1993, Bergerson and Heriot went to Polk's house to interview him about his expected testimony at Conley's trial.  Chhabria Decl. Ex. KK (June 11, 1993 Declaration of Donald Bergerson regarding Clifford Polk Issues) at 3.  According to Bergerson, Polk informed them that he had not spontaneously come forward as a witness.  *Id*. at 4.  Rather, Sanders and Hendrix "induced Polk to cooperate by playing for him a tape recording of the conversation in which Polk had told Conley that the Hunter's Point gang had relaxed its vigilance."  *Id*. at 4:13-16.  Sanders wrote that Polk told him how he later learned that Sanders and Hendrix "had surreptitiously monitored a number of residences in both Hunter's Point and Sunnydale during 1989."  *Id*. at 4:18-20.

According to Bergerson, as he and Heriot were leaving Polk's house, Polk solicited a bribe from Heriot in consideration for him to not testify at Conley's trial.  *Id*. at 4-5.  Bergerson raised this issue with the court and requested that Sanders be ordered to refrain from all further

communication with Polk. Chhabria Decl. Exs. KK, LL. Bergerson wrote about Polk's and

Sanders's relationship in a declaration he submitted to the court:

> Polk has resided both in and outside of this residence during
> portions of the past several years as part of some sort of arrangement
> supervised by Inspectors Hendrix and Sanders. Polk has something
> of a friendship with Sanders, who has shown Polk gruesome
> evidence photos to amuse him, and who has hired Polk to do
> yardwork. Polk claims to meet often with both inspectors, and
> especially Sanders, to go over testimony.

Chhabria Decl. Ex. KK at 4:3-9. At the hearing regarding this matter, Bergerson told the court

that Polk "had represented to [them] he had been paid by the police department." Chhabria Decl.

Ex. LL at 4:20.

Bergerson was also aware that on July 13, 1994, Sanders appeared in a televised interview

on KTVU stating that he requested witness protection funds for an unnamed witness who would

testify at Conley's trial. *See* SF JSUF ¶ 25. Sanders stated in the interview that the witness was

afraid for himself and his family, and that Sanders was trying to relocate him, but the state witness

protection program had "absolutely no funds." Chhabria Decl. Ex. T (Transcript of KTVU

Interview).

Bergerson wrote a letter to Giannini the day after Sanders's interview on KTVU to inquire

about the identity of the unnamed witness because Sanders's description of the witness did not fit

either Polk or Johnson. JSUF ¶ 12; Purcell Dec. Ex. 12. On July 18, 1994, Bergerson filed a

formal motion on the matter. JSUF ¶ 13; Purcell Decl. Ex. 13. At a July 29, 1994 hearing on this

motion, Giannini confirmed for the court that Sanders had been talking about Polk during the

KTVU interview. JSUF ¶ 15. On August 30, 1994, Sanders took the witness stand and testified

that he had been referring to Polk in the KTVU interview. Purcell Decl. Ex. 16 at 119:19-26.

Around the time of the July 29, 1994 hearing, Giannini disclosed to Bergerson a

memorandum written by Sanders on July 25, 1994 requesting witness protection funds for Polk.

JSUF ¶¶ 16-17; Chhabria Decl. Ex. W. The July 25, 1994 memorandum appears to be an edited

version of another memorandum Sanders wrote on May 27, 1994, which was not disclosed to

Bergerson; they are almost identical. *See* SF JSUF ¶ 23; Chhabria Decl. Exs. RR, W. Both

United States District Court
Northern District of California

memoranda are addressed to Lieutenant Gary R. Pisciotto, the Officer-in-Charge of the Homicide Section, and show that Sanders sought witness protection funds for Polk. Chhabria Decl. Exs. RR, W. Sanders wrote in the July 25, 1994 memorandum that "[o]ne of the key witnesses in the People's case, Cliford Polk had been approached several times by friends of the defendant in efforts to deter Mr. Polk from giving testimony in the upcoming trial." Chhabria Decl. Ex. W. Sanders further wrote:

> There have been monetary offers, verbal threats, physical assault and a direct attempt on the witness's life. The most recent attempt occurred on or about August 21st, 1994 in the Army Street Projects.
>
> In that attack, the perpetrator has been identified as Kevin Hall aka "Sinister," whom we strongly believe to be a hired assassin involved in at least one other witness assassination.
>
> Due to the gang and drug related issues in this case, we strongly feel there is a real and present danger to this witness.
>
> Therefore, we recommend that Mr. Polk be relocated from his present residence with his mother to a location where he is unlikely to be in contact with or accessible to friends, family, and associates of Defendant Conley or members of the Swampy Desert Street Gang.
>
> In order to accomplish this, we further recommend Mr. Polk be placed in the California State Witness Protection Plan. In this way, we can better provide for his safety. We request this assistance immediately.

*Id*. Sanders attached to the memorandum a proposed budget requesting $1030 for a six-month to year-long program "to be determined by when the eminent danger has passed." *Id*.

On September 5, 1994, weeks before the start of Conley's trial, Giannini wrote to Bergerson to inform him that Conley called Polk from jail. JSUF ¶ 32; Purcell Decl. Ex. 28. Polk supposedly informed Sanders that Conley had asked Polk not to testify. *Id*. On September 6, 1994, Giannini disclosed to Bergerson the notes Sanders had taken of Polk's description of the phone call. JSUF ¶ 33; Purcell Decl. Ex. 29. Sanders's notes state, *inter alia*, that Conley asked Polk why he was telling "lies" and spoke in a "hostile" tone. *Id*. At the bottom of the notes, Sanders wrote: "According to Polk several members of the Sunnydale group have been seen as late as 9/5/94 driving past his mother's house. On 9/5/94 Polk states he saw a red car pass his mother's house occupied by Sunnydale residents." *Id*.

Conley also wrote three letters to Polk while he was in the San Francisco County Jail awaiting trial.  SF JSUF ¶ 22; Chhabria Decl. PP.  In each of the letters, Conley urges Polk to call Bergerson and explain why he made false statements, and emphasizes the importance of Polk doing so.  The following excerpt exemplifies the tone of these letters:

> So listen dude this is my life we talking about and it's all up to you now all you have to do is tell my lawyer you want to hollar at him with my investigator and just tell them the reason you implecated [sic] me was because you were scared they were going to cross you up in all that shit that was going on.

Chhabria Decl. Ex. PP.

Conley's criminal trial began on September 26, 1994.  On October 1, 1994, the Saturday before the Monday in which Polk testified, Giannini wrote Bergerson a letter informing him that Patrick Rushing (Deann Rushing's brother) decided to testify in the case.  *See* Purcell Decl. Ex. 18.  The first two paragraphs of the letter discuss Patrick Rushing.  The final paragraph reads: "Statements from Rushing and other witnesses attached.  Specifically, please note that Clifford Polk has been relocated temporarily to an out of town location, and is receiving room and board while the trial lasts."  *Id*.  The October 1, 1994 letter did not refer to any other payments given to Polk.  *See id.*

Giannini testified in Conley's habeas proceeding that, aside from the October 1, 1994 letter, he could not recall any other written disclosure he made to Bergerson regarding the benefits given to Polk in connection with Conley's trial.  Purcell Decl. Ex. 4 at 166:12-24.  Giannini explained why he began to put his disclosures to Bergerson in writing "[i]ncreasingly by the end of the case":

> That was the very purpose of the [October 1, 1994] letter.  I had become very concerned that Mr. Bergerson had a habit of saying he never got stuff or he didn't know stuff that turned out, in my estimation, to be inaccurate.  So what I was doing was backfiling. [Bergerson] knew that Mr. Polk had been relocated before I wrote [the October 1, 1994] letter because I informed him as it was happening as I had informed him all along.  But given the history of the case, at this point I began to write confirming letters that I did not write in any other case nor had I written previously in this case.

*Id*. at 166:28 - 167:10.

On October 3, 1994, during Polk's testimony at Conley's trial, there was a sidebar between the court, Bergerson and Giannini. Chhabria Decl. Ex. H at 757:14 - 760:14. Bergerson initiated the sidebar to object to Giannini's questioning about any bribes Polk had been offered not to testify against Conley. *Id*. at 757:14. The judge overruled Bergerson's objection and then also rejected Giannini's subsequent request that he be permitted to elicit testimony that Polk had been attacked by Kevin "Sinister" Hall. *Id*. at 758-59. Giannini protested, and the following discussion ensued:

> Mr. Giannini: What's going to happen counsel is going to stand up and say: You got room, board, food, money, Earl Sanders did this for you, Earl Sanders did all of that for you, and the reason that happened is that this witness (Polk) reported all of his problems. If you believe me. If counsel is going to do that, I'm entitled first.

> The Court: Your inquiry at this point is limited to the question about bribes. The other stuff is irrelevant.

> Mr. Bergerson: As long as we're here, though, let me explain something. I do not intend to go and bring in Mr. Polk's current witness protection status or lack thereof since this attack on him by this individual Sinister. I don't know what his status is. It has already been qualified by counsel. What I [will] bring up is other benefits which may or may not been given to this witness prior to the attack by Sinister.

> The Court: At this point the Sinister thing is irrelevant at this point. May be come relevant later.

> Mr. Giannini: Counsel is going to stand up. This guy told you he is living across the bay. He is. This witness is bought and paid for.

> The Court: At this point we're limited to the bribe statement.

*Id*. at 759:17 - 160:12.

### D. Information Allegedly Not Disclosed to the Defense

There are several pieces of evidence that were allegedly not disclosed to the defense, including: (1) Sanders's alleged facilitation of conjugal visits for Johnson and Rushing in exchange for Johnson's testimony; (2) handwritten IOU's showing Polk borrowed money from Sanders in 1991; (3) a letter Polk wrote to Sanders in 1992 in which Polk told Sanders "I still love you" and asked for $200 to buy clothes while living in Los Angeles; (4) Sanders's coordination of

a six-month lease on an apartment for Polk and his mother to live in during the end of Conley's

trial and after, as well as associated expenses; (5) cash, and receipts for cash, that Sanders gave to

Polk under the title of witness protection funds before, during and after Conley's trial; and (6) the

manner in which Sanders gave Polk the cash.[4]

### 1.    *Conjugal Visits*

As explained above, Sanders is accused of having facilitated conjugal visits between

Johnson and Rushing in exchange for Johnson's testimony at Conley's trial.  Sanders denied ever

permitting such conjugal visits when questioned by Bergerson (who had heard of a rumor), and

Giannini believes that it would have been impossible for Sanders to have facilitated secret

conjugal visits in the Homicide Detail.  Purcell Decl. Ex. 7 at 22284; Ex. 36 at 56.  Both Johnson

and Rushing were deposed in connection with this lawsuit, and testified that Sanders facilitated the

conjugal visits.  Purcell Decl. Ex. 32 at 26-38; Ex. 34 at 29-40.

### 2.    *IOU's*

There is documentation that Sanders lent Polk small amounts of cash in July and October

of 1991, and documented the loans in a series of "IOU's."  *See* Purcell Decl. Ex. 23 at SFPD 416-

17.  The IOU's show that each loan was generally in the amount of $10, but ranged from $4 to

$27.  The total amount of the IOU's was $41 in July of 1991, and $20 in October of 1991.

Giannini could not recall whether Sanders ever informed him about the IOU's, or whether he

disclosed the IOU's to Bergerson.  Purcell Decl. Ex. 4 at 197.

---

[4] At the motion hearing, Plaintiff's counsel identified another alleged item of undisclosed evidence−the October 6, 1994 presentencing report from the San Francisco Probation Department regarding Polk's then-pending narcotics case.  There is no reference, however, to this report in the parties' briefs, and Court did not find the report in the record.  The only indication that there is such a report is from Judge Miller's findings in her habeas order:

> The report states that Polk was receiving "*$60 every three or four days or approximately $120 a week or $480 a month*" and that Polk "believes it is from the San Francisco Police Department *for services provided to them.*" (emphasis added).  The report also states that Polk had previously been employed at "Sanders Security Firm of South San Francisco."  The probation officer described Polk as an "unrepentant" criminal[.]

Purcell Decl. Ex. 1 (Habeas Order) at 32.  While this report could support Conley's claim, neither the report, nor any admissible evidence regarding the report is before the Court.  Accordingly, Sanders is entitled to summary judgment as to any claim arising out of this report.

### 3. *The "I still love you" Letter*

Polk mailed a handwritten letter to Sanders that was dated July 10, 1992. JSUF ¶ 29. The return address on the envelope indicates that Polk was living in Los Angeles at the time he wrote the letter. Purcell Dec. Ex. 24. It is undisputed that Bergerson did not receive a copy of this letter. SF JSUF ¶ 21. In the letter, Polk refers to himself as Sanders's "son in law" and updates Sanders about his progress in school. Polk then writes:

> Well Earl I appreciate every thing you done [sic] for me as guiding me from destruction to learning about life, when I come home I really want to maintain the same relationship we have now and a little bit more, remember you said we were going fishing, so I'm looking forward to being on that boat. Well Earl I'm going to end this letter now but *I still love you* and [] tell Espanola I said hello.

Purcell Dec. Ex. 24 (emphasis added).

Polk concludes the letter as follows: "P.S. Earl could you please send me 200$ hundred dollars I no [sic] that sounds like a lot of money but I would like to buy some clothes and shoes up here, after all I'm going to be here at least a year. Thanks a lot. Write Back soon!!" *Id*. There is documentation that in the two weeks after Polk's request for $200, Sanders withdrew $600 in four installments from a bank account he used to provide witness protection funds to Polk in connection with the *Green* case. *See* Purcell Decl. 17 at SFPD 301.

### 4. *Six-month Lease & Associated Expenses*

On October 14, 1994, after Polk's testimony but before the end of Conley's trial, Polk signed a six-month lease with the Bay Area Coalition for the Homeless to live in protective housing with his mother (and pay zero rent) in a single-family home in [the East Bay]. JSUF ¶ 27; SF JSUF ¶ 47; Chhabria Decl. Ex. WW. Sanders arranged for this lease through the United States Department of Housing and Urban Development ("HUD"). SF JSUF ¶ 47. Before Polk signed the lease, Polk stayed at a hotel in San Francisco for two nights on October 11 and 12, 1994, and Sanders paid for the $123.20 in charges with SFPD funds. SF JSUF ¶ 46; Chabbria Decl. Ex. NN.

Sanders also paid for the expenses associated with the new home with SFPD funds. The same day Polk signed the lease, Sanders distributed $240 in cash from SFPD funds to Polk, with a notation stating that the funds were, in part, for cleaning, repair, and new locks for the home. SF

JSUF ¶ 48; Chhabria Decl. Ex. XX. The record shows that about a month after Polk signed the lease, on November 17, 1994, Sanders indicated that $400 would be (or had been) used to purchase used furniture for Polk, including a sofa, chairs and table for the living room, a bed and mattress for the bedroom, as well as lamps and a refrigerator. Chhabria Decl. Ex. AAA. Sanders also used SFPD funds to pay hundreds of dollars for the utilities for the HUD home during the time of the lease. JSUF ¶ 28; Purcell Decl. Ex. 17 at SFPD 496, 509, 518-19, 523, 535-36, 539-40.

At his deposition for Conley's habeas case, Sanders testified that he informed Giannini when Polk was relocated, but left out the details unless Giannini asked for more information. Chhabria Decl. Ex. FF at 229:21 - 230:15. Sanders would tell Giannini that Polk "was in a safe place in another city" and that "the people who were trying to kill him didn't have access to him." *Id.* at 229:22-24. Sanders testified that he would not, however, have told Giannini where Polk was living or that Polk had received a six-month lease on a HUD house. *Id.* at 230:12. There is no evidence that any of the details recited in this section, other than the bare fact of relocation, were provided to Bergerson.

### 5. *Cash Payments Provided to Polk*

It is undisputed that Sanders provided Polk with a series of cash disbursements before, during and after Conley's criminal trial using SFPD witness protection funds. There are a series of receipts documenting these cash payments in evidence. *See* Purcell Decl. Ex. 17. The first such receipt shows that Sanders provided Polk with $25 in SFPD funds on July 29, 1994. Purcell Decl. Ex. 17 at SFPD 582. This was the same day that the court held a hearing regarding Sanders's interview on KTVU, when Giannini represented to the court that Polk "is not being relocated at this point." Purcell Decl. Ex. 14 at 4:15-16.

The receipts also show that between July 29, 1994 and the first day of Conley's trial on September 26, 1994, Sanders gave Polk $390 in cash from SFPD witness protection funds. SF JSUF ¶ 30. Between September 26, 1994 and October 10, 1994, Sanders gave Polk another $205. *Id.* ¶ 45. This includes $145 that was given to Polk in the five days after Polk testified on October 3, 1994, before the jury began to deliberate. JSUF ¶ 26. The jury concluded deliberations and

returned a guilty verdict on October 18, 1994. SF JSUF ¶ 51. Between October 18, 1994 and

November 12, 1994, Sanders distributed $590 in cash from SFPD funds to Polk. SF JSUF ¶ 52.

Plaintiff was sentenced on January 25, 1995. The record reflects that between November 17, 1994

and the day of Conley's sentencing, Sanders gave Polk $325. Purcell Decl. Ex. 17 at SFPD 518,

597, 619, 621-25.[5]

Sanders testified at his deposition for Conley's habeas proceeding that he and Giannini

were in "constant communication" about his efforts to obtain witness protection funds for Polk

and the status of those efforts. Chhabria Decl. Ex. EE at 158:20. Sanders stated that he would

always let Giannini know when a new piece of information arose in a case. *Id*. at 109:2-15. When

asked to describe in his own words a police officer's duty under *Brady*, Sanders testified that his

"understanding" was that he had an obligation to "turn everything over to the District Attorney."

Purcell Decl. Ex. 2 at 33:24-25 - 34:1.

Giannini testified at his deposition for this proceeding that he knew Polk was receiving

witness protection funds "[b]ecause of the way" he and Sanders "did business." Chhabria Decl.

Ex. DD at 11:4-5. Giannini stated that he was aware of Clifford Polk's status "because that would

be a very, very routine thing," and if he "had stopped knowing what was going on with Clifford

Polk, that would have become an issue." *Id*. at 11:13-15. Giannini could not recall, however, any

specific conversation he had with Sanders about the amount of money he was spending on Polk

when he testified in Conley's habeas proceeding. Purcell Decl. Ex. 4 at 179:4-7. Giannini could

also not recall whether he saw any receipts documenting the payments Sanders gave to Polk. *Id*.

at 176:15 - 177:4. Moreover, on May 28, 2009, Giannini wrote in a declaration:

> I do not recall either receiving from inspectors or providing to the
> defense specific details regarding the "room and board" or any cash
> disbursements given to Clifford Polk during the Conley trial. As a
> general practice, I would not have obtained or provided that
> information because there is often information on such receipts that
> can be used to locate a witness. I do not recall any specific request
> from defense counsel regarding the details of the payments made to
> Clifford Polk. If such a request had been made, I would likely

[5] The record also shows that Sanders gave Polk another $140 between Conley's sentencing and March 29, 1995. Purcell Decl. Ex. 17 at SFPD 498, 533-34.

United States District Court
Northern District of California

remember that, and copies of any information provided would be in my file.

Purcell Decl. Ex. 27.

It is undisputed that at the time the State responded to Conley's subpoena in the habeas proceedings, the receipts documenting Sanders's cash payments to Polk during the *Green* and *Conley* trials were not located either in Sanders's SFPD file or in Giannini's SFDA file for the murders of Roshawn Johnson and Charles Hughes. JSUF ¶¶ 30-31. Rather, it appears that the receipts documenting payments to Polk were found in unmarked boxes in a SFPD storage facility. *See* Purcell Decl. Ex. 26 (Deposition of David DiFranco). This evidence seems to contradict Sanders's deposition testimony that although he never observed Giannini review the receipts, Giannini "knew the receipts were in the file." Purcell Decl. Ex. 2 at 142:7-8.

In any event, Giannini testified at Conley's habeas proceeding that he did not believe it was important for him to actually see the receipts documenting the money Sanders provided to Polk. Purcell Decl. Ex. 4 at 178-79. Giannini said that he was aware Sanders was giving Polk witness protection funds around the time of Conley's trial, and "was sure there was receipts somewhere." *Id.* at 177:8. Giannini also testified that he would not have asked to see the receipts, nor would he have wanted the receipts in his SFDA case file, because they were "administrative" and may have posed a threat to Polk's safety. *Id.* at 179:28. This, of course, conflicts with Giannini's statement to the trial court that he had "provided … every document … compiled by the San Francisco Police Department" in connection with this case. JSUF ¶ 10; Purcell Decl. Ex. 10.

At his deposition for Conley's habeas proceeding, Giannini testified that it was his "recollection" that he informed Bergerson about Polk's receipt of witness protection funds "at regular intervals." Chhabria Decl. Ex. CC at 179:1-5 ("Now, I can't tell you the dates or the conversations, but we did periodically update discovery for Mr. Bergerson on this case including stuff that was happening with Clifford Polk."). Giannini stated that "[w]henever anything came up in a periodic update, if there's been a benefit provided to a witness, that's part of the routine discovery." *Id.* at 192:1-3. Giannini testified that if Polk was receiving payments before the trial

started, then Bergerson "was aware of it" because Giannini "would have told him." *Id.* at 208:13-16. At Conley's habeas proceeding, Giannini estimated that he gave Bergerson roughly "six, seven, [or] eight" oral updates on the benefits Polk was receiving. Purcell Decl. Ex. 4 at 167:27-168:27.

Bergerson's deposition testimony for Conley's habeas proceeding implies the contrary. *See* Purcell Decl. Ex. 6. Bergerson testified that, apart from the October 1, 1994 letter informing him that Polk had been temporarily relocated and was receiving room and board while the trial lasts, he had not received any specific disclosure discussing benefits paid to Polk by Sanders. *Id.* at 379:8-12. Bergerson testified: "My understanding, as of October 1st, was that there had been no relocation benefits, protection, or anything for Clifford Polk, with — well, there was — I was aware that at some point he had mowed Inspector Sanders' lawn or something; but other than that, I knew of nothing." *Id.* at 372:11-16.

Bergerson also testified that he "[a]bsolutely would have remembered" being informed of such payments. *Id.* at 379:14. Bergerson said he "felt it was possible or likely that Mr. Polk was not motivated by good community sentiment [to testify against Conley] but was being offered inducements to testify." *Id.* at 337:16-18. Bergerson stated that it would have been important for him to know the duration of the payments, the amount of the payments, and the frequency of the payments. *Id.* at 379:6-7.

### 6. *Manner of Payment*

Conley argues that the way in which Sanders distributed cash to Polk is indicative that the money was not for witness protection, but rather was payment for testimony. Sanders testified that Polk would page him and the two of them would arrange a time for Polk to pick up cash at Sanders's office in the Hall of Justice. Purcell Decl. Ex. 2 at 127:21-28:5. When asked whether Polk was given something like a "weekly allowance," Sanders responded: "Yeah, that's reasonable. Yeah, that's about right." *Id.* at 128:11-15. Sanders testified that he would document the cash payments he provided to Polk by creating a receipt which included the amount of cash, the date, and what the money was for, and Polk would sign the receipts. *Id.* at 128:19-22. Sanders testified that he did not ask for receipts of Polk's purchases or place any controls over the way

1  Polk spent the cash he gave him.  *Id*. at 142:17-25.

2      Judy Cornick from the California Witness Protection Program was also deposed in

3  connection with Conley's habeas proceedings.  Purcell Decl. Ex. 20.  Cornick testified that an

4  individual's life must be threatened before they will disburse witness protection funding.  *Id*. at

5  52:24.  Cornick also testified that they did "not have guidelines on how the officers handle their

6  witnesses," and that officers have a lot of discretion in how they handle witness protection funds.

7  *Id*. at 72:13-19.

8      Giannini was asked, when testifying at Conley's habeas proceeding, whether he was aware

9  that before and after Conley's trial, Polk would page Sanders and then go to the Hall of Justice to

10 pick up cash.  Purcell Decl. Ex. 4 at 183:25-184:1.  Giannini testified that he could not recall, and

11 in any event, would not have disclosed to Bergerson the particular manner in which Polk retrieved

12 money from Sanders:

13          Q: So were you aware that in 1994-1995, around the time of the
            Conley case, Mr. Polk and Inspector Sanders had a relationship
14          where Mr. Polk paged Inspector Sanders, would come to the Hall of
            Justice and received a weekly amount of cash?
15

16          A: I don't recall.

17          Q: You never disclosed that relationship to Mr. Bergerson; did you?

18          A: If it existed and if I knew about it, I would have told Mr.
            Bergerson that Clifford Polk is still getting money from Inspector
19          Sanders, and I would have put it that way.

20

21 *Id*. at 184:16-25.

22      Conley also points to the fact the payments to Polk increased in frequency and amount

23 around the time of Polk's testimony and thereafter.  The receipts show that Polk began to receive

24 payments from Sanders about two months before Conley's trial (approximately $415 for two

25 months), but that the payments increased immediately before and after Polk's testimony.  Polk

26 received $110 in the first week of Conley's trial, before he testified on October 3, 1994, and

27 received $145 in the week after his testimony.  JSUF ¶ 26; Purcell Decl. Ex. 17 at SFPD 601-03.

28 Polk received $590 between October 18, 1994 and November 12, 1994, *see* SF JSUF ¶ 52, and

another $325 before Conley's sentencing, *see* Purcell Decl. Ex. 17 at SFPD 518, 597, 619, 621-25.

At Sanders's deposition in connection with Conley's habeas proceeding, Sanders was asked whether he "ever provide[d] Mr. Polk with money for food or transportation outside of the context of witness relocation." Purcell Decl. Ex. 2 at 224:21-23. Sanders responded: "No." *Id*. at 224:24. It is undisputed, however, that Polk received $595 in cash from Sanders, over a period of roughly two and a half months, before he was relocated during Conley's trial on October 11, 1994. SF JSUF ¶¶ 30, 45-46.

**E.     Evidence Allegedly Indicating Sanders Concealed Impeachment Evidence**

Conley also directs the Court to other evidence allegedly supporting the inference that Sanders sought to conceal the extent of benefits he provided to Polk. For instance, on August 30, 1994, the court held a hearing to determine the identity of the confidential informant Sanders had mentioned during the KTVU interview. Bergerson questioned Sanders under oath:

> Q: In that [KTVU] interview you made reference to an individual who was, I believe, living in the neighborhood and fearful for his life. You recall the interview, the reference you made to an individual who sought protective housing from you, but you were unable to provide it?
>
> A: That's correct.
>
> Q: Okay. To whom were you referring?
>
> A: Clifford Polk.
>
> Q: Do you have in your possession whether constructive or otherwise records of Mr. Polk's application for protective housing?
>
> A: No. We just didn't have − he didn't make application. He just responded that he had been threatened and in his neighborhood.
>
> Q: Do you have logs, notes or other memoranda concerning the interviews you had with Mr. Polk with regard to the threats and/or with regard to his request for protective housing?
>
> A: I did make a note. And you've been provided with that document.[6]

---

[6] Sanders deposition testimony in Conley's habeas proceedings clarifies that his reference to "that document" meant the memorandum written by Sanders dated July 25, 1994 requesting witness protection funds for Polk. Purcell Decl. Ex. 2 at 163:2-9.

25

Purcell Decl. Ex. 16 at 119:19 - 120:10.  It is undisputed that by the time Sanders was questioned

under oath on August 30, 1994, Sanders had given Polk $170 in cash payments in SFPD funds.

JSUF ¶ 19.  Sanders did not mention any of these payments at the August 30, 1994 hearing.  *See*

Purcell Dec. Ex. 16.  Sanders gave Polk $40 the very next day, and gave Polk another $155 before

he testified.  SF JSUF ¶ 30.

Sanders was later questioned about his testimony at the August 30, 1994 hearing in

connection with Conley's habeas proceedings:

> Q: Okay.  If Clifford Polk had been provided witness protection
> funds as of the date of this hearing, is that something that you think
> you would have mentioned to the court?
>
> A: I would have mentioned to the court and given them
> documentation of it.  Whatever I do on a − whatever we do on a
> homicide case, it was documented.
>
> Q: So at this hearing, if he had been provided funds up to that point,
> that's something that you would have mentioned to the court,
> correct?
>
> A: That was the policy, yes.

Purcell Decl. Ex. 2 at 163:24 - 164:10.

In addition to Sanders's testimony, Conley argues that Polk's false testimony about his

status in the witness protection program also supports the inference that Sanders sought to conceal

this impeachment evidence.  On October 3, 1994, when testifying at Conley's trial, Polk answered

the following questions from Giannini on direct examination:

> Q: Who specifically did you talk to in the police department?
> A: Earl Sanders.
> Q: And is that Inspector Sanders who is seated here at counsel table?
> A: Yes.
> Q: At that time what, if anything, did you tell them about this
> incident.
> A: Everything I knew.
> Q: Now, have you previously testified against Mr. Green?
> A: Yes.
> Q: And at that time were you given room and board and some living
> expenses during trial?
> A: Yes.
> Q: Is that part of the witness protection program?
> A: Yes. But I'm not in the witness protection program right now.

26

Purcell Decl. Ex. 19 at 755:13- 756:2.

Polk's statement that he was "not in the witness protection program right now" is contradicted by the fact that by the time of his testimony, Polk had received at least $450 from Sanders in cash disbursements of SFPD witness protection funds. JSUF ¶¶ 17-18, 25; Purcell Decl. 17. Polk had also signed every receipt documenting the cash disbursements, and almost every receipt explicitly stated that money was for "witness protection." JSUF ¶¶ 23-24; Purcell Decl. 17. As shown by Polk's testimony, Sanders was seated at the counsel's table when this questioning occurred. Sanders did nothing to correct Polk's testimony.

### F.    Conley's Habeas Petition

After spending 18 years in jail for the murder of Charlie Hughes and Roshawn Johnson, Conley's conviction was vacated on December 14, 2010 when Judge Marla J. Miller of the Superior Court of California, County of San Francisco, granted Conley's Petition for Writ of Habeas Corpus after a week-long evidentiary hearing. Although the Court does not rely on Judge Miller's decision, it is described in this Order as additional background. Judge Miller found that the State failed to disclose material impeachment evidence in violation of *Brady* and *Giglio*, and also knowingly presented false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).

Judge Miller first discussed Conley's *Napue* claim, and found that the State knowingly presented false testimony on the basis of Polk's testimony at Conley's trial that he was "not in the witness protection program anymore." Purcell Decl. Ex. 1 ("Habeas Order") at 8-15. Judge Miller wrote that "[s]ince July 1994 at the latest, Sanders had been giving Polk cash benefits through the San Francisco witness protection program," and that "Sanders knew [Polk's] testimony was false and did nothing to correct it." *Id.* at 9:3-5, 13; *see also id.* at 15:1-2 ("Even if the trial prosecutor was completely in the dark, Sanders should have prompted the trial prosecutor to correct the misstatement for the jury. But Sanders sat silently and allowed Polk to testify to facts that were not true."). Judge Miller found this to be material under *Napue*'s prejudice standard—there was a "reasonable likelihood that the false testimony could have affected the judgment of the jury," *United States v. Agurs*, 427 U.S. 97, 103 (1976)—because Polk's credibility was a key issue. Habeas Opinion at 13-14.

Judge Miller then discussed Conley's *Brady/Giglio* claim, focusing primarily on the cash payments Sanders gave to Polk from the SFPD witness protection fund.[7] *Id.* at 18-31. Other than the October 1, 1994 letter−which Judge Miller found to be "incomplete and misleading," *id.* at 27-28:16−Judge Miller found that the "records of payments or the fact of payments to Polk" had not been disclosed to Conley's defense counsel. *Id.* at 19:10-11. According to Judge Miller, there was a "direct contradiction" between Giannini's testimony that he did not recall seeing the receipts documenting Sander's cash payments to Polk, or recall discussing with Sanders the amount of money being paid to Polk in Conley's case, and Sander's testimony that he turned over "everything" to Giannini, including the receipts reflecting payments to Polk. *Id.* at 19-20.

Judge Miller was not persuaded by Giannini's vague testimony that he made oral disclosures of the payments to Bergerson in part because Giannini also testified that he put all disclosures in writing by the time of trial. *Id.* at 21-22. Judge Miller found "that as of the pretrial hearing on July 29, 1994, defense counsel was left with the unequivocal statement by trial prosecutor that Polk was *not* in witness protection," *id.* at 25:13-14, and further noted that "[n]either Sanders nor the trial prosecutor disclosed at the hearing on August 30, 1994 that Polk had already received direct cash payments from Sanders." *Id.* at 26:7-8, *see also id.* at 26:20-22.

Judge Miller held that there were *Brady* violations because "the totality of the suppressed evidence helps the defense and hurts the prosecution by casting doubt on the credibility and reliability of Polk—the State's linchpin witness—and Sanders, the co-lead investigator in the case to whom Polk came forward with evidence against Conley." *Id.* at 36:2-5. Finding that Polk's credibility was "central to the case," and "[s]o, too, was the credibility of Inspector Sanders," Judge Miller rejected the State's argument that Conley's defense counsel would not have sought to use this evidence. *Id.* at 37:10-11.

## G.      The Instant Lawsuit & Summary Judgment Motions

Plaintiff asserts one claim for relief in his Complaint under 42 U.S.C. § 1983. Section 1983 provides civil remedies for an individual who was deprived of rights secured by the United

---

[7] At the time of Conley's habeas proceeding, Johnson and Rushing had not yet been deposed, and therefore, had not testified to the conjugal visits.

States Constitution or federal law by a government official acting under the color of law. 42 U.S.C. § 1983. Conley alleges that Sanders deprived him of his constitutional rights under *Brady* and *Giglio* by withholding material impeachment evidence from Giannini, and, consequently, from Conley and his defense counsel.

Defendants move for summary judgment, contending Sanders did not violate Conley's rights, and in any event, is entitled to qualified immunity as a matter of law. Dkt. No. 109 (Defendants City and County of San Francisco and Prentice Earl Sanders' Motion for Summary Judgment) ("Def. Motion/Opp."). Conley opposes Defendants' Motion for summary judgment, and has filed his own Motion for Partial Summary Judgment with respect to particular elements of his *Brady/Giglio* claim. Dkt. No. 88 (Plaintiff Caramad Conley's Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment) ("Pl. Motion").

## III. DISCUSSION

### A. Legal Standard − Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

### B. Admissibility of Polk's 2005 Declaration

When deciding a motion for summary judgment, courts may only consider evidence that would be admissible at trial. *See* Fed.R.Civ.P. 56(c)(4). Polk is now deceased and therefore will not testify if this case goes to trial. Therefore, Defendants argue that Polk's declaration is inadmissible hearsay. If Polk's declaration is used for the truth of the matter asserted−that Polk

presented false testimony at Conley's trial—then Polk's declaration is hearsay and must be excluded unless it fits into one of the hearsay exceptions. *See* Fed.R.Evid. 802.

Defendants argue that Polk's declaration is not admissible under the hearsay exception for statements against interest. *See* Fed.R.Evid. 804(b)(3). Rule 804(b)(3) provides that a statement against interest may be admissible where, as here, the declarant is unavailable. The Rule defines a statement against interest as a statement that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it … had so great a tendency … to expose the declarant to civil or criminal liability." Fed.R.Evid. 804(b)(3).

Polk writes in his declaration that his entire testimony at Conley's trial was perjury. *See* Polk's 2005 Declaration ¶¶ 2, 7, 17-18, 21. This is a statement against Polk's penal interest because perjury is a crime. Cal. Penal Code §§ 166, 118. The statute of limitations for a crime of perjury does not begin to run until the perjury is discovered. *Id.* § 803(c)(2). Polk could have been prosecuted for this crime. Defendants argue that there was a remote possibility Polk would have been prosecuted for perjury, and notes that Polk died two years after writing the declaration. These arguments are beside the point. Polk executed a declaration under oath recanting his previous testimony under oath, exposing himself to criminal liability for perjury.

Defendants argue that Conley cannot rely on Polk's declaration because Polk's corollary statements blaming Sanders are not against Polk's penal interest. In support of this position, Defendants cite the Ninth Circuit's decision in *LaGrand v. Stewart*, where the court held that "a statement that includes both incriminating declarations and corollary declarations that, taken alone, are not inculpatory of the declarant, *must be separated* and only that portion that is actually incriminating of the declarant admitted under the exception." 133 F.3d 1253, 1267 (9th Cir. 1998) (emphasis added) (citing *Williamson v. United States*, 512 U.S. 594, 599–600 (1994) (noting that judges in federal cases must separate the incriminatory portions of statements from other portions for purposes of Rule 804(b)(3) because "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts")).

The parts of Polk's declaration which are against Polk's interest are separable from the parts of Polk's declaration which accuse Sanders of wrongdoing. For instance, in paragraphs 2, 7,

30

18-19 and 21, Sanders recants his testimony at Conley's trial, and does not refer at all to Sanders's conduct. These paragraphs are admissible under Rule 804(b)(3). Under *LaGrand* and *Williamson*, these paragraphs must be separated from the rest of Polk's declaration, which constitutes hearsay and does not fall under any exception to the hearsay rule. *LaGrand*, 133 F.3d at 167-68; *Williamson*, 512 U.S. at 599–600.

Moreover, the Court does not find Polk's declaration to be "exceedingly unreliable," *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005), as Defendants contend. In *Allen*, the Ninth Circuit did not discuss the admissibility of a declaration recanting previous testimony. Rather, the court affirmed the denial of a habeas petition upon finding "overwhelming" evidence of guilt. *See id.* at 933. In "briefly" rejecting one of the petitioner's claims, the court wrote that a witness's "later recantation of his trial testimony does not render his earlier testimony false… because his trial testimony implicating [the defendant] is consistent with the other evidence, while his recantation is not." *Id.* at 994. That is not the test, here, on summary judgment. In this case, a reasonable jury could find that Polk's declaration recanting his testimony at Conley's trial was not false.

### C. The Law under *Brady*

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The *Brady* principle applies to impeachment evidence that would discredit a state witness testifying against the accused. *Giglio v. United States*, 405 U.S. 150, 153 (1972); *United States v. Bagley*, 473 U.S. 667 (1985). The defendant is not required to request exculpatory or impeachment evidence. Rather, "the duty to disclose such evidence is applicable even though there has been no request by the accused." *Strickler v. Greene*, 527 U.S. 263, 280 (1999).

In *Kyles v. Whitley*, the Supreme Court held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." 514 U.S. 419, 437 (1995); *see also Youngblood v. West Virginia*, 547 U.S.

867, 869–70 (2006) (per curiam). The Court quoted its previous decision in *Giglio* that "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Kyles*, 514 U.S. at 438 (quoting *Giglio*, 154 U.S. at 154). The Court reasoned that "any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." *Kyles*, 514 U.S. at 438.

Courts in the Ninth Circuit may hold individual police officers liable for their *Brady* violations under 42 U.S.C. § 1983 if the officers act "with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1088 (9th Cir. 2009). In *Tennsion*, the Ninth Circuit decided whether Inspectors Sanders and Hendrix, in an unrelated case, were liable under § 1983 for their *Brady* violations. The court rejected the Inspectors' argument that they could only be liable if they acted in bad faith, and found that Inspectors Sanders and Hendrix were not entitled to qualified immunity for their *Brady* violations. *See id.* at 1087-95.

### D. Defendants' Motion for Summary Judgment

Defendants argue that Sanders is entitled to summary judgment as a matter of law. First, Defendants argue that there was no constitutional violation. Defendants contend that Sanders's disclosures to Giannini about Polk's status were sufficient to satisfy his *Brady* obligation as a matter of law. Defendants also argue that no reasonable jury could find that Conley was prejudiced by the evidence allegedly not disclosed, and contend there is no proof that Sanders acted with deliberate indifference with respect to his disclosures regarding Polk. Defendants also argue that the alleged conjugal visits provided to Johnson are not *Brady* material.

Even if Sanders did violate Conley's constitutional rights under *Brady*, Defendants argue that Sanders is still entitled to qualified immunity because any rights which were violated were not clearly established at the time of Conley's trial. Defendants argue that it was not clearly established in 1994 that the *Brady* obligation extended to police officers in addition to prosecutors, and in any event, the particularized facts of this case do not show a violation of a clearly

established right.  Defendants also argue that Conley cannot prove Sanders acted in bad faith, which he must to show that Sanders violated a right that was clearly established in 1994.

       **1.**       **Whether a Reasonable Jury could find that Sanders Violated Conley's Rights under *Brady***

             **i.**       **Whether Johnson's Conjugal Visits are *Brady* Material**

Before discussing the particular elements of Conley's *Brady* claim, the Court addresses Defendants' contention that the conjugal visits allegedly provided to Johnson are not *Brady* material.  First, Defendants argue that the conjugal visits never happened.  Defendants rely on the testimony of Sanders and Giannini to support this proposition.  However, both Johnson and Rushing were deposed in connection with this proceeding and testified that they were permitted conjugal visits in exchange for Johnson's testimony.  *See* Purcell Decl. Ex. 32 at 26-38, Ex. 34 at 29-40.  Therefore, the Court finds a disputed question of material fact as to whether the conjugal visits ever happened.

Defendants also argue that the conjugal visits are not *Brady* material because there is no *Brady* claim when a police officer makes false statements to the prosecutor or jury about the state of the evidence.  Defendants cite no Ninth Circuit authority for this proposition.  Instead, Defendants cite a series of cases from the Seventh Circuit.  *See Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008); *Harris v. Kuba*, 486 F.3d 1010 (7th Cir. 2007); *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1010 (7th Cir. 2006); *see also Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2006), overruled on other grounds by *Wallace v. City of Chicago*, 440 F.3d 421 (7th Cir. 2006).  Although no other circuit has followed the Seventh Circuit's reasoning on this point, the Court addresses this argument.

A close reading of the foregoing cases reveals two unremarkable principles relating to *Brady*.  The first is that *Brady* does not extend to circumstances in which the claimed violation consists solely of a police officer suppressing "evidence of the truth by making a false statement." *Harris*, 486 F.3d at 1017.  In other words, an officer's lie does not itself create exculpatory evidence that must be disclosed under *Brady*.  For instance, in *Harris*, police officers were accused of falsely informing a prosecutor that the defendant and another person who confessed to the

crime associated together on the street. *Harris*, 486 F.3d at 1016. The prosecutor apparently used the alleged association to defend the conviction of the defendant by theorizing that the defendant convinced the other person to confess to the crime. The Seventh Circuit refused to extend *Brady* to cover such circumstances. *Id*.

The difference between *Harris* and this case is that without the officers' alleged lie in *Harris*, there would have been no basis to allege a *Brady* claim. There was no suppressed evidence in *Harris*, separate from the lie itself. The lie in *Harris* created the incriminating evidence−rather than covering up exculpatory evidence. That is not the case here, where there is evidence that Johnson and Rushing were permitted conjugal visits because Johnson and Rushing both testified to that fact. The conjugal visits themselves, regardless of Sanders's alleged misrepresentations of their existence, constitute impeachment evidence under *Brady*. Sanders did not disclose these facts. The fact Sanders may have lied about the conjugal visits in addition to failing to disclose this exculpatory evidence to Giannini and the defense does not lead to the conclusion that the failure to disclose the exculpatory facts was permissible under *Brady*. Without any distinction between suppressed evidence and an officer's lie about the suppressed evidence, the government would not have a *Brady* obligation to disclose favorable evidence whenever a police officer lies about its existence.

Nevertheless, this distinction does not hold true with respect to the three other decisions of the Seventh Circuit. In *Gauger*, *Sornberger* and *Carvajal*, there was exculpatory evidence that was separate from the officer's lie. In *Gauger*, for instance, the § 1983 plaintiff asserted a *Brady* claim based on police officers' alleged misrepresentations about certain exculpatory details contained in his confession made to the officers in an interrogation room. *Gauger*, 349 F.3d at 360. The exculpatory parts of the confession were separate from the officer's lie about the confession. *See id.*; *see also Sornberger*, 434 F.3d at 1027 (the exculpatory evidence was the coercive circumstances, which was distinct from the officer's lie). Similarly, in *Carvajal*, an officer was accused of lying *about* the day in which he first saw a photograph of the defendant because another officer's testimony suggested he saw it sooner. *Carvajal*, 542 F.3d at 567.

The reasoning in these cases, however, renders them inapplicable to this matter. The

34

United States District Court
Northern District of California

Seventh Circuit first discussed the issue in *Gauger* when the court wrote that the defendant "knew what he had said at the interrogation room. The problem was not that evidence useful to him was being concealed; the problem was that the detectives were giving false evidence." *Gauger*, 349 F.3d at 360. The Seventh Circuit's reasoning in *Sornberger* and *Carvajal* is the same. In *Sornberger*, the court held that the § 1983 plaintiff already knew about the evidence she was contending had not been disclosed. *Sornberger*, 434 F.3d at 1029 ("However, Teresa already was quite familiar with those circumstances. Teresa knew herself what occurred during the interrogation, and the police were under no *Brady* obligation to tell her again that they coerced her into confessing."). In *Carvajal*, the court found no *Brady* violation because the § 1983 plaintiff was aware of the inconsistencies between the two officers' accounts and "[t]here was nothing preventing Carvajal from discovering and drawing out this discrepancy between the officers' stories during the suppression hearing." *Carvajal*, 542 F.3d at 567.

Thus, in the three cases where exculpatory evidence existed separate and apart from the lie about the exculpatory evidence, the Seventh Circuit found no *Brady* violation because "[s]uppression does not occur when the defendant could have discovered it himself through reasonable diligence." *Carvajal*, 542 F.3d at 567 (quotations omitted). The Seventh Circuit's holdings in these cases are not straight-forward, but the underlying rationale is self-evident−evidence that is not suppressed does not qualify as *Brady* material. The origins of this rule go back to the Supreme Court's rule that *Brady* evidence must have "been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976).

The Court does not find the Seventh Circuit's reasoning persuasive as applied to this case for two reasons. First, the existence of the conjugal visits is the impeachment evidence that should have been disclosed. The fact Sanders may have lied about the conjugal visits does not excuse this nondisclosure. Second, unlike the § 1983 plaintiffs in *Gauger, Sornberger* and *Carvajal*, Conley was not aware that Johnson was permitted conjugal visits in exchange for his testimony. The Court elaborates on this second conclusion in the following discussion of the "nondisclosure" element of Conley's *Brady* claim.

### ii. Analysis of the *Brady* Elements

There are three elements to a *Brady* claim. "First, there must be evidence that is favorable to the defense, either because it is exculpatory or impeaching. Second, the government must have willfully or inadvertently failed to produce the evidence. Third, the suppression must have prejudiced the defendant." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013) (citing *Strickler*, 527 U.S. at 281-82). The Court addresses each element separately.

### a. Favorability

A jury could reasonably find that the evidence at issue was favorable. "Any evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes." *Milke*, 711 F.3d at 1013.

First, with respect to the conjugal visits, there can be no question that this was favorable impeachment evidence. For an incarcerated man serving life without parole, the opportunity for conjugal visits may have been more influential than any monetary reward.

A jury could also find that Sanders's cash disbursements and other benefits of SFPD witness protection funds given to Polk was favorable evidence. Each cash disbursement was not an insignificant amount, and the cash payments increased in frequency as the trial and Polk's testimony drew nearer, as well as after Polk's testimony. *See* Purcell Decl. Ex. 17. This evidence tends to impeach Polk by permitting the inference that Polk's testimony against Conley was motivated by the rewards he received. *Tennison*, 570 F.3d at 1095 (9th Cir. 2009) ("The offer of a reward to a key witness is material impeachment evidence that should have been disclosed.").

This inference is buttressed by the July 10, 1992 letter showing that Polk referred to himself as Sanders's "son in law" and told Sanders "I still love you." *See* JSUF ¶ 29; Purcell Decl. Ex. 24. This is evidence of an unusually close relationship between an investigator and a witness. In the letter, Polk asked Sanders to send him $200 for clothes, despite the fact he was in Los Angeles at the time, and therefore, outside of the threat zone. *Id.* Polk's request for $200 to spend on clothes, combined with the IOU's showing that Polk borrowed $61 from Sanders in July and October of 1991, as well as the lack of any controls on how Polk used the cash disbursements, shows that Sanders provided Polk with money outside of the normal scope of witness protection

funds.  All of this evidence tends to call into doubt the motivations behind Polk's testimony.

### b.    Nondisclosure

"The Second element of a *Brady* violation is the willful or inadvertent failure of the prosecutor to disclose evidence favorable to the defendant." *Milke*, 711 F.3d at 1016 (citing *Strickler*, 527 U.S. at 281-82).  The evidence must have "been known to the prosecution but unknown to the defense." *Agurs*, 427 U.S. at 103.  It is undisputed that Giannini made all the disclosures that were made to Bergerson, and that Sanders gave information to Giannini.  Therefore, to hold Sanders liable under § 1983 for suppressing evidence, Conley must show that Sanders withheld material impeachment evidence from Giannini−which was then not disclosed to the defense.  For the following reasons, a reasonable jury could find that Sanders failed to disclose to Giannini each category of evidence Conley contends was withheld.

Defendants do not contend that Sanders was under no obligation to disclose impeachment evidence, but do argue that Sanders made sufficient disclosures to Giannini as a matter of law.  The heart of Defendants' argument is that the *Brady* duty is a prosecutorial duty, and that police should not be held to the same standards as prosecutors.  Defendants quote the Supreme Court for the proposition that "the individual prosecutor has duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437.  Defendants also cite the Fourth Circuit in *Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000) (*en banc*), where six judges on an equally divided *en banc* court maintained that police officers must be held to a much more lenient *Brady* duty than prosecutors in § 1983 cases.  *See id.* at 660 ("[T]o speak of the duty binding police offices as a *Brady* duty is simply incorrect.  The Supreme Court has always defined the *Brady* duty as one that rests with the prosecution.").[8]

The Court finds that Defendants' argument begs for abuse and runs counter to *Brady* precedent.  *See Tennison*, 570 F.3d at 1087 (rejecting the argument that *Brady* only imposes a duty

---

[8] The six judges on the other side agreed that while there are "functional differences" between a prosecutor's duty and a police officer's duty under *Brady*, that "should not obscure the fact that *Brady* creates a singular constitutional duty, which prosecutors and police officers are capable of breaching in factually different ways." *Jean*, 221 F.3d at 664 (Murnaghan, J. dissenting).  Notably, the plaintiff in *Jean* alleged "at most a negligent communication between these officers and the prosecutor." *Id*. at 658.

on prosecutors, and not on police officers). If a law enforcement officer may, as a matter of law, fulfill his or her constitutional *Brady* duty by disclosing only a portion of exculpatory and impeachment evidence, even the duties imposed on prosecutors−to disclose exculpatory material in the possession of investigators−would be insufficient to protect against abuse. Investigators could thwart the otherwise reasonable efforts of the prosecutor by not disclosing material (as here), and, in the absence of a habeas proceeding, the evidence might never come to light. One of the virtues of claims under § 1983 is that investigators know that they can be held personally liable if they withhold exculpatory material. The Ninth Circuit has clearly held that "*Brady* and *Giglio* impose obligations not on the prosecutor, but on the government as a whole." *United States v. Blanco*, 392 F.3d 382, 394 (9th Cir. 2004) (citing *United States v. Zunco-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995) ("it is the government's, not just the prosecutor's, conduct which may give rise to a *Brady* violation.").

There is sufficient evidence in this case from which a reasonable jury could conclude that Sanders failed to disclose material impeachment evidence to Giannini, which was then not disclosed to the defense. Defendants contend that Bergerson was aware of the allegations that Sanders was permitting Johnson and Rushing to have the visits, and therefore, the evidence was not suppressed. *Agurs*, 427 U.S. at 103 (*Brady* evidence must have been "unknown to the defense"). It is true that before Conley's trial, Bergerson's investigator, Ken Heriot, had heard rumors of unsupervised visits between Johnson and Rushing. *See* Purcell Decl. Ex. 35 (April 30, 2013 Deposition of Ken Heriot) at 9:1-3. Presumably, that is why Bergerson asked Sanders under oath at Conley's December 8, 1993 pretrial hearing whether he ever allowed Rushing to visit Johnson at the Homicide Detail. *See* Purcell Decl. Ex. 7. Nevertheless, even if Bergerson was aware of the possibility of conjugal visits, the Court agrees with Plaintiff that "[t]his argument is meritless under the Ninth Circuit's ruling in *Tennison*." Pl. Opp/Reply at 13:4.

In *Tennison*, the Inspectors argued that there was no *Brady* violation with respect to one of the items of suppressed evidence−a statement from a witness that the accused had not been at the scene of the crime−because the criminal defendants were also aware that this witness might be helpful to their case. *Tennison*, 570 F.3d at 1083, 1090-91. The court rejected this argument,

distinguishing a previous case where the State did not disclose the defendant's pretrial confinement medical records, and the court had held that defense counsel already had sufficient notice that those records existed. *Id.* at 1091 (citing *Raley v. Ylst*, 444 F.3d 1085, 1087 *opinion amended and superseded on denial of reh'g*, 470 F.3d 792 (9th Cir. 2006)). The court found the defendant in *Tennison* had not been aware of the exculpatory evidence, and quoted the Seventh Circuit for the proposition that "it is simply not true that a reasonably diligent defense counsel will always be able to extract all favorable evidence a defense witness possesses. Sometimes, a defense witness may be uncooperative or reluctant." *Id.* (quoting *Boss v. Piece*, 263 F.3d 734, 740 (7th Cir. 2001)).

In this case, the vague allegations that Bergerson's investigator had heard with regard to the conjugal visits were not of the same impeachment quality as the information that Sanders and at least two other people allegedly knew—that Sanders had facilitated the conjugal visits in exchange for Johnson's testimony. A reasonable jury could find that the conjugal visits were suppressed. The Court further notes that the suppression of the conjugal visits—if the jury finds they were suppressed—affects the entire case. If Sanders facilitated the conjugal visits, concealed that information from Giannini, and later denied such wrongdoing under oath, then, in Giannini's words: "It throws a shadow of suspicion on everything that they've said and done." Purcell Decl. Ex. 36 at 67:4-5.

With respect to Polk, Defendants argue that the uncontroverted evidence shows that Sanders made sufficient disclosures to Giannini. It is undisputed that Sanders had disclosed to Giannini—or Bergerson was otherwise aware—that Sanders paid Polk to do yard work at his home, that Polk had a personal relationship with Sanders—and had at least once referred to Sanders as his "stepfather," and that Polk was in the witness protection program during the *Green* trial. Bergerson and Giannini were also aware that Sanders requested witness protection funds for Polk in a July 25, 1994 memorandum, and that by October 1, 1994, Polk was being relocated temporarily and paid room and board "while the trial lasts." Purcell Decl. Ex. 18. Moreover, both Sanders and Giannini testified that they were in constant communication regarding all aspects of the case, including Polk's witness protection benefits and whether he had been relocated and was

receiving payments.  *See* Chhabria Decl. Ex. DD at 11-15, Ex. EE at 158.

The foregoing does not show that Sanders made disclosures of all the evidence that would tend to impeach Polk.  First, it is undisputed that the "I still love you letter" was not disclosed to Bergerson, and Giannini does not recall ever seeing the IOU's or disclosing them to Sanders.  JSUF ¶ 21; Purcell Decl. Ex. 4 at 197.  Giannini could also not recall being informed of the lease.  Therefore, a reasonable jury could find that Sanders did not disclose this evidence to Giannini.

Second, there is evidence from which a jury could conclude that Sanders did not disclose to Giannini (who then could not disclose to the defense) the cash payments given to Polk before, during and after Conley's trial, the receipts for those payments, or the manner in which the payments were given to Polk.  Bergerson testified that he was never told about these funds.  Giannini could not testify to any specific instance in which Sanders told him about any specific payment of money before, during or after the trial.  And of course, Giannini's testimony that−having been told generally that Polk was receiving funds−he told Bergerson about such funds, is contradicted by Bergerson.  A jury could also conclude that Sanders withheld the receipts for cash payments to Polk.  Giannini could not recall ever receiving the receipts.  This conclusion is also supported by the fact that the receipts were not found in either the SFPD case file, or in the SFDA's file.

The July 25, 1994 memorandum requesting witness protection funds does not change this conclusion.  That memorandum was only a request for funds−not evidence of any payments.  Similarly, the October 1, 1994 memorandum that Polk was relocated and receiving room and board did not disclose the extensive cash payments before and after the memorandum, or the six-month lease arranged for Polk.  Even Sanders testified misleadingly that Polk was not provided "with money for food or transportation outside of the context of witness relocation."  Purcell Decl. Ex. 2 at 224:21-24.

In sum, a reasonable jury could conclude that Sanders failed to disclose impeachment material to Giannini−which was then not disclosed to the defense−in violation of *Brady*.

### c.       Prejudice

The Supreme Court has held that "favorable evidence is material, and constitutional error

40

results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433 (quoting *Bagley*, 473 U.S. at 682). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434; *Milke*, 711 F.3d at 1018 ("it isn't necessary to find that the jury would have come out differently"). There is a "reasonable probability of a different result" when "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley,* 473 U.S. at 678).

A reasonable jury could find that the totality of the undisclosed evidence prejudiced Conley. *Kyles*, 514 U.S. at 421 (the *Brady* analysis "turns on the cumulative effect of all such evidence suppressed by the government"). First, as to the favors allegedly given to Johnson, in Giannini's own words, disclosure of the conjugal visits may have "gutted" the entire prosecution. Purcell Decl. Ex. 36 at 67:7. Moreover, if the conjugal visits occurred, then it is impeachment evidence not only against Johnson, but also against Sanders. Giannini stated that officers who would be so "moronic" would be "useless themselves as witnesses for any other part of this case." *Id.* at 67:2-4.

Sanders's alleged failure to disclose the full extent of benefits provided to Polk also could support a finding of prejudice. Polk testified that Conley told him he had participated in the crime, and also testified that he was not receiving witness protection payments. Disclosure of the payments Polk undisputedly received would have undermined Polk's credibility by suggesting to the jury that Polk had an ulterior motive to testify against Conley.

Defendants contend that the undisclosed evidence did not prejudice Conley as a matter of law. First, Defendants point to Conley's own testimony, and argue that the real reason Conley was convicted was because of the inconsistencies in his statements to the police and his alleged lies on the witness stand. Second, Defendants argue that Conley overstates the prejudicial value of the conjugal visits, and contend that in light of the fact Johnson had, in Bergerson's words, been "thoroughly impeached," the conjugal visits had no further impeachment value. Third,

Defendants argue that the undisclosed evidence regarding cash and other benefits provided to Polk, as well as evidence about Sanders's and Polk's relationship, is merely cumulative of the evidence undisputedly disclosed, and therefore, could not have prejudiced Conley. Fourth, Defendants argue that had the undisclosed evidence been presented at trial, it would have opened the door to further evidence incriminating Conley. Finally, Defendants argue that, the fact Polk made several prior consistent statements about Conley's involvement in the April 8, 1989 shooting before receiving any benefits from Sanders, undermines Conley's argument that Polk was motivated to testify because of the payments. The Court addresses each argument in turn.

First, with respect to Conley's own testimony, the Court agrees it was damaging to his defense. Giannini's cross-examination showed that Conley initially lied about his whereabouts the day of the crime. Chhabria Secl. Ex. J at 1030. Giannini told the jury that this lie indicated Conley was also lying about his whereabouts at the time of the murder, and that he was not, as Conley testified, asleep at his father's house. Giannini's theory was corroborated by the fact Conley's father never testified at trial, despite being in the courtroom. Chhabria Decl. Ex. BBB at 1237-38; Ex. K at 1113.

Giannini also impeached Conley's representation that he was not a member in the Sunnydale gang by showing inconsistencies in various statements made by Conley. Conley's testimony that he could walk freely in Hunter's Point was contradicted by Conley's previous statement to Hendrix and Sanders that he could not just be "walking around" that area. Chhabria Decl. Ex. J at 1039-65. Conley's testimony that he did not know why he attacked Jeffrey Franklin was similarly impeached by his earlier statement implying the attack was motivated by a desire to get revenge on Hunter's Point members. *Id.*

Nonetheless, while Conley's testimony hurt his case, Conley could not have been convicted solely on the basis of his own testimony. Indeed, without Polk's testimony, there would not have been sufficient evidence to prosecute Conley. *See* JSUF ¶ 4. Moreover, drawing all reasonable inferences in the light most favorable to Conley, there may have been no trial if Giannini had been apprised of the conjugal visits given to Johnson. When asked to assume the conjugal visits did occur, Giannini responded that "[i]t is so completely irresponsible, not to say

42

criminal, that it would have gutted that prosecution." Purcell Decl. Ex. 36 at 67:5-7. Thus, despite Conley's testimony, a reasonable jury could find that the totality of the undisclosed evidence undermines confidence in the fairness of Conley's trial and conviction.

Second, the Court does not find that the undisclosed evidence is merely cumulative of the evidence already disclosed. Defendants point to evidence showing that Bergerson was aware Polk received witness protection funds during and after the *Green* trial. In May of 1993, Polk told Bergerson that he "has resided in and outside of this residence during portions of the past several years as part of some residential arrangement supervised by inspectors Hendrix and Sanders." Chhabria Decl. KK. Around this same time, Polk also told Bergerson that "he has been paid by the police department." Chhabria Decl. LL at 4:16-20. Defendants also point to the fact Bergerson had been informed by the July 25, 1994 memorandum that Sanders requested witness protection funds for Polk, and was informed on October 1, 1994 that Polk was being temporarily relocated and provided with room and board for the duration of the trial.[9]

The information that had been disclosed regarding the payments to Polk does not undermine the importance of the other evidence that should have been disclosed. The fact Bergerson was aware Polk was receiving witness protection funds in connection with the *Green* trial is inapposite in light of Giannini's, Sanders's and Polk's subsequent representations that Polk was no longer in witness protection. And, as explained above, the July 25, 1994 memorandum requesting witness protection funds, and the October 1, 1994 letter informing Bergerson that Polk would be temporarily relocated, did not disclose the full extent of the benefits provided to Polk. Had the jury been informed that Polk received over a thousand dollars in cash, and free housing for six months, it may have been more inclined to find that Polk's testimony was not credible.

Defendants also argue that the "I still love you" letter is merely cumulative in light of the

---

[9] Defendants also argue that on October 3, 1994, Bergerson was made aware of the payments Polk was receiving when Giannini referred to such payments during a sidebar at Conley's trial. No such conclusion is required by a reading of the transcript. A reasonable jury could conclude that the prosecutor merely referred to evidence that Bergerson indisputably knew before that time.

fact Bergerson already knew that Sanders and Polk had a close relationship. Although Bergerson

knew that Polk had worked on Sanders's yard and had once referred to Sanders as his "stepfather,"

a jury could conclude that the true extent of the relationship had not been revealed. *See* Chhabria

Decl. Exs. R, KK. Bergerson was not informed, for instance, that Polk felt comfortable enough to

ask Sanders for $200 so he could buy clothes while living in Los Angeles. Bergerson was also not

informed about the series of IOU's executed by Polk in 1991. These payments, combine with the

"I still love you letter," show the depth of the relationship between Sanders and Polk, and a

reasonable jury could infer that Polk would lie for Sanders.

Third, the Court considers Defendants' argument that the conjugal visits provided to

Rushing and Polk would not have been material in light of the fact Johnson was already

thoroughly impeached on cross-examination. *See United States v. Kozinski*, 16 F.3d 795, 819 (7th

Cir. 1993) ("Evidence that impeaches an already thoroughly impeached witness is the definition of

'cumulative impeachment' evidence and its suppression cannot give rise to a *Brady* violation.").

This argument misstates the importance of this evidence: the conjugal visits impeached not just

Johnson, but Sanders and the entire prosecution. Moreover, while Bergerson admitted that

Johnson was "thoroughly impeached" on cross-examination because of his early lies to the police,

Chhabria Decl. Ex. DDD at 350-51, the superior impeachment value of conjugal visits is self-

evident. Whatever evidence Bergerson was aware of, including evidence that Johnson initially

denied his involvement in the shooting and falsely implicated an innocent man because he "[j]ust

wanted to go home," JSUF ¶ 38, paled in comparison to the conjugal visits.

Fourth, the Court addresses Defendants' argument that, had the jury been informed about

the true extent of the cash payments, the information would have backfired. According to

Defendants, any questions based on Polk's receipt of benefits would have opened the door to

evidence showing Polk needed protection, which would have further incriminated Conley. For

instance, the jury would have seen Sanders's May 27 and July 25, 1994 memorandums requesting

witness protection funds after the attack on Polk by Kevin "Sinister" Hall, as well as Sanders's

notes from September 6, 1994 showing that Sunnydale gang members had driven past Polk's

mother's house on September 5, 1994. Chhabria Decl. Exs. M, X, Y.

Defendants contend that this evidence proves Sunnydale gang members were trying to intimidate Polk to not testify, which shows that Conley was a member of the Sunnydale gang, which, in turn, tends to show Conley was guilty of participating in the April 8, 1989 shooting. At the very least, Defendants argue the evidence undermines Conley's credibility by refuting his testimony that he was not a member of the Sunnydale gang. Defendants argue that this evidence is of such force that no reasonable jury could find prejudice from the alleged nondisclosures.

The Court disagrees. None of this evidence is so damaging to Conley that the nondisclosures are not prejudicial as a matter of law. First, the argument ignores the cumulative nature of the prejudice analysis: evidence that one witness was bribed and that another was given conjugal visits, could reasonably be described as prejudicial. Moreover, despite the evidence regarding the attack by Sinister and intimidation by Sunnydale gang members, Conley could still persuade the jury that the money given to Polk was a bribe. If they did reach that conclusion−and disregarded Polk's testimony−a reasonable inference is that prejudice resulted.

This is particularly true where Conley could argue, as he does, that the alleged witness intimidation by Sunnydale gang members did not occur. Aside from Sanders's memoranda, there is no police record or other documentation that the April 1994 attack by Sinister in fact occurred. The same is true for Sanders's September 6, 1994 notes stating that Sunnydale gang members were driving by Polk's residence.

Defendants argue the money was not a bribe because Sanders indisputably requested the money for witness protection, and because the receipts clearly indicate that the money was for witness protection. *See* Purcell Decl. Ex. 17. This does not, however, foreclose Conley's argument even though the funds were tagged for "witness protection," the true motivation for disbursing the funds was to bribe Polk. Rather, it shows a disputed issue of material fact. There is also a triable issue as to the reason the pace of payments picked up before, during and after the Conley trial—Defendants argues it was in response to threats, and Conley argues this is indicative of a bribe. Whether the payments provided to Polk were required for his safety, or were unnecessary and given to Polk as an inducement to testify against Conley, will be a question for trial.

Finally, the Court addresses Defendants' argument that Polk made prior consistent statements that Conley was involved in the April 8, 1989 murders before he had received any witness protection funds, *see* Chhabria Decl. Ex. SS, which "renders remote any possibility that the jury would have thought that he had fabricated his story in return for cash." *Mastraccio v. Vose*, 274 F.3d 590, 604 (1st Cir. 2001). The fact Polk made earlier statements consistent with his testimony does not outweigh, as a matter of law, the prejudicial effect of the allegedly undisclosed evidence. This argument also assumes that Sanders only began give Polk improper payments at the time of Conley's trial, or at least, after his initial May 1991 statement incriminating Conley. A reasonable jury could find otherwise. Polk executed a series of IOU's in favor of Sanders in July and October of 1991, and wrote the "I still love you" letter on July 10, 1992. While this evidence still postdates Polk's initial May 1991 statement to Sanders, it certainly undermines the assumption that Sanders only began providing Polk with cash payments at the time of Conley's trial.

Drawing all reasonable inferences most favorable to Conley, the Court finds a triable issue of fact with regard to whether the undisclosed evidence "undermined confidence in the outcome of [Conley's] trial." *Kyles*, 514 U.S. at 433.

### iii. Whether a Reasonable Jury could find that Sanders Acted with the Requisite Intent

In *Tennison*, the Ninth Circuit held that "a § 1983 plaintiff must show that police officer acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Tennison*, 570 F.3d at 1089. The court juxtaposed *Brady*'s "no fault" rule in the criminal and habeas contexts—finding a *Brady* violation "irrespective of the good faith or bad faith of the prosecution," *Brady*, 373 U.S. at 87—with the rule from *Daniels v. Williams*, 474 U.S. 327, 330 (1986), that the Due Process Clause does not protect against merely negligent conduct. The *Tennison* court held that in the *Brady* context, where "the decision whether to disclose or withhold exculpatory evidence is a situation in which actual deliberation is practical," the deliberate indifference standard should apply. *Tennison*, 570 F.3d at 1089. In so holding, the Ninth Circuit rejected the argument that law enforcement officers

46

only violate *Brady* if they act in bad faith. *See id.* at 1087-89.

Nevertheless, Defendants argue that Conley cannot prevail on a claim under § 1983 unless he can prove Sanders acted in bad faith. Defendants' argument is based on the doctrine of qualified immunity, which is discussed primarily in the next section. An officer is not liable under § 1983 unless he violates a clearly established right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Defendants argue that until *Tennison* was decided in 2009, it was not clearly established that an officer violated *Brady* with a deliberately indifferent mental state. Therefore, Defendants contend that Conley must prove Sanders acted in bad faith because it was not clearly established in 1994 that an officer violated *Brady* with a mental state less culpable than bad faith.

Defendants' argument is contrary to the Ninth Circuit's holding in *Tennison*. There, the Ninth Circuit affirmed the denial of a summary judgment based on qualified immunity, and held that a plaintiff need only show deliberate indifference, for conduct which *predates* the acts in this case. Defendants argue, however, that the *Tennison* court never explicitly considered whether, in 1989-1990, it was clearly established that a law enforcement officer violated *Brady* with a deliberately indifferent mental state. While the Court does not feel free to disregard *Tennison* in this fashion, the Court need not decide this issue. There is sufficient evidence from which a reasonable jury could find that Sanders acted with deliberate indifference, or in bad faith.

Sanders knew about his obligation to disclose exculpatory evidence, including impeachment evidence that would undermine the credibility of the State's witnesses. This is shown by Sanders's testimony that a police officer is required to disclose every piece of evidence to the prosecutor. Purcell Decl. Ex. 2 at 33:25-34:1. Sanders also testified that he remembered reviewing the Training Bulletin circulated in the SFPD in 1984, which reminded police officers of their obligations under *Brady*. *See* Purcell Decl. Ex. 2 at 49:12-14.

The evidence permits a reasonable inference that Sanders acted with deliberate indifference or in bad faith by actively concealing evidence and by ignoring his obligations under *Brady*. Assuming Johnson's and Rushing's testimony is credible and Sanders did facilitate secret conjugal visits to procure Johnson's testimony, then bad faith is demonstrated by both Sanders's facilitation of such visits, as well as his lies under oath at Conley's pretrial hearing that he only

permitted Johnson and Rushing to visit with the door open and did not know that they were in a sexual relationship. *See* Purcell Decl. Ex. 7. The allegation that Sanders deliberately kept Giannini in the dark would also be consistent with Giannini's striking reaction and disbelief to the information, which implies that Giannini was not privy to this arrangement. *See* Purcell Decl. Ex. 36 at 66-67.

Sanders's testimony during the August 30, 1994 hearing may also support a finding of deliberate indifference or bad faith. At this hearing, Sanders was asked the identity of the witness for whom he sought protective housing but was "unable" to provide the protection:

> Q: You recall the interview, the reference you made to an individual who sought protective housing from you, but you were unable to provide it?
>
> A: That's correct.
>
> Q: Okay. To whom were you referring?
>
> A: Clifford Polk

Purcell Decl. Ex. 16 at 119:21-26. It is undisputed that by the time of the August 30, 1994 hearing, Sanders had given Polk $170 cash from SFPD funds. JSUF ¶ 19. It is also undisputed that Sanders gave Polk $40 the very next day, and another $155 before he testified. SF JSUF ¶ 30. Nevertheless, Sanders was far from candid about the money he gave (and would soon give) to Polk when testifying at this hearing.

While Defendants are correct to point out that Sanders was never directly asked if he was giving money to Polk, Sanders had an independent duty under *Brady* to disclose the cash payments. Sanders failed to clarify that Polk was receiving funds *at the time* which Sanders denied providing protective housing. Sanders testified in 2010 that if he had provided Polk with witness protection funds by the August 30, 1994 hearing, he would have mentioned it to the court because that was "the policy." Purcell Decl. Ex. 2 at 164:10. Notably, Giannini did not interrupt Sanders's testimony at this hearing or otherwise mention to the court that Polk was receiving cash at this time, suggesting that Giannini was not aware of these facts. A reasonable jury could find Sanders acted in bad faith to actively conceal the cash he provided to Polk from Bergerson and

Giannini.

Polk's testimony that he was not in witness protection may also support the inference that Sanders intended to conceal such benefits. *See* Purcell Decl. Ex. 19 at 755:25 - 756:2. It is undisputed that at the time of Polk's testimony at Conley's trial, Polk had received $450 in cash from Sanders in SFPD funds, and that Polk had signed a receipt indicating the money was for the purpose of "witness protection" for almost every cash disbursement. JSUF ¶¶ 18-19, 25; Purcell Decl. Ex. 17. Nevertheless, Polk testified on direct examination from Giannini that he was "not in the witness protection program right now." Purcell Decl. Ex. 16 at 756:1-2. Sanders obviously knew Polk was in witness protection because he was the one giving Polk money. Neither Giannini nor Sanders sought to correct Polk's testimony.

The manner in which Polk received benefits may also indicate that the money Sanders gave to Polk was a bribe. The payments increased around the time of Polk's testimony and thereafter. *See* Purcell Decl. Ex. 17. Sanders's testimony shows that Polk would page Sanders to arrange a time for him to pick up money at the Homicide Detail, and that Sanders would not place any controls on Polk's expenditure of the funds−despite calling them "witness protection" payments on the receipts. Purcell Decl. Ex. 2 at 142:17-25. Moreover, although Sanders testified at Conley's habeas proceeding that he would not have provided cash to Polk outside the context of witness relocation, *see* Purcell Decl. Ex. 2 at 224:21-24, the undisputed evidence shows Polk received $595 between July 29, 1994 and October 11, 1994, when Polk was first moved into a hotel. SF JSUF ¶¶ 30, 45-46.

Defendants also point to items of evidence which they contend constitute direct evidence that Sanders did not act with the requisite mental state. Defendants contend that no officer trying to hide the fact he is providing benefits would have: (1) made a plea on KTVU for witness protection funds for Polk; (2) disclosed the July 25, 1994 memorandum requesting witness protection funds for Polk; and (3) informed Giannini (as evidenced by the October 1, 1994 letter) that Polk was being temporarily relocated and receiving room and board while the trial lasts.

The Court disagrees. As a threshold matter, the foregoing disclosures say *nothing* about the nondisclosure of any evidence relating to the alleged Johnson conjugal visits. Nor do they

establish beyond dispute that Sanders was not trying to conceal, or was deliberately indifferent to disclosing, the significant cash payments and other benefits given to Polk. These disclosures may show that Sanders did not intend to conceal the fact he requested witness protection funds for Polk, and that Polk was being provided with room and board during the trial, but that is all. The disclosures do not establish that Sanders did not seek to conceal the fact that Polk *actually received* significant cash payments−that may or may not have been "protection" funds. If that were indeed the case, why would Sanders not have disclosed the $170 he had provided to Polk by the time of the August 30, 1994 hearing? Why would Sanders have sat silent while Polk testified that he was not in the witness protection program, even though he had received $450 in SFPD witness protection funds by that time? Moreover, the fact Sanders requested witness protection funds says nothing about how he intended to use the funds. A jury could conclude that Sanders sought to conceal the fact that the cash he gave to Polk was a bribe, and not for Polk's protection.

*          *          *

There are triable issues of fact as to each element of Conley's *Brady* claim, as well as whether Sanders acted with the requisite mental state. Accordingly, a reasonable jury could find that Sanders violated Conley's constitutional rights under *Brady* and *Giglio*.

### 2. Whether Sanders is Entitled to Qualified Immunity

#### i. The Law on Qualified Immunity

Qualified immunity protects "government officials performing discretionary functions" from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982). The doctrine is designed to balance two important interests−"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The test for determining whether an official is entitled to qualified immunity is two-fold. The first part of the qualified immunity analysis considers whether, when all reasonable inferences are drawn in favor of the non-movant, "the facts alleged show the officer's conduct violated a

constitutional right." *Saucier*, 533 U.S. at 201. In the preceding analysis, the Court held that a reasonable jury could find that Sanders violated Conley's constitutional rights under *Brady*.

The other part of the qualified immunity analysis considers whether the right violated was "clearly established" at the time of the alleged wrongdoing. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201 (citing *Anderson v. Creighton*, 483 U.S. 635, 638-40 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.") (citations omitted)). While the plaintiff need not prove that the "very action in question has previously been held unlawful," the "unlawfulness must be apparent" "in light of preexisting law." *Id*. at 640. Thus, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

ii.      **Whether Sanders Violated Conley's Clearly Established Rights**

Defendants argue that it was not clearly established in 1994 that *Brady* applied to police officers. This argument is peculiar in light of the Ninth Circuit's decision in *Tennison*. In *Tennison*, the Ninth Circuit held that Inspectors Sanders and Hendrix, in an unrelated case, were not entitled to qualified immunity for violations of their duty to disclose under *Brady*, which took place before the alleged misconduct in this case. In the opening brief for the defendants in *Tennison* submitted to the Ninth Circuit, the appellants argued that "both Inspectors are, as a matter of law, protected by qualified immunity related to each piece of evidence the district court identified." Opening Brief of Appellant Officers, *Tennison v. City and County of San Francisco*, 570 F.3d 1078 (9th Cir. 2009), No. 06-15426, 2006 WL 2984511. Nevertheless, Defendants note that it was never argued in *Tennison* that, in the late 1980's, it was not clearly established that *Brady* applied to police officers, so the Ninth Circuit never decided that question. Def. Motion/Opp. at 19-20.

The *Tennison* court's denial of qualified immunity for Inspectors Sanders and Hendrix for their conduct in the late 1980's was based on the recognition, whether or not explicit, that the *Brady* obligation extended to police officers at the time of the events in that case. The Ninth

51

Circuit undertook a particularized analysis to determine whether, with respect to three specific items of evidence, a reasonable officer would have known that withholding the evidence was unlawful. *See Tennison*, 570 F.3d 1090-95. The court found that qualified immunity was unwarranted with respect to: (1) a confession by someone other than the defendant (*id.*, 570 F.3d at 1084-85, 1091-94); (2) a statement from another witness exculpating the defendant and identifying the perpetrator as the man who confessed (*id.* at 570 F.3d at 1083, 1090-91); and (3) the Inspectors' request for a $2500 reward from the Secret Witness Protection program to encourage witnesses to come forward (*id.* at 570 F.3d at 1082, 1094-95). For each of these analyses, the court considered "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202, and found that it would be. *See Tennison*, 570 F.3d 1094 ("it would have been clear to a reasonable officer that such information should have been disclosed to the defense").

In any event, by the time of *Tennison*, no reasonable officer could have believed that he or she did not have a disclosure obligation under *Brady*. Pre-existing case law, while perhaps not singling out law enforcement officers, makes it clear that the duty to disclose falls on the government—which includes both the prosecutor and law enforcement officers. For instance, in *Unites States v. Butler*, the Ninth Circuit reversed the district court's denial of a motion for a new trial upon finding that material impeachment evidence had not been disclosed to the criminal defendant. 567 F.2d 885 (9th Cir. 1978). The court clarified that there was a *Brady* violation regardless of whether it was the prosecutor or the federal law enforcement agents who made promises to a government witness, and regardless of whether the prosecutor knew about such promises:

> At the conclusion of the most recent evidentiary hearing, the district court found that no one from the United States Attorney's office had made any direct promises to Durden. While this new factual finding is supported by the evidence and is not clearly erroneous, *it does not affect the outcome of this case.*
>
> The district court found that Durden and the agents had failed to disclose to the jury in the Butler trial the assurances the agents had made to Durden in return for his agreement to cooperate with the

> prosecution. The prosecutor is responsible for the nondisclosure of assurances made to his principal witnesses *even if such promises by other government agents were unknown to the prosecutor.*

*Butler*, 567 F.2d at 891 (emphasis added) (citing *Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir. 1964)). The court wrote that "[s]ince the investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutor, were guilty of nondisclosure." *Id.*

The Ninth Circuit reaffirmed the *Butler* holding in 1985 when it wrote that "[b]ecause the government was required to furnish all exculpatory evidence under the doctrine of *Brady*…, and because investigative officers are part of the prosecution, … there was indeed a negligent nondisclosure." *United States v. Steel*, 759 F.2d 706, 714 (9th Cir. 1985) (citing *Butler*, 567 F.2d at 891 and affirming the district court's denial of a new trial because it applied the "proper" test from *Butler*); *see also United States v. Hsieh Hui Mei Chen*, 754 F.2d 817, 824 (9th Cir. 1985) ("the prosecution must disclose any information within the possession or control of law enforcement personnel"); *United States v. Monroe*, 943 F.2d 1007, 1011 (9th Cir. 1991) (same); *United States v. Bernal-Obeso*, 989 F.2d 331, 334 (9th Cir. 1993) (remanding for evidentiary hearing on the candidness of a State witness and stating that "we expect prosecutors *and investigators* to take all reasonable measures to safeguard the system against treachery") (emphasis added). Therefore, the Court finds it was "clearly established" in the Ninth Circuit by 1994 that *Brady* imposed a duty to disclose on both law enforcement and prosecutors.

Defendants note that the Supreme Court's decision in *Kyles*, holding that *Brady* applies even when a prosecutor is not informed by the police of certain exculpatory evidence, was decided in 1995, one year *after* Conley's trial. Defendants cite the First Circuit's decision in *Drumgold v. Callahan*, 707 F.3d 28, 43 (1st Cir. 2013), where the majority found that the "affirmative disclosure obligation *Brady* imposed on prosecutors in 1963 was not expanded to include law enforcement officers until *Kyles* was decided in 1995." *Id.* at 43 (citing *Haley v. City of Boston,* 657 F.3d 39, 48–49 (1st Cir. 2011)).

The Supreme Court did not purport to create a new rule in *Kyles*. To the contrary, the Court believed that to hold *Brady* did not apply when evidence was known only to the police investigators and not to prosecutors would "amount to a serious change of course from the *Brady*

line of cases." *Kyles*, 514 U.S. at 438.  The Ninth Circuit has described the *Kyles* decision as "unexceptional" because the "holding dates back, at the latest, to the Supreme Court's decision in *Giglio*[.]" *Jackson v. Brown*, 513 F.3d 1057, 1073-74 (9th Cir. 2008).[10]

Moreover, before the Supreme Court's decision in *Kyles*, several other circuit courts, in addition to the Ninth Circuit, had extended the *Brady* duty to police officers.  In *Barbee v. Warden*, 331 F.2d 842 (4th Cir. 1964), decided one year after *Brady* and cited in the Ninth Circuit's decision in *Butler*, the Fourth Circuit granted a habeas petition upon finding that the police had failed to disclose to the prosecutor ballistics and fingerprint tests tending to exculpate the defendant.  *See id*. at 844.  The court stated that the "effect of the nondisclosure" was the same despite the fact "the prosecuting attorney was not shown to have had knowledge of the exculpatory evidence."  *Id*.  The court continued:

> Failure *of the police to reveal* such material evidence in their possession is equally harmful to a defendant whether the information is purposely, or negligently, withheld.  *And it makes no difference if the withholding is by officials other than the prosecutor.* The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure.  If the police allow the State's Attorney to produce evidence pointing to guilt without informing him of other evidence

---

[10] In *Jackson*, the Ninth Circuit responded to the State of California's argument that *Brady* did not extend to evidence known only by the police prior to 1995 because the Supreme Court's decision in *Kyles* created a new constitutional rule of criminal procedure.  *Jackson*, 513 F.3d at 1072-73.  The court had to "ask whether the Constitution, as interpreted by the precedent then existing, compels the rule" because if then-existing precedent already compelled the rule, the rule was not new.  *Jackson*, 513 F.3d at 1073 (quoting *Beard v. Banks*, 542 U.S. 406, 411 (2004)).  The *Jackson* court held that *Kyles* did not create a new rule in part because "*Giglio*'s focus on the responsibility of the prosecutor to investigate all promises made on behalf of the government extends to promises made by the police[.]"  *Jackson*, 513 F.3d at 1073.  The court also looked to circuit court decisions explicitly extending *Brady* to police officers, including the Ninth Circuit's decisions in *Butler* and *Steel*, and then made the following conclusion: "Therefore, on March 30, 1981, the United States Constitution, as interpreted by *Brady* and *Giglio*, compelled prosecutors to disclose evidence favorable to the accused, even when that evidence was known only to the police and not to the prosecutor."  *Id*.

To be clear, asking whether then-existing precedent compels a constitutional rule is not equivalent to asking whether a constitutional rule is clearly established.  Nevertheless, the holding in *Jackson*, and in particular, its reference to the Ninth Circuit's decisions in *Butler* and *Steel*, does further support this Court's conclusion that by the time of Conley's trial, there was clearly established law extending the obligations under *Brady* to police officers.

54

United States District Court
Northern District of California

in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant. The cruelest lies are often told in silence. If the police silence as to the existence of the reports resulted from negligence rather than guile, the deception is no less damaging.

The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused.

*Id.* at 846 (citations omitted) (emphasis added). Other circuit courts agreed. *See Freeman v. State of Ga.*, 599 F.2d 65, 69 (5th Cir. 1979) ("when an investigating police officer willfully and intentionally conceals material information, regardless of his motivation and the otherwise proper conduct of the state attorney, the policeman's conduct must be imputed to the state as part of the prosecution team."); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ("*Brady v. Maryland* does not require the police to keep written records of all their investigatory activities; but attempts to circumvent the rule of that case by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated."); *see also Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) (holding that in order to state a claim under § 1983 against a municipality for failing to train police officers of their obligation to disclose exculpatory evidence under *Brady*, the plaintiff must allege that the police failed to turn over exculpatory evidence to the prosecutor); *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991) (evidence in the hands of the police could be imputed to the prosecutor for *Brady* purposes).

Defendants also argue that, even if it was clearly established that *Brady* extended to information known only to police offices, it was not clearly established that *Brady* imposed an affirmative disclosure obligation upon police officers such that police officers could be held civilly liable based on their own role in the State's failure to disclose. Reply at 9-10. The Court rejects this argument for two reasons.

First, to the extent Defendants argue that it was not clearly established that police officers could be held liable under § 1983 for their constitutional violations, Defendants miss the mark. The relevant question is not whether a reasonable officer would have known that potential liability could result from his or her conduct, but "whether it would be clear to a reasonable officer that his

55

conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The focus of the "clearly established" prong is on the constitutional violation, not the exposure to civil liability. Thus, Defendants are incorrect to argue that *Brady* analyses from criminal and habeas cases are irrelevant when determining whether the law was clearly established that a police officer could violate an individual's rights under *Brady*. In 1994, it was clearly a *Brady* violation for a law enforcement officer to withhold exculpatory evidence from a prosecutor–who then did not disclose it to the defense.

It was also established in 1994 that police officers had an affirmative disclosure obligation under *Brady*. Defendants argue that even in the Supreme Court's 1995 decision in *Kyles*, the Court held that evidence solely in the possession of police officers would be imputed to the prosecution, but did not explicitly write that police officers had an affirmative obligation to disclose exculpatory or impeachment evidence. *See Kyles*, 514 U.S. at 1567-68. Indeed, the Supreme Court wrote in *Kyles* that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* at 1566-67. For this reason, the Third Circuit found that it was not clearly established in 1994 that a police officer had an affirmative duty to disclose exculpatory evidence to the prosecutor. *See Gibson v. Superintendent of NJ Dep't of Law & Pub. Safety-Div. of State Police*, 411 F.3d 427, 443-44 (3d Cir. 2005), overruled on other grounds in *Dique v. New Jersey State Police*, 603 F.3d 181, 183 (3d Cir. 2010), (interpreting *Kyles* to only stand for the proposition "that evidence in the hands of the police could be imputed to the prosecutor").[11]

In *Tennison*, however, the Ninth Circuit rejected the notion that there can be a distinction between *Brady*'s application to information known by the police but not the prosecutor, and any

---

[11] Defendants argue that in *Reichle v. Howards*, -- U.S. --- , 132 S.Ct. 2088 (2012), the Supreme Court "made clear that if circuits are in disagreement on an issue, this by definition means the law is not clearly established." Def. Motion/Opp. at 20 n. 4. That is incorrect. In *Reichle*, the Court held that its own opinion undermined a circuit's prior case law, and that the fact other circuit courts believed the Supreme Court precedent put prior case law in doubt supported that conclusion. *See Reichle*, 132 S.Ct. at 2096. The Court did not hold that when circuit courts are disagreement, the law of a circuit court could not be clearly established within that circuit. *See id.*

imposition of an affirmative disclosure obligation on police officers. Inspectors Sanders and Hendrix argued in *Tennison* that "*Brady* imposes a duty on prosecutors, but not on police officers, to disclose exculpatory evidence." *Tennsion*, 570 F.3d at 1087. The court rejected that argument as "untenable in light of the Supreme Court's admonition that '*Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.''" *Id.* (quoting *Youngblood*, 547 U.S. at 869-70 (quoting *Kyles*, 514 U.S. at 438)).

The Ninth Circuit's rejection of that artificial distinction makes sense. If police officers are not held accountable for their actions, then the utility of § 1983 actions in deterring wrongful conduct in the future will be reduced. *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) ("Requiring culpable officers to pay damages to victims of their actions … holds out promise of both deterring and remediating violations of the Constitution." ). It makes no sense to find a constitutional violation under *Brady* when a police officer fails to disclose material exculpatory evidence, but then hold that only the prosecutor, and not the police officer, is responsible for that constitutional violation.

Moreover, Sanders is not merely accused of negligently failing to disclose impeachment evidence. He is accused of deliberately concealing material impeachment evidence−including conjugal visits for Johnson and cash payments to Polk in exchange for testimony. Almost every circuit court to consider whether it was clearly established (in 1994 or earlier) that a police officer violated *Brady* by deliberately concealing evidence has answered that question in the affirmative. For instance, the Seventh Circuit held that in 1979 and 1980, it was clearly established that police officers violated *Brady* by concealing from the prosecutor evidence that the defendant's fingerprints did not match fingerprints at the scene of the crime, and by influencing two witnesses' identification of the defendant at a line up. *Newsome*, 256 F.3d at 751; *see also Steidl v. Fermon*, 494 F.3d 623, 633 (7th Cir. 2007) (stating that police officers "had ample notice [in 1987 and throughout post-conviction proceedings] that the knowing suppression of exculpatory material that was in the files at the time of the trial violated the defendant's constitutional rights"); *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) (stating that a "police officer cannot avail himself of a qualified immunity defense if he procures false identification by unlawful means or

57

deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles"); *Millian v. Johnson*, 88 F.3d 1554, 1567 *opinion amended on other grounds on reh'g*, 101 F.3d 1363 (11th Cir. 1996) (agreeing with the Fifth Circuit in *Geter* that "clearly established law in 1987 and 1998 prohibited the police from concealing exculpatory or impeachment evidence"); *Drumgold*, 707 F.3d at 43 ("There can be no doubt that, under the line of cases running from *Mooney* to *Pyle* to *Brady*, the law was firmly settled [in 1989] that a law enforcement officer may not deliberately suppress material evidence that is favorable to a defendant."); *but cf. Gibson*, 411 F.3d at 433 (finding that "it would be anomalous to say that police officers are not liable when they affirmatively conceal material evidence from the prosecutor," but finding the duty to disclose was not clearly established in 1994).

The Court finds that given the state of the law at the time, a reasonable officer in Sanders's position would have known that it was unconstitutional to withhold from Giannini the evidence at issue. Accordingly, Sanders is not entitled to qualified immunity, and Defendants Motion for Summary Judgment is DENIED.

### E. Plaintiff's Motion for Partial Summary Judgment

Conley has moved for partial summary judgment on particular elements of his claim. First, Plaintiff moves for summary judgment on the undisputed element of his § 1983 claim that Sanders was acting under the color of law. Second, Conley seeks a declaration that the evidence not disclosed by Sanders was favorable under *Brady/Giglio* on the basis that under Ninth Circuit law any evidence "that would tend to call the government's case into doubt is favorable." *Milke*, 711 F.3d at 1012. Third, Conley moves for judgment on the "prejudice" element of his claim. Finally, Conley moves for judgment on the issue of whether Giannini ever disclosed certain evidence to Conley or his defense counsel. The Court addresses each issue in turn.

#### 1. Color of Law

Liability under § 1983 requires the defendant to have acted under the color of law. *W. v. Atkins*, 487 U.S. 42, 49 (1988) ("generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."). Defendants concede that at all relevant times, Sanders was acting under the color of law. Def.

Motion/Opp. at 28.

Nevertheless, Defendants argue that it is improper to grant summary judgment on an element "not materially in dispute." *Id.* Defendants have not, however, cited a single case from this district which would support denying Conley's motion on an undisputed element. Defendants cite *Roger-Vasselin v. Marriott Int'l, Inc.*, but that case merely stands for the proposition that "some courts look with disfavor on summary judgment motions that seek rulings on factual issues other than liability." No. 04-4027, 2006 WL 2038291 (N.D. Cal. July 19, 2006) (holding that the motion for summary judgment on one claim out of several in the case was proper). Conley's motion as to the "color of law" element of his § 1983 claim is GRANTED.

### 2. Favorability

The next question is whether partial summary judgment should be granted as to the "favorability" element of Conley's *Brady* claim. The Ninth Circuit has held that "[a]ny evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes." *Milke*, 711 F.3d at 1012 (citing *Strickler,* 527 U.S. at 290). In their opposition brief to Conley's motion for partial summary judgment, Defendants offer no principled reason why the Court should not grant Conley's motion with respect to favorability. At the motion hearing, counsel for Defendants conceded that the allegedly undisclosed evidence is favorable. For the reasons discussed *supra* 36-37, no reasonable jury could find that evidence Sanders withheld was not favorable to Conley's defense. The motion is GRANTED with respect to the favorability element of Conley's claim.

### 3. Prejudice

Unlike the favorability element of Conley's *Brady* claim, the Court finds material facts in dispute with regard to whether the undisclosed evidence prejudiced *Conley*. On Conley's motion, the Court must draw all reasonable inferences in favor of Sanders. Thus, Conley's citation to *Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) (en banc), is irrelevant to the Court's analysis. *See id.* at 988 (granting a habeas petition on a *Napue* claim).

Drawing all reasonable inferences in favor of Sanders, a reasonable jury could find that there was no "reasonable probability" that the undisclosed evidence "undermined confidence" in Conley's trial. *Kyles*, 514 U.S. at 434. Therefore, Conley's motion as to the "prejudice" element

1    of his *Brady* claim is DENIED.

2              **4.    Whether Giannini Disclosed the Evidence to Bergerson**

3              Conley asks the Court to hold as a matter of law that Giannini withheld all the

4    impeachment evidence in question from Conley, but fails to differentiate between the specific

5    items of evidence allegedly withheld.  With regard to the "I still love you letter," it is undisputed

6    that Giannini never made these disclosures to Bergerson, and Giannini does not recall ever seeing

7    the IOU's or disclosing them to Giannini.  JSUF ¶ 29; Purcell Decl. Ex. 4 at 197.  Similarly,

8    Sanders testified that the conjugal visits never happened, Purcell Decl. Ex. 7, and there is no

9    dispute that Giannini did not disclose such visits to Bergerson.  Giannini could also not recall

10   whether he was informed of the manner in which Sanders provided payments to Polk.  Defendants

11   have presented no evidence to suggest Giannini made such disclosures to Bergerson.  Thus, the

12   portion of the motion is granted as to these items of evidence.

13             Nevertheless, there is a disputed issue of material fact as to whether Giannini ever

14   informed Bergerson that Polk was receiving cash payments and other benefits, beyond what

15   Bergerson could be expected to know from the October 1, 1994 letter and July 25, 1994

16   memorandum.  Giannini testified that it was his "recollection" that he informed Bergerson about

17   Polk's receipt of witness protection funds "at regular intervals."  *Id*. Chhabria Decl. Ex. CCC at

18   178:12-179:5.  Giannini stated that "[w]henever anything came up in a periodic update, if there's

19   been a benefit provided to a witness, that's part of the routine discovery."  *Id*. at 192:1-3.  At the

20   habeas proceeding, Giannini roughly estimated that he gave Bergerson "six, seven, [or] eight" oral

21   updates on the benefits Polk was receiving.  *Id*. at 167:27-168:27.

22             Conley contends that Giannini's testimony is too general to create a genuine issue of

23   material fact for trial.  The Court disagrees.  A reasonable jury may find that given the lapse in

24   time, Giannini should not be expected to remember the specific instances in which he informed

25   Bergerson about the benefits provided to Polk.  This case, therefore, must be distinguished from

26   the Ninth Circuit's decision in *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir.

27   1997), where the court held that a "conclusory, self-serving affidavit, lacking detailed facts and

28   any supporting evidence, is insufficient to create a genuine issue of material fact."  *See id.* at 1171.

United States District Court
Northern District of California

1  Therefore, the motion is denied as to Giannini's disclosures to Bergerson regarding the cash

2  payments and other benefits provided to Polk.

3       Accordingly, Conley's motion as to Giannini's disclosures to Bergerson is GRANTED in

4  part and DENIED in part.

5  **IV.    CONCLUSION**

6       For the foregoing reasons, Defendants' Motion for Summary Judgment is DENIED and

7  Plaintiff's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part.

8       **IT IS SO ORDERED**.

9  Dated: September 5, 2013      _____

10                               JOSEPH C. SPERO
                                United States Magistrate Judge